---

**STEPHEN F. CASS,**

**Plaintiff,**

**v.**

**TOWN OF WAYLAND, WAYLAND PUBLIC SCHOOLS, WAYLAND POLICE DEPARTMENT, PAUL STEIN, BRAD CROZIER, ALLYSON MIZOGUCHI, JAMIE BERGER,**

**Defendants.**

Civil Action No. 1:17-cv-11441

---

## FIRST AMENDED COMPLAINT AND JURY DEMAND

## INTRODUCTION

This is an action to recover damages sustained by Plaintiff Stephen F. Cass as a result of the wrongful actions of Defendants Town of Wayland (the "Town"), Wayland Public Schools ("WPS"), Wayland Police Department ("WPD"), Dr. Paul Stein, Brad Crozier, Allyson Mizoguchi, and Jamie Berger (collectively "Defendants"). Mr. Cass seeks to be compensated for the wrongful and/or tortious acts of the Defendants – specifically, their retaliation in violation of M.G.L. c. 149, § 185 ("Massachusetts Whistleblower Act") and 20 U.S.C. § 1681 ("Title IX"), as well as their malicious prosecution, intentional infliction of emotional distress, intentional interference with contractual relations, defamation and violation of Mr. Cass's civil rights under 42 U.S.C. § 1983.

As set forth more fully below, Mr. Cass was terminated from his position as Athletic Director and Health and Wellness Instructor at Wayland High School ("WHS") in retaliation for, among other actions, his whistleblowing activities with respect to the disparate treatment of

female student-athletes within the Wayland school system. Indeed, on multiple occasions throughout his tenure, Mr. Cass informed Town and WPS administrators – including Defendants Stein, Crozier and Mizoguchi – of ongoing discriminatory and inequitable practices, as well as violations of WSC fundraising policies, being perpetrated by various members of the WHS boys' coaching staff. Despite Mr. Cass's repeated requests that these administrators take action to rectify the ongoing issues, they refused to do so, turning a blind eye to the coaches' long-standing wrongful and illegal practices.

Mr. Cass's wrongful employment termination, however, was not the end of Defendants' retaliatory conduct against him. Several months after his termination, while Mr. Cass continued to publicly advocate for gender equality within WPS's athletic programs, various Defendants, acting in concert, initiated against Mr. Cass the charge of "felony larceny over $250" involving the alleged "theft" of a five-year-old school-issued laptop computer, which had not only been given to Mr. Cass many months prior to his termination by a school official, but which was also effectively worthless by the time of his termination as WHS had decided to discard it along with all other computers of its type and age. Moreover, Defendants took further pains to defame and harass Mr. Cass by posting his mugshot on social media outlets, besmirching his name in the media and forcing him to Defend, up through a trial verdict in his favor, allegations which were utterly manufactured and untrue.

As a direct and proximate result of the Defendants' actions, Mr. Cass's professional reputation has been utterly ruined to the point where he cannot find gainful employment in his area of experience and training. Mr. Cass has also suffered severe financial damages due to the loss of his full-time employment and has suffered related, detrimental emotional effects.

Accordingly, through this action, Mr. Cass seeks to recover for the substantial, permanent and ongoing damage that Defendants' outrageous conduct has caused him.

## PARTIES

1. Plaintiff Stephen F. Cass is an individual residing at 55 Green Street, Clinton, Worcester County, Massachusetts. Mr. Cass holds a bachelors degree in Sociology and Economics from Yale University and a masters degree in Business Administration from Ohio State University. Prior to the termination of his employment with the WPS that is the subject of this action, Mr. Cass had worked in the areas of education and athletic administration for approximately 20 years.

2. Defendant Town of Wayland (the "Town") is a municipal corporation which maintains a principal address of 41 Cochituate Road, Wayland, Middlesex County, Massachusetts.

3. Defendant Wayland Public Schools ("WPS") is an agency of the Town with a principal address of 41 Cochituate Road, Wayland, Middlesex County, Massachusetts.

4. Defendant Wayland Police Department ("WPD") is an agency of the Town with a principal address of 38 Cochituate Road, Wayland, Middlesex County, Massachusetts.

5. Defendant Dr. Paul Stein ("Dr. Stein") is an individual, who, on information and belief, resides in Newton, Massachusetts, and, during all relevant times to this cause of action, has worked for the Town and WPS as Superintendent of the WPS.

6. Defendant Brad Crozier ("Mr. Crozier") is an individual who resides in Winthrop, Massachusetts, and, during all relevant times to this cause of action, has worked for the Town and WPS as Assistant Superintendent of the WPS.

7.     Defendant Allyson Mizoguchi ("Ms. Mizoguchi") is an individual who resides in Watertown, Massachusetts, and, during relevant times to this cause of action, has worked for the Town and WPS as Principal of Wayland High School ("WHS").

8.     Defendant Jamie Berger ("Officer Berger") is an individual, who, on information and belief, resides in Auburn, Massachusetts, and, during all relevant times to this cause of action, has worked for the Town and the WPD as a police officer with the WPD.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this matter pursuant to G.L. c. 212, § 4 and G.L. c. 214 § 1.

10.     This Court has personal jurisdiction pursuant to G.L. c. 223A, § 2 because the parties maintain their principal places of business and/or residences within the Commonwealth of Massachusetts.

11.     This Court has concurrent jurisdiction over Plaintiff's claims arising under federal law pursuant to 20 U.S.C. § 1681 and 42 U.S.C. § 1983.

12.     Venue is proper in Middlesex county pursuant to G.L. c. 223, §§ 1 and 8.

## FACTS

### *The Hiring of Stephen Cass as Wayland High School Athletic Director*

13.     In the Spring of 2013, Mr. Cass filed an application with the Town for the positions of Athletic Director and Health and Wellness Instructor at Wayland High School ("WHS").

14.     Thereafter, Mr. Cass was invited by Dr. Stein to participate in a series of formal interviews concerning these positions with Dr. Stein, among other WPS officials.

15.     After completing the interview process, in mid-July, 2013, Dr. Stein, on behalf of WPS, executed and forwarded to Mr. Cass an employment contract for the 2013-2014 school year, which Mr. Cass accepted and executed on July 31, 2013.

16.     Additionally, the contract issued Mr. Cass a clear mandate to "carry out the duties and responsibilities of the Director of Athletics…and…the Health/Wellness Teacher" in conformity with the "laws of the Commonwealth of Massachusetts [and] Wayland School Committee policies…"

17.     Mr. Cass formally undertook his duties as Athletic Director and health and wellness teacher in July of 2013.

*Mr. Cass's Budgetary Inquiry and Subsequent Discovery of Gender Discrimination, Title IX Violations and Misappropriation of Funds*

18.     Over the course of the interview and hiring process, Mr. Cass was never informed by Dr. Stein or Mr. Crozier that the Wayland athletic program had encountered significant budgetary issues due to continuous mismanagement by the WPS Administration (the "Administration") and previous athletic directors, or that, as a result, the Wayland athletic program would be forced to operate with drastically reduced funding going forward.

19.     However, within approximately two weeks of undertaking his duties as Athletic director for WHS, Mr. Cass was informed by the WPS Business Manager that he would need to cut WHS athletic expenses by at least $65,000, or approximately 25%, for the 2013-2014 school year.

20.     As a result of receiving this information, Mr. Cass immediately began investigating the WHS athletic department budget.  Through careful investigation and analysis of the then-current and previous budgets, as well as various coaches' spending trends, Mr. Cass determined that excessive, unnecessary spending, as well as certain coaches' failure to properly

handle and account for funds provided to them through fundraising activities, were rampant throughout WHS's athletic program.

21.     In particular, the manner in which teams may raise funds for their athletic endeavors is set forth and articulated in, *inter alia*, policies promulgated by the Wayland School Committee ("WSC"), which are public records and to which all teams and coaches are bound.

22.     Through his investigations, Mr. Cass discovered that various boys' sports teams had been undertaking fundraising activities which were in violation of clearly articulated WSC policies.  For example, in 2013, the football team held an unsanctioned and impermissible golf tournament to support their annual preseason training trip to Maine and engaged in unauthorized email fundraising through a third-party entity.

23.     Mr. Cass's inquiry, investigation and subsequent discovery of teams' impermissible fundraising activities also led him to become concerned with WHS's compliance with state and federal law, including 20 U.S.C. 1681 ("Title IX"), given the imbalance in funding between boys' and girls' teams that appeared to be created, at least in large part, by the improper fundraising by several boys' teams.

24.     Mr. Cass raised these concerns on several occasions to Dr. Stein, Mr. Crozier and Ms. Mizoguchi.

25.     In an effort to execute his duties in conformity with his contractual mandate and bring WHS's athletic budget and finances into conformity with relevant law and policy, Mr. Cass sought to eliminate inappropriate fundraising and solicitation of funds, as well as to achieve a balance of the already limited athletic budget and ensure fairness and equity across all sports teams.  To do so, Mr. Cass began vigilantly enforcing WSC finance policies and placed strict but reasonable constraints upon coaches in order to balance the athletic budget.

26.     Mr. Cass's expense reductions and enforcement of protective expenditure policies, however, forced him into an adversarial relationship with several WHS boys' coaches because certain of the funds those coaches had been accustomed to receiving were no longer available for activities Mr. Cass determined to be either excessive, in violation of Title IX, or non-essential.  For example, under the revised budget, Mr. Cass could not authorize payment of transportation expenses for the football team's trip to Maine for preseason training, he was forced to cut boys' soccer funding by 80 percent, and he could no longer fund multiple, expensive wrestling tournaments in Western Massachusetts.

27.     Despite the fact that Mr. Cass was merely performing his job responsibilities in managing athletic funding and enforcing clearly established fundraising policies, the impact and perceived inconvenience of these fiscal measures spawned severe hostility towards Mr. Cass, in particular from WHS's head football coach, its head wrestling coach and its head boys' soccer coach.

28.     Nonetheless, Mr. Cass continued to perform his duties and his contractual mandate as Athletic Director in a professional and sound manner.  In doing so, over the course of Mr. Cass's tenure at WHS, he became increasingly aware of – and vocal with the WHS Administration in regard to – several inequitable practices that were ongoing within the WHS athletic community.

29.     On more than one occasion, Mr. Cass informed Dr. Stein, Mr. Crozier and Ms. Mizoguchi, that inequitable practices existed and were allowed to persist within the WPS system. Mr. Cass informed each of the foregoing individuals of several inequitable practices, including without limitation: (1) systematic financial inequity and gender discrimination with respect to the funding of girls' athletics in comparison with boys' programs; (2) conflicts of interest arising

from the varsity football coach's involvement in the selling of athletic apparel for profit within the WHS athletic community; (3) various head coaches' failure to submit assistant coaches for CORI background checks; (4) various coaches being paid "under the table" in violation of WSC policies; (5) various teams and coaches soliciting and/or accepting monetary and other gifts in excess of amounts allowable under WSC policies and applicable Massachusetts law; and (6) various other forms of fundraising in violation of WSC policies.

30.     For example, both the football and boys' soccer teams received funds from outside sources in excess of amounts allowable under the WSC's policy, which required that any gifts valued at $200 or more, provided to WHS athletics must first be approved by the WSC to ensure equity with respect to all sports teams.  This policy had been – and, despite Mr. Cass's efforts, continued to be – routinely disregarded and flaunted by certain WHS boys' coaches, resulting in a grossly disproportionate amount of funds being provided to multiple boys' teams to the detriment of other sports teams and, in particular, girls' teams.

31.     Moreover, over the first year or more of Mr. Cass's tenure as Athletic Director, numerous parents approached him to express their dissatisfaction at being required to pay the salaries of various boys' teams' assistant coaches "under the table," in addition to paying the more transparent and evenly applied "user fees" charged by the athletic department to all participant families.

32.     From very early on his tenure as Athletic Director forward, concerned that the above-referenced inequities, among others of which he had become aware, constituted gender discrimination in violation Title IX, as well as misappropriation of funds in violation of Massachusetts law and WSC policies, Mr. Cass continuously informed WPS administrators,

including Defendants Stein, Crozier and Mizoguchi, both in person and in writing, of his legal concerns regarding, *inter alia,* athletic fundraising, gender equity, and secret coach payments.

33.     Unfortunately, Mr. Cass's expressions of concern garnered little or no reaction and/or support from administrators.

34.     Mr. Cass wrote a November 14, 2013 email to Dr. Stein emphasizing his concern, as Athletic Director, that fundraising and other athletic finances and expenditures be administered and, where necessary, restricted in a manner so as to comply with WSC policies as well as applicable law, including ensuring gender equity.

35.     Moreover, on January 27, 2014, Mr. Cass emailed Dr. Stein and Mr. Crozier requesting that the Administration draft a letter to coaches with respect to adhering to fundraising policies, a request that Dr. Stein and Mr. Crozier completely ignored.

36.     On September 3, 2014, Mr. Cass met with Dr. Stein and Ms. Mizoguchi regarding his concerns over gender equity, coaches mishandling and/or misappropriating fundraising proceeds, and coaches requiring impermissible payments from parents of student-athletes.

37.     Despite Mr. Cass's consistent and thorough effort to apprise the WPS Administration of ongoing gender discrimination, violations of fundraising policies, and misappropriation of funds – as well as the hostility Mr. Cass was experiencing from various WHS coaches – the Administration, by and through Defendants Stein, Crozier and Mizoguchi, made it clear to Mr. Cass that political and historical relationships between coaches, the Town, and WHS trumped Mr. Cass's obligation as Athletic Director to enforce school policy, as well as other applicable state and federal law.

38.     The Administration's responses typically encouraged Mr. Cass to try to build better working relationships with these disgruntled coaches, rather than to address and rectify the

inequities, misappropriations, and violations of WSC policies and state and federal law that had become rampant with the WHS athletics system.

39.     Dr. Stein's, Mr. Crozier's and Ms. Mizoguchi's failure to assist Mr. Cass in addressing the clear violations of law and policy he reported to them as ongoing (and which were ongoing) within the WPS community – coupled with their insistence that Mr. Cass work within the framework of the political and historical relationships between coaches, the Town and WHS – had the effect of both preventing Mr. Cass from performing many duties required of him under the his employment contract and made the completion of other such duties thereunder far more burdensome.

40.     Consequently, feeling essentially abandoned by the Administration, Mr. Cass was left to enforce the WHS and WPS policies with little to no support from his superiors, which created an increasingly antagonistic relationship not only with the above-referenced WHS boys' coaches, and, ultimately, between Mr. Cass and various administrators, including Defendants Stein, Crozier and Mizoguchi.

41.     Nonetheless, by the close of the 2014 school year, Mr. Cass was able to balance the athletic budget for the first time in many years.

42.     Additionally, with the notable exceptions of the football, wrestling and boys' soccer coaches, Mr. Cass had successfully built and maintained strong working relationships with the other coaches on his athletic staff.

43.     Although Mr. Cass was successful in rehabilitating the athletic department's budget, he continued to encounter stiff opposition from the football, wrestling and soccer coaches, as well as the school Administration, to his attempted enforcement of WSC fundraising policies.

44.     Accordingly, as the 2015 school year came to a close, and after seeing no marked improvement in terms of the ongoing discriminatory and other inappropriate practices outlined above, Mr. Cass sent a letter to Ms. Mizoguchi and Dr. Stein, dated March 31, 2015, again outlining each of these ongoing and unrectified problems within the WPS athletic community.

45.     Specifically, Mr. Cass explained that, despite having brought the issues to the Administration's attention, several serious issues remained ongoing and unaddressed by the Administration, including gender equity issues, impermissible fundraising practices, impermissible retention of financial gifts and impermissible payments being made to coaching staff.   Mr. Cass also expressed his frustration that he had been criticized, rather than supported, by the WPS Administration for attempting to ensure that the WHS athletic department maintained "fiscal responsibility, gender equity and [requiring] coaches to adhere to MIAA policies."

46.     Unfortunately, notwithstanding his success in balancing the WPS athletic budget and ensuring that all sports teams would have adequate funding to complete their respective seasons, Mr. Cass was unable to gain the support of the Administration in fostering and enforcing policies that would have led to greater gender equity and increased fiscal responsibility within the WHS athletic program.

### Mr. Cass's Yearly Evaluations and Improper Termination

47.     As noted above, while Mr. Cass documented and frequently communicated his concerns to his superiors, the Administration continuously responded that political and historical relationships between coaches, the Town and WHS were a higher priority.  For example, in both Mr. Cass's 2014 and 2015 performance evaluations, the Administration indicated to Mr. Cass that the issues he encountered were created simply because he did not have a good grasp of

"town politics" and did not have a good working relationship with the primary culprits of his concerns, i.e. the football, wrestling and boys' soccer coaches.

48.    In Mr. Cass's 2014 performance evaluation, the then-Principal (Ms. Mizoguchi's predecessor) offered a positive assessment, stating that Mr. Cass had been doing a "good job in his first year" by beginning "to bring order and control to expenditures, and imposing certain restrictions on how monies are spent." He added that Mr. Cass spent countless, "thankless" hours poring over budgetary documents, balancing accounts and "conducting difficult conversations with coaches who have a hard time grasping the new realities of school and athletic funding." Overall, Mr. Cass was praised in the evaluation for undertaking the "challenges that he faced" in his first year.

49.    Despite his otherwise positive 2014 review of Mr. Cass, the WHS Principal did offer, however, two telling critiques: first that Mr. Cass needed to build supportive relationships with the coaching staff, because, otherwise, such staff would "work around the system, rather than within the system" and, second, that Mr. Cass should be seeking the support of the Administration prior to instituting policies "that pinch" with respect to fundraising because he "may find himself increasingly – if unfairly – isolated trying to make necessary changes…"

50.    In Mr. Cass's 2015 evaluation, Ms. Mizoguchi also praised Mr. Cass for his ability to manage the athletic budget and for putting forward new, well-reasoned ideas with respect to the athletic department.  Ms. Mizoguchi's assessment was silent, however, with respect to the Administration's utter failure to support Mr. Cass in doing his job by balancing the athletic budget, enforcing WPS policy, and attempting to bring WHS in conformity with state and federal law.

51.     While Ms. Mizoguchi's evaluation noted that Mr. Cass was "extremely hard-working and dedicated" to his position, she added that he did not understand "the broader historical or political context" of the situations he was tasked with improving.  On information and belief, Ms. Mizoguchi was referring to two "contexts" in this statement.  The first was how Mr. Cass had handled the opposition and hostility he had received from the head coaches of the football, wrestling and boys' soccer teams.  The second context of Ms. Mizoguchi's statement addressed Mr. Cass's relationship with the Wayland Department of Public Works ("DPW"), which had suffered over the prior months due to the lack of communication and cooperation Mr. Cass had received from the DPW regarding the maintenance of WHS athletic facilities.

52.     In fact, the deteriorating relationship between Mr. Cass and the DPW that, in November, 2014, inspired one Wayland Selectman to write an email to WHS parents in which he encouraged parents to contact the Town Administrator, Dr. Stein, and the DPW, among other officials, to express "support for the athletic director."  In that email, the Wayland Selectman also expressed, tellingly, his view that "[i]t is a very difficult situation for [Mr. Cass] when he wants to do the right thing to help kids with the fear that other responsible parties in town will not support him or… possibly punish him for helping get the situation resolved with no support from any other department heads."

53.     Ms. Mizoguchi's statements concerning how Mr. Cass dealt with the coaches and the DPW – as well as numerous other purported criticisms of Mr. Cass expressed in Ms. Mizoguchi's evaluation – were exaggerated, misleading and/or inaccurate.

54.     Ms. Mizoguchi wrote Mr. Cass's 2015 performance evaluation with the knowledge that the statements contained therein were exaggerated, misleading and/or inaccurate,

and intended that they be used as pretext for the WPS's and the Town's imminent and retaliatory termination of Mr. Cass as Athletic Director.

55.     After receiving Ms. Mizoguchi's evaluation, on May 5, 2015, in accordance with WSC policy, Mr. Cass sent a letter to Dr. Stein explaining that, despite Ms. Mizoguchi's assertions to the contrary, the vast majority of the coaching staff and Town employees were pleased with Mr. Cass's administration of the athletic department and that any existing animosity was due to Mr. Cass's attempts to enforce the WSC policies that directly impacted and rejected the football, wrestling and soccer coaches' spending habits and desires.

56.     Additionally, Mr. Cass informed Dr. Stein that, as a result of the Administration's failure to support his efforts to rectify longstanding problems, significant issues of gender inequity, and the impermissible handling of funds remained virtually unchecked within the WHS athletic system.

57.     On May 8, 2015, just three days after receiving Mr. Cass's letter, Dr. Stein forwarded Mr. Cass a letter informing him that his employment contract would not be renewed for the following year.

58.     Having received his termination notice from Dr. Stein, consistent with WSC policy, Mr. Cass attended a May 26, 2015 WSC meeting to voice his concerns both regarding the gender equity and fundraising concerns outlined above, as well as with his termination.

59.     Mr. Cass publicly explained his position that, due to his continuous attempts to rectify the gender-based discrimination and budgetary concerns that had long-plagued the Wayland athletic department, he had recently received a grossly exaggerated, negative performance assessment by Ms. Mizoguchi, which became the purported basis for his termination as Athletic Director.  Indeed, only after learning that Mr. Cass had expressed his

concerns in a public, town forum, did the WHS Administration and School Committee agree to take any action regarding the ongoing gender discrimination and mishandling of school and other funds.

*Mr. Cass's Wrongful Arrest, Trial and the Court's Issuance of a Directed Verdict in His Favor*

60.     During the final days of his employment with WHS, Mr. Cass had a number of communications with members of the WHS Information Technology ("IT") and Human Resources ("HR") departments in connection with his departure.

61.     In response to these requests, on June 22nd, Mr. Cass met briefly with one WHS IT department employee where it was agreed that Mr. Cass would turn in his computer, his keys and his ID card on or before the morning of June 24.

62.     On June 23rd, Mr. Cass returned the requested items to Mr. Crozier – i.e., his current school computer and power cord, and his keys.

63.     Mr. Cass did not return a five-year-old laptop computer (a prior WHS-issued computer), however, as, over a year earlier, upon being issued a new computer, another employee within WHS's IT Department told Mr. Cass that he could keep the old computer explaining that she believed WHS would be disposing of it.  Indeed, in Dr. Stein's Superintendent's FY 2016 Recommended Budget, dated December 15, 2014, he stated that "[c]omputers that are 5+ years old will be retired/recycled" at the conclusion of the 2014-15 school year.

64.     Following his departure from WHS, over the course of the summer of 2015, Mr. Cass had several meetings and conversations with various WPS administrators with respect to

his termination, and at no time did any of these individuals refer to the five-year-old computer or request that it be returned.

65.     However, following Mr. Cass's public statements to the WSC in the wake of his termination (and related adverse press coverage concerning Dr. Stein and various other WPS administrators and staff), Mr. Cass received a letter from Dr. Stein stating that Mr. Cass was no longer permitted within Wayland School Buildings.  Notwithstanding the negative and bitter sentiment growing within the WPS Administration toward Mr. Cass, Mr. Cass continued to advocate for gender equity and fiscal responsibility throughout the summer of 2015 at School Committee meetings.  He had no further direct communication, however, with any member of the WPS Administration.

66.     The animosity within the WPS and Wayland athletics communities towards Mr. Cass came to a head on October 26, 2015, when several Wayland police officers arrived at Mr. Cass's home and presented a warrant to search his home for the above-referenced, five-year-old laptop that Mr. Cass had been told he could keep many months earlier.

67.     Mr. Cass cooperated fully with the officers and immediately provided them with the computer.  At that point, however, Mr. Cass was summarily arrested, handcuffed, and taken to the Wayland Police Department, where he was "booked" and ultimately charged with, among other charges "felony larceny over $250.00."  Yet, upon information and belief, this was a charge that WPS Administrators, including Dr. Stein and Mr. Crozier, and the WPD, including Officer Berger, knew or should have known to be utterly unfounded and false.

68.     The details of this incomplete and hurried investigation of this matter are as follows.  On Friday, October 23, 2016, the Chief of the WPD received a call from a member of the WPS Administration who reported that Mr. Cass had allegedly failed to return a computer

after his termination.  Upon information and belief, Dr. Stein and Mr. Crozier were among the WPS administrators involved in the decision to report the matter to the WPD and/or were directly in communication with the Chief in connection the complaint.  In response to these communications from WPS administrators, the WPD Chief requested that Officer Berger investigate the matter.

69.     The following Monday morning, October 26, 2015, Officer Berger and a fellow police officer arrived at WHS and met with Mr. Crozier and two members of the WHS IT Department.

70.     Upon information and belief, this meeting, which lasted approximately one hour and constituted Officer Berger's entire investigation of this matter failed to yield any of the following critical information: (i) how many computers Mr. Cass had been provided during his employment, (ii) that he had returned his newer issued computer upon request to do so, (iii) the duration of time Mr. Cass had possessed the older computer, (iv) that Mr. Cass had been informed by a member of the WHS IT Department that he could keep the older computer, and, (v) that the older computer in question was essentially valueless and, along with other 5+ year-old computers in the WPS system, was scheduled to be discarded imminently.

71.     Officer Berger's failure to conduct a thorough investigation was exacerbated by the fact that he, alone, assessed the value of the computer in question without any input from the WPS's IT staff, thereby wrongfully subjecting Mr. Cass to felony charges for larceny in excess of $250.

72.     Additionally, despite the fact that Officer Berger knew of the animosity that had developed between Mr. Cass and several members of the WPS Administration (as alleged herein), Officer Berger never inquired as to why WPS would report such a minor infraction to

the police without first contacting Mr. Cass to request the computer's return. Moreover, Officer Berger, himself, made no attempt to contact Mr. Cass with regard to the computer, opting instead, to apply for a search warrant immediately after his meeting with WPS personnel on October 26, 2015.

73.    In fact, upon information and belief, only three hours had elapsed from the time Officer Berger arrived at WHS to meet with WPS personnel, then obtained a search warrant, and finally arrived at Mr. Cass's home to execute the search warrant and arrest him

74.    Officer Berger's investigation yielded absolutely no probable cause with which to arrest Mr. Cass, let alone charge him with the crime of felony larceny over $250.

75.    The complete disregard and wanton malice shown toward Mr. Cass by the WPD and Officer Berger did not end with Mr. Cass's arrest, however.    Immediately after Mr. Cass's arrest, Officer Berger and/or his colleagues posted Mr. Cass's "mugshot" on the WPD's public page along with information related to his completely baseless and unwarranted arrest.

76.    Additionally, one or more of these officers further tweeted information about the arrest over the WPD's public Twitter account and the WPD sent a press release of the arrest to Boston media outlets, prompting such outlets to extensively cover the matter.

77.    These actions by the WPD were highly unusual within the department.    In fact, based on information and belief, Mr. Cass's mugshot was one of only two mugshots ever posted to the site immediately following an arrest.

78.    The malice demonstrated by the WPD towards Mr. Cass can be explained, at least in significant part, by the close association between various WPD officers, including Officer Berger, and Wayland boys' athletics and various members of the coaching staff, including the head coaches of the boys' football and wrestling teams.  Upon information and belief, three of

the members of the WPD who were involved in Mr. Cass's investigation and/or arrest, including Officer Berger, graduated from Wayland High School within three years of the head football coach's graduation in 1991, and all three such officers participated in the Wayland athletic program including on the football and wrestling teams. Upon information and belief, at least one of the investigating officers is a close friend of the head WHS football coach, who, as alleged above, repeatedly displayed animosity towards Mr. Cass throughout his tenure as WHS Athletic Director.

79.     Despite the fact that the charges levied against Mr. Cass were unfounded, he was nonetheless forced to expend a great deal of his time and money to defend himself in the criminal proceeding, and, due to the adverse press and internet coverage spawned largely by Officer Berger and the WPD, Mr. Cass's reputation in the community was severely and wrongfully damaged.

80.     Shortly before Mr. Cass's trial, in the criminal proceeding, the Court reduced the charges against Mr. Cass from felony larceny over $250 to misdemeanor larceny of property worth less than $250, because the prosecution could offer no evidence substantiating the valuation of the five-year old and barely functioning computer at issue.

81.     Moreover, even the prosecution's misdemeanor larceny case was so lacking in merit that, at the close of the prosecution's case at trial, the presiding judge issued a directed verdict in favor of Mr. Cass.

82.     Despite having been completely exonerated through the Court's directed verdict, the damage to Mr. Cass's reputation caused by the frivolous, malicious and manufactured charges brought against him, as well as the ensuing and resulting media coverage had caused and, to the present continues to cause, Mr. Cass to suffer damages.

83.     It is likely that Mr. Cass's name and reputation – as well as his ability to secure gainful employment in his area of training and experience – will endure constant and pervasive harm arising from the above-alleged wrongful actions and their resulting publicity for the rest of his life.

84.     Since his wrongful termination by WPS, Mr. Cass has applied for well over 100 positions within various school systems; however, he has failed to secure full-time employment. Moreover, multiple national recruiting firms in the education space have informed Mr. Cass that, notwithstanding his acquittal on the larceny charges, due to the adverse press surrounding his termination by WPS and his subsequent arrest, the firms will be unable to assist Mr. Cass in securing employment through their extensive networks. Indeed, even though he was acquitted in the criminal trial when the trial judge issued a directed verdict at the close of the prosecution's case, a simple Google search of "Stephen Cass" yields a Boston Globe article recounting Mr. Cass's arrest as the first search result.

85.     The events leading to Mr. Cass's arrest were set in motion by the intentional, malicious and vengeful acts of various members of the WPS Administration and WPD, including Dr. Stein, Mr. Crozier, Ms. Mizoguchi, and Officer Berger.

86.     Moreover, based upon information and belief, Mr. Cass's arrest and criminal charges were primarily motivated by Mr. Cass's "whistleblowing" activities, which embarrassed members of the WHS community due to their failure over a lengthy time-period to adequately address the illegal gender inequity and other athletic fundraising improprieties alleged herein.

87.     As Mr. Cass brought these issues into the public eye upon his wrongful termination, these WPS administrators, with the assistance of Officer Berger and the WPD, took

extreme and outrageous actions to exact their revenge on Mr. Cass, destroying his credibility and reputation through the filing and prosecution of baseless charges against him.

88.     Due to the Defendants' extreme and outrageous actions, Mr. Cass has suffered and will continue to suffer substantial damages.

## COUNT I

**UNLAWFUL RETALIATION AND DISCRIMINATION IN VIOLATION
OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972
20 U.S.C. § 1681
(Town of Wayland and Wayland Public Schools)**

89.     Plaintiff restates, realleges and incorporates all foregoing paragraphs as if fully set forth herein.

90.     Title IX prohibits exclusion from participation in, denial of benefits of, or discrimination under any education or athletic activity receiving federal financial assistance.

91.     WPS is an agency of the Town and an educational body that receives federal financial assistance for its educational and athletic activities, and is therefore covered under Title IX.

92.     Title IX additionally prohibits discrimination on the basis of sex at educational institutions receiving federal assistance.

93.     Title IX further prohibits retaliation against individuals who engage in protected activity, including but not limited to, good faith complaints of sex discrimination, opposing illegal practices under Title IX, opposing discrimination through internal school communications and voicing concerns to superiors at such educational institution.

94.     Mr. Cass engaged in activity that is protected under Title IX, including but not limited to:

a. Recognizing and reporting to WPS and Town administrators about discrimination against student athletes on the basis of their sex;

b. Recognizing and reporting to WPS and Town administrators that WPS and WHS's treatment of female student athletes may be in violation of Title IX;

c. Opposing, and speaking out in regard to, the Town's and WPS's indifference to, and failure to investigate and remedy, Title IX violations occurring at WHS in regard to the treatment of female athletes.

95. The Town and WPS deliberately and intentionally subjected Mr. Cass to adverse employment actions, including the drafting of misleading and inaccurate annual assessments containing false information and, ultimately, the termination of Mr. Cass due to his advocacy of gender equity under Title IX at WHS and/or because Mr. Cass engaged in the above-described protected activity.

96. There was a causal connection between the Town's and WPS's adverse actions against Mr. Cass and his protected activities.

97. The Town and WPS's unlawful conduct was the proximate cause of Mr. Cass's loss of employment and general damages arising from mental distress, defamation and other economic damages suffered by Mr. Cass, including loss of compensation and benefits, which damages continue.

## COUNT II

### UNLAWFUL RETALIATION AND TERMINATION IN VIOLATION OF
### G.L. c. 149, § 185, et seq. ("MASSACHUSETTS WHISTLEBLOWER ACT")
### (Town of Wayland and Wayland Public Schools)

98. Plaintiff restates, realleges and incorporates all foregoing paragraphs as if specifically set forth herein.

99.     The Massachusetts Whistleblower Act forbids "Employers" within the Commonwealth, including cities, towns and regional districts, or any authority, commission, board or instrumentality thereof, from discharging or otherwise retaliating against any public "Employee," due to that employee having disclosed to a superior and/or public body any activity, policy or practice of the "Employer" that the employee reasonably believes is in violation of law, or of a regulation promulgated pursuant to law, or that the employee reasonably believes poses a risk to public health or safety.

100.    The Town and WPS are "Employers" within the meaning of the Whistleblower Act.

101.    On several occasions, prior to his termination, Mr. Cass reported his concerns to the Town and WPS Administration concerning activities that he believed were in violation of law, including but not limited to:

    a.  Recognizing and reporting to WPS and Town administrators about discrimination against student athletes on the basis of their sex;

    b.  Recognizing and reporting to WPS and Town administrators that WPS and WHS's treatment of female student athletes may be in violation of title IX;

    c.  Opposing, and speaking out in regard to, the Town's and WPS's indifference to, and failure to investigate and remedy, Title IX violations occurring at WHS in regard to the treatment of female athletes.

102.    Mr. Cass reasonably believed that the Town's and WPS's activities and practices, which he reported, were in violation of Massachusetts and Federal law.

103.     Mr. Cass was terminated by the Town and WPS because, *inter alia*, he reported activities and practices of the Town and WPS that he reasonably believed violated Massachusetts and Federal Law.

104.     Mr. Cass's termination was in retaliation for his having reported the Town's and WPS's activities to his superiors within the Town and WPS.

105.     There was a causal connection between the Town's and WPS's adverse actions against Mr. Cass and his whistleblowing activities.

106.     The Town and WPS's unlawful conduct was the proximate cause of Mr. Cass's loss of employment and general damages arising from mental distress, defamation and other economic damages suffered by Mr. Cass, including loss of compensation and benefits, which damages continue.

## COUNT III

### MALICIOUS PROSECUTION
**(Town of Wayland, Wayland Police Department, Officer Berger, Wayland Public Schools, Dr. Stein and Mr. Crozier)**

107.     Plaintiff restates, realleges and incorporates all foregoing paragraphs as if fully set forth herein.

108.     Defendants Town of Wayland, Wayland Police Department, Officer Berger, Wayland Public Schools, Dr. Stein and Mr. Crozier sought process and caused a criminal prosecution to commence against Mr. Cass.

109.     The prosecution was malicious and without merit.

110.     Defendants Town of Wayland, Wayland Police Department, Officer Berger, Wayland Public Schools, Dr. Stein and Mr. Crozier actively participated in initiating legal

process against Mr. Cass knowing that the criminal charges they sought were baseless and lacked any probable cause.

111.    The prosecution terminated in Mr. Cass's favor.

112.    As a result of these wrongful actions, Mr. Cass has suffered and continues to suffer damages.

## COUNT IV

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (All Defendants)

113.    Plaintiff restates, realleges and incorporates all foregoing paragraphs as if fully set forth herein.

114.    Defendants knew or should have known that, *inter alia,* terminating Mr. Cass's employment under false pretenses, arresting him, distributing his mugshot via social media and forcing him to stand trial for a crime he did not commit, or any one of these acts alone, would subject him to embarrassment and distress related to the wrongful termination of his employment, wrongful prosecution and defamation.

115.    As a result of the Defendants' outrageous actions, Mr. Cass suffered physical harm manifested by objective symptomatology.  Mr. Cass has suffered severe negative physical and emotional effects due to Defendants intentional conduct, including but not limited to: anxiety, trouble sleeping and depression.

116.    The Defendants' actions were extreme and outrageous such that any reasonable person in Mr. Cass's position would have suffered emotional distress under the circumstances Mr. Cass was forced to endure due to the Defendants' intentional conduct.

## COUNT V

### VIOLATION OF 42 U.S.C. § 1983 and G.L. c. 12, § 11H
### (Wayland Police Department and Officer Berger)

117.    Plaintiff restates, realleges and incorporates all foregoing paragraphs as if fully set forth herein.

118.    Defendants, acting under color of state law wrongfully deprived Mr. Cass of his constitutional rights, privileges and immunities by retaliating against him for exercising his First Amendment rights and duties as a public educator in publicly speaking out with respect to ongoing violations of state and federal law within WPS.

119.    Defendants further deprived Mr. Cass of his right to personal security by wrongfully accusing him of stealing WPS property, causing his wrongful arrest, and, thereafter, seeking and causing a criminal prosecution to commence against him.

120.    The Defendants completed all such acts with knowledge that Mr. Cass had committed no crime and that no probable cause to arrest him existed.

121.    As a direct and proximate result of the Defendants' wrongful actions and deliberate indifference to Mr. Cass's rights, Mr. Cass has suffered emotional distress, monetary damages, and his character and standing in the community have been irreparably harmed.

## COUNT VI

### DEFAMATION
### (Wayland Police Department and Officer Berger)

122.    Plaintiff restates, realleges and incorporates all foregoing paragraphs as if fully set forth herein.

123. The Wayland Police Department's and Officer Berger's (the "WPD Defendants") dissemination of Mr. Cass's mug shot held Mr. Cass up to scorn, hatred and contempt within and outside of the Town of Wayland community.

124. The mugshot was disseminated via the WPD open and public Facebook account and displayed to an unknown number of viewers.

125. The WPD Defendants knew that Mr. Cass had been arrested under false pretenses and knowingly and willfully defamed Mr. Cass and/or acted in reckless disregard of his legal rights, his reputation and his standing within the community.

126. The WPD Defendants knew that the dissemination of Mr. Cass's mugshot would cause him severe embarrassment within the community and posted his mugshot with the intention of achieving that end.

127. As a result of the WPD Defendants' actions, Mr. Cass has suffered actual injury or harm.

## <u>COUNT VII</u>

### INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Paul Stein, Brad Crozier and Allyson Mizoguchi)

128. Plaintiff restates, realleges and incorporates all foregoing paragraphs as if fully set forth herein.

129. Defendants knew a contract for employment existed between Mr. Cass and WPS and/or the Town.

130. Defendants knowingly interfered with Plaintiffs' contract in a manner that prevented performance thereunder and/or caused performance of the contract to become more burdensome.

131. As a result of Defendants' tortious and/or intentional interference with Mr. Cass's contractual relationship with WPS and/or the Town, Mr. Cass has suffered harm.

**WHEREFORE**, Plaintiff Stephen F. Cass respectfully requests that this Honorable Court:

(i)     Enter a judgment in favor of Mr. Cass and against Defendants on all Counts prayed herein;

(ii)    Award Mr. Cass the compensatory damages he has sustained because of Defendants' wrongful actions, in an amount to be determined at trial;

(iii)   Award Mr. Cass multiple and/or punitive damages where allowable, in an amount to be determined at trial;

(iv)    Award Mr. Cass his costs and reasonable attorneys' fees; and

(v)     Award such other and further relief as may appear just and proper.

## JURY DEMAND

Plaintiff Stephen F. Cass hereby requests a jury on all counts so triable.

Respectfully submitted,

**STEPHEN F. CASS**,

By his attorneys,

*/s/ Benjamin L. Hincks*
Benjamin L. Hincks (BBO# 630685)
Kristen S. Scammon (BBO #634586)
Ryan A. Rucki (BBO# 680227)
TORRES, SCAMMON, HINCKS & DAY, LLP
35 India Street, 5th Floor
Boston, MA 02110
T: (617) 307-4426
E: bhincks@tshdlegal.com
    kscammon@tshdlegal.com
    rrucki@tshdlegal.com

Dated: April 18, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2018, a copy of the foregoing document was served on all counsel of record via the Court's ECF System.

/s/ *Ryan A. Rucki*

Ryan A. Rucki (BBO #680227)