# EXHIBIT 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEPHEN F. CASS,<br>　　　　Plaintiff,<br><br>v.<br><br>TOWN OF WAYLAND, WAYLAND PUBLIC<br>SCHOOLS, WAYLAND POLICE DEPARTMENT,<br>PAUL STEIN, BRAD CROZIER, ALLYSON<br>MIZOGUCHI, and JAMES BERGER (MISNAMED),<br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>) C.A. NO. 1:17-cv-11441<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF JOHN M. RITCHIE

I, John M. Ritchie, hereby depose and state as follows:

1. I am a life-long educator and administrator having spent thirty-two years in various roles in both the private and public school setting, beginning as a teacher and including serving as a Superintendent. For one year (July 7, 2013 to June 30, 2014), following my retirement, I served as the Interim Principal at Wayland High School ("WHS"). It is the one and only position I have held in the Wayland School Department. My one year at WHS overlapped with Stephen Cass's ("Cass") first year as the WHS Athletic Director.

2. I have read the First Amended Complaint in this Action and, hence, I understand that Stephen Cass claims that his contract as the WHS Athletic Director was not renewed because he (Cass) engaged in certain "whistle blowing" activities. I cannot comment on that claim because I was not involved in that decision; however, I was involved in the difficult decision to re-new Cass's contract for a second year.

3. I use the phrase "difficult decision" because I had very significant concerns about Cass's performance in year one of his contract with WHS. In fact, Mr. Cass required more

frequent, regular, and corrective supervision – by far – than any staff member I supervised in my entire career. It is not an exaggeration to note that I had to meet with him at least once every week, all year, to try to redirect his attention, chastise him for some intemperate remark, or pick up the pieces from some disastrous meeting he had held with a coach, or coaches.

4. On what was, literally, my first day on the job, I learned that Cass had, in passing, said to the Head Cheerleading Coach words to the effect that "Cheerleading isn't really a sport" – this despite the fact that Cheerleading is a fully legitimate element of the athletic budget. When I called this to his attention, he apologized immediately and said he'd call the coach to explain and make things right – which to my knowledge he never did.

5. Mr. Cass was fixated on what he saw as the need to reduce the athletic budget, and – despite being clearly and repeatedly told by me that this was not the case – seemed to believe that his job would be assessed on the basis of how many cuts he would be able to achieve. Several of us – myself, Assistant Superintendent Brad Crozier, the Assistant Principals, Scott Parseghian and Allyson Mizoguchi, even the Superintendent, Paul Stein – met with him regularly to convey the following message: "You are not going to be evaluated in terms of reducing the athletic budget. Your goal should be to build rapport and trust in the Athletic Department, emphasize inclusion, fair play, and sportsmanship, and help us come to understand all the aspects of the athletic department's budget, so that together we can set priorities and realize efficiencies in the coming years."

6. Despite the constant repetition of this message, Cass never got it. Instead, he conveyed to many, if not all, his coaches – both explicitly and implicitly – the idea that cuts had to be made, and everything was under consideration. From my perspective, Cass made little effort to understand the issues coaches were dealing with, to listen to their concerns, to take their

suggestions. Despite my advice, Cass continued to tell the coaching staff that they had to do more with less. I told him, again and again, that his approach wasn't working, that his first job was to get to know all the coaches, to gather information, not to put people on edge with threats about coming reductions – especially as we weren't expecting him to make reductions in his first year.

7. As a result of his approach, Cass ended up in multiple adversarial relationships with various members of the coaching staff within his first few months on the job. Being his direct supervisor, and working in the same office suite, I was often called upon to mediate these many disputes, disagreements, and misunderstandings. It was frustrating and exhausting.

8. To cite a typical example: Cass told the wrestling coach that, because of budget concerns, he would no longer support the team's making a trip to a tournament in the western part of the state, one that obviously required a long bus trip. This was a trip the wrestling team had been making for years. As a result of his being told that the wrestling team could not participate in the long-standing event, without any advance notice and even though the tournament had been included in the wrestling team's budget, the Wrestling Coach complained to me about a decision he thought was arbitrary, if not punitive. To Cass's consternation, I approved the trip.

9. I was direct with Cass, and tried not to beat around the bush. (An interim position provides a great deal of opportunity for being direct, for not holding anything back.) To his credit, Cass – with me at least – took even the most withering criticism pretty well and promised to make changes. This contributed to my conviction that if I put my energies and skills into it, I could help Cass become successful at WHS. Still, the difficulties continued, almost always around the theme of Cass suspecting coaches of working around the system, or engaging in illicit

fundraising, or scheduling unnecessary games. Cass had particular difficulties with Scott Parseghian, Assistant Principal and Head Football Coach; with Sean Chase, History Teacher and Wrestling Coach; with Guy Enoch, a Soccer Coach, and a number of other individuals whom I can't now recall.

10. On May 21, 2014, I had a meeting with Cass, Allyson Mizoguchi and Scott Parseghian, to have a global discussion concerning a number of issues that arose in the Athletic Department during the school year and to prepare for the following school year. We reiterated the importance of building relationships, and that Cass wouldn't be evaluated on the basis of his success in cutting the athletic budget. Later that day, I had a volatile meeting with Cass, Sean Chase and Scott Parseghian. Cass's belligerence and accusatory tone suggested, again, that he had heard nothing of, or simply ignored, what we said to him earlier that day.

11. On May 23, 2014, I had a meeting with Cass, Scott Parseghian and Guy Enoch (a Soccer Coach). This was as volatile as the meeting with Sean Chase. I recall receiving an email from Cass the next day (Saturday) in which he stated that he was "incredibly upset" about things that were said during our Friday meeting. The following Monday, I responded to Cass and, given that Allyson Mizoguchi was soon going to take over as the WHS Principal, I brought her into the discussion.

12. Around this time (late Spring, 2014), I met with Paul Stein, Brad Crozier, Allyson Mizoguchi, and Scott Parseghian, to discuss whether to renew Cass's contract for the upcoming school year. Everyone at that meeting shared the belief that he (Cass) had created unnecessary turmoil in the Athletic Department and could only survive if he were to make major changes in his approach. However, given the difficulty of finding a new Athletic Director, and the disruption that would be caused by removing Cass after one year, we decided it was worth the

risk of renewing his contract.

13. Sometime in late spring, 2014, with my own departure from Wayland High School imminent, I sat down with Cass to give him a complete, direct, oral assessment of his performance, what wasn't going well, what he absolutely needed to change. It was not at all a heated meeting. We agreed at the outset that I had nothing to gain by being anything other than honest, as I'd soon be gone. I proceeded to tell Cass that he had failed to listen to my (and our) message that his first goal was to build relationships, not find ways to cut the budget; that he'd continually offended or alienated coaches with an abrasive personal style; that he didn't take the time to actually listen to the perspective of coaches, but tended to dismiss them as troublemakers. I also conveyed my sincere hope that he could turn things around and become successful. At the end of the meeting, Cass said "This must have been very hard for you. I appreciate it."

14. When I wrote his formal Performance Review, it was more moderate than the verbal review I'd provided to Cass. In hindsight, I can see that the evaluation I wrote for him in the spring of 2014 presents a more positive picture than the one I've tried to draw here, or during the regular discussions we'd had throughout the year. The reasons for this seeming discrepancy are as follows:

- My own desire to have Cass succeed led me to feel that I should try to provide a somewhat positive formal evaluation, so that he'd head into his second year with a positive attitude, rather than a feeling of defeat.

- Because I had given him such a lengthy, direct, and critical oral evaluation, which he seemed to take well, I didn't feel as compelled as I ordinarily would to be as critical in his written evaluation.

- Because I knew that the next year's Principal, Ms. Mizoguchi, and I were

5

in agreement about Cass's shortcomings, Ms. Mizoguchi had all the information she needed from me to make whatever decision she would make about his status in the following year.

15. The following June, in 2015, I happened to see Cass in the school parking lot one afternoon, after I'd returned to Wayland High School for a visit. At this point, his contract had not been renewed. Out of the blue, he began screaming at me, and seemed to be in an uncontrolled rage. Cass was hard to understand, but seemed to be accusing me of "conspiring with the administration" to get him fired. I remained calm and told him I hadn't conspired with anyone. I remember asking him why he had printed off hundreds of flyers saying "STEIN CROZIER FRAUD/ THE THREE AMIGOS" and had them placed on car windshields at the Commencement exercises the previous week. Cass quieted down and turned and walked away, saying "I didn't know about that."

Signed under the penalties of perjury:

*Dr. John M. Ritchie* (signature)

John M. Ritchie, Ph. D.

November 16, 2018