# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEPHEN F. CASS,<br><br>Plaintiff,<br><br>vs.<br><br>TOWN OF WAYLAND, WAYLAND PUBLIC SCHOOLS, WAYLAND POLICE DEPARTMENT, PAUL STEIN, BRAD CROZIER, ALLYSON MIZOGUCHI, and JAMES BERGER (MISNAMED),<br><br>Defendants. | C.A. NO 1:17-cv-11441 |

## PLAINTIFF STEPHEN CASS'S CONSOLIDATED
## STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56.1, Plaintiff Stephen Cass submits the following statement of material facts, in support of his Objection to Defendants' Motion for Summary judgment.

1.      One of Stephen Cass's predecessors as the Athletic Director for Wayland High School was Martha Jamieson. (**Exhibit A** at 4.)

2.      Martha Jamieson was discharged (not renewed) from her position as the Athletic Director. (**Exhibit A** at 5.)

3.      Former Wayland High School principal Pat Tutwiler testified that the Wayland High School football coach Scott Parseghian, soccer coach Dave Gavron and wrestling coach Sean Chase reported to him that Martha Jamieson was inflexible and at time disrespectful to them. (**Exhibit B** at p. 91.)

4.      Martha Jamieson filed a discrimination action against the Wayland School Department (and a number of defendants) which was settled by the Defendants in a confidential payment to Ms. Jamieson. (**Exhibit A** at 6.)

5.      Subsequent to Martha Jamieson serving as the Athletic Director, Justice Smith became the next Athletic Director between 2011-2013. (**Exhibit C** at 97-98.)

6.     According to former principal John Ritchie, Justice Smith was discharged (not renewed) as the Athletic Director in large part because of his inability to maintain control of the budget.  (**Exhibit A** at 3).

7.     Ms. Jamieson and Mr. Smith had left the Athletic Department in an "unsettled situation."  (**Exhibit C** at 97:15-21).

8.     Stephen Cass was the immediate successor to Athletic Director Justice Smith.  (**Exhibit A** at 2).  Mr. Smith had often authorized expenditures that caused a line item to exceed the allotted budget.  (**Exhibit C** at 47:2-8).

9.     When Stephen Cass interviewed for the Wayland Athletic Director's job, he was not told that the Athletic Department was over budget by at least $60,000. (**Exhibit A** at 7).

10.     When Stephen Cass accepted the job as the Athletic Director, he was not told that the Athletic Department was over budget by $60,000. (**Exhibit A** at 8).

11.     When Stephen Cass accepted the job as the Athletic Director, the Athletic Department's revolving account fund had been decreased by more than $150,000.00.  (**Exhibit C** at 97:1-14).

12.     It was not until Mr. Cass was approximately two weeks into his job that he first learned that the Wayland Athletic Department was over budget by at least $60,000. (**Exhibit A** at 9).

13.     When all outstanding expenses were tabulated Mr. Cass discovered that the Wayland Athletic Department was over budget by almost $85,000.  (**Exhibit A** at 10).

14.     When Mr. Cass was interviewing for the Athletic Director's job, he was not informed that the School Committee had a fundraising policy that limited the fundraising by individual athletic teams at Wayland High School and promoted general fundraising by the Boosters Club. (**Exhibit A** at 11).

15.     Mr. Cass did not learn of this fundraising policy until after he took the job as the Wayland Athletic Director. (**Exhibit A** at 12).

16.     Under Document KCD, the Wayland School Committee had the following fundraising policy:

> A. *Fundraising.  All fundraising for schools shall, in all but the most unusual circumstances, be conducted by school support organizations such as the P.T.O., CAPA, Boosters, Metco Steering Committee, and Wayland Public Schools Foundation.  Any other fundraising must receive prior approval from the Superintendent and School Committee, and will be considered case by case based on the principles of need and equity set forth hereinabove.* (**Exhibit E** at 3).

2

17.     Under Document KCD, Wayland School Committee instituted the mandatory "SCHOOL GIFTS AND FUNDRAISING" policy that was promulgated to "provide comparable education opportunity for all pupils." (**Exhibit E** at 1).

18.     In addition, the policy expressly states: "All gifts to the Wayland School System … that have a market value of in excess of $200 must be submitted to the School Committee for acceptance."  In addition, the policy exempted the Boosters from this requirement: "Gifts from school support organizations such as … Boosters … shall be excepted … and may be made directly to the school." (**Exhibit E** at 1, 2).

19.     Superintendent Dr. Paul Stein did not want Wayland High School's teams to be bound by the policy's clear and mandatory prohibition on team-specific fundraising.  (**Exhibit C** at 148: 2-6.)

20.     Within the Wayland Athletic Department, there were between 90 and 110 coaches who Mr. Cass supervised. (**Exhibit A** at 14).

21.     During the time that Mr. Cass was the Wayland High School Athletic Director, Assistant Principal Scott Parseghian was the head football coach and an assistant wrestling coach under Sean Chase. (**Exhibit A** at 15, 18).

22.     During the time that Mr. Cass was the Wayland Athletic Director, Sean Chase was the head wrestling coach and an assistant football coach under Scott Parseghian. (**Exhibit A** at 15, 18).

23.     During the time that Mr. Cass was the Wayland Athletic Director, the boys' varsity soccer coach, Dave Gavron, was married to the middle school principal, Betsy Gavron, who was a colleague and friend of Principal Allyson Mizuguchi. (**Exhibit A** at 17).

24.     Of the vast number of Wayland coaches over whom he supervised, Mr. Cass believed there were four coaches in particular – football coach Scott Parseghian, boys' soccer coach Dave Gavron, head wrestling coach Sean Chase, and girls' soccer coach Guy Enoch – with whom he believed he did not have a good working relationship. (**Exhibit A** at 19).

25.     Three of those coaches were reported by former Wayland High School principal Pat Tutwiler to not appear to have a good working relationship with former Athletic Director Martha Jamieson, characterizing her as inflexible and at time disrespectful. (**Exhibit A** at 20).

26.     Mr. Cass attempted to ensure that the policies, rules and regulations that governed Wayland athletic teams were followed. (**Exhibit A** at 21).

27.     Mr. Cass believed that coaches Parseghian, Gavron, and Chase did not consistently abide by the policies, rules, and regulations that governed the activity of Wayland athletic teams and their coaches. (**Exhibit A** at 22).

28.     Although Mr. Cass took a position that purported to divide his time as eight-tenths Athletic Director and two-tenths wellness teacher, Mr. Cass was never asked to teach a wellness course and, therefore, 100 percent of his time was devoted to Athletic Director. (**Exhibit A** at 23).

29.     Because Mr. Cass did not have any teaching role, Mr. Cass does not know if he was covered by the Wayland Teacher Association Collective Bargaining Agreement. (**Exhibit A** at 24).

30.     Mr. Cass never told the cheerleading coach that, "cheerleading isn't really a sport," as indicated in the Defendants' Statement of Facts ("DSOF") No. 19. (**Exhibit A** at 35).

31.     Mr. Cass believed he had a good relationship with the cheerleading coach. (**Exhibit A** at 34).

32.     Mr. Cass asked interim principal John Ritchie to send a letter to the Wayland coaching staff concerning the Wayland School Committee gift and fundraising policy. (**Exhibit A** at 220).

33.     Although they indicated they would, Brad Crozier and John Ritchie never offered public support or supported Mr. Cass's efforts to ensure compliance with rules, regulations and procedures.  (**Exhibit A** at 26).

34.     Of the twelve departments over which Principal Allyson Mizoguchi supervised, the Athletic Department was the largest in terms of number of staff members involved and breadth of oversight. (**Exhibit A** at 27).

35.     In the fall of 2013, soccer parents, including Linda Sinomoto, complained to Mr. Cass that the fundraising money for the boys' soccer team was disappearing. (**Exhibit A** at 38).

36.     In the fall of 2013, Wayland parent Sue Fisk Williams reported to Mr. Cass what she believed to be impermissible football fundraising through a fund sponsor called "eteamsponsur.com." (**Exhibit A** at 39).

37.     On October 15, 2013, Mr. Cass informed wrestling coach Sean Chase that long distance wrestling trips would have to be paid through the wrestling gift account, which upset Mr. Chase. (**Exhibit A** at 40).

38.     On October 16, 2013, Mr. Cass wrote to Brad Crozier and then-Principal John Ritchie stating the following:

> *"This is just the type of situation I'm trying to avoid.  Right now, I am the point person for this fiscal mess and I am going to make enemies of many coaches if I don't have explicit support from above – School Committee, Superintendent, etc.  I need to get something in writing ASAP to provide me with the necessary support so I don't have these situations lead to longer-term resentment and distrust."* (**Exhibit A** at 41).

39.     In November 2013, Assistant Principal Scott Parseghian ordered a fan bus at the request of the boys' soccer coach. (**Exhibit A** at 221).

40.     Mr. Parseghian did this without seeking Mr. Cass's permission or even input. (**Exhibit A** at 222).

41.     Intentionally omitted.

42.     By failing to request permission from Mr. Cass or even seek his input, Mr. Cass informed his superior that he felt he was being undermined. (**Exhibit A** at 223).

43.     On December 1, 2013, Stephen Cass wrote to Assistant Superintendent Brad Crozier indicating the following regarding coaching stipends:  *"Just wanted to follow up on this topic.  It is a really awkward setup at present, with some coaches making double what others make for doing the same job."* . . . *"Nothing we can do about it in the short-term, but at present it's a pretty odd setup which merits significant further discussion."* (**Exhibit A** at 42).

44.     In the winter of 2013-14, athletic trainer Chris Brown informed Mr. Cass that there was gender disparity in the use of the weight room. (**Exhibit A** at 43).

45.     Ms. Brown also informed Mr. Cass that she was aware there were wrestling coaches who: 1) did not appear to be listed on the coaching roster; and, 2) had not taken the proper steps to comply with the CORI requirements. (**Exhibit A** at 44).

46.     On Monday, January 27, 2014, Mr. Cass wrote to Assistant Superintendent Brad Crozier asking for a letter coming from Mr. Crozier or Superintendent Dr. Paul Stein regarding the School Committee fundraising policy to include:  (1) all fundraising must have prior approval of the School Committee; and (2) that the coach must state the intended purpose for the funds to be received.  This letter was never provided. (**Exhibit A** at 45, 46).

47.     Neither Dr. Stein nor Mr. Crozier assisted in such a request. (**Exhibit A** at 47).

48.     On April 1, 2014, Mr. Cass met with Ms. Mizoguchi (at the time the assistant principal) to discuss concerns that some teams were violating the Wayland Public School policy on the $200 gift limitation. (**Exhibit A** at 53).

49.     As interim principal, John Ritchie provided Mr. Cass with a written evaluation in the spring of 2014. (**Exhibit D**.)

In contrast to what Mr. Ritchie wrote in his affidavit which was created expressly for this litigation, he provided an evaluation of Mr. Cass which included the following:

> *"Mr. Cass has just completed his first year as Athletic Director of Wayland High School, a position that brought with it a number of challenges with which he had to grapple upon his arrival.  His two immediate predecessors were each*

*removed from the job, for different reasons, so he arrived into a somewhat unsettled situation.  The finances and accounting of the Athletic Department were in some turmoil, with expenses exceeding the allocated budget.  As is unfortunately the case in most Massachusetts high schools, a successful athletic program depends on revenues from a variety of sources: the school's budget, user fees, and a variety of fundraising ventures, with few clear guidelines about how these are to be managed or accounted for. Compounding the pressures on the Athletic Director, Wayland is a town with historically high expectations for its athletic program:  that teams be successful, that they be well-equipped, and that the program offer a broad range of sports for all students."*  (**Exhibit D**.)

50.     The evaluation also contained the following:

*"Given the challenges that he faced, Mr. Cass did a good job in his first year in many ways, most particularly in beginning to bring order and control to expenditures, and imposing certain restrictions on how monies are spent. Altering long-standing practices is never easy, and rarely popular, and while there is still work to be done, Mr. Cass was able to address the fundamental problem of the shortfall effectively, and courageously, laying the groundwork for increasing clarity and consistency in the athletic program."*

*"It should be noted that this effort included many long hours poring over purchase orders, wrestling with MUNIS accounting system, balancing accounts, reallocating funds, and conducting difficult conversations with coaches who have a hard time grasping the new realities of school and athletic funding.  All of this took place in a somewhat charged political environment, where mistrust, suspicion, and excessive scrutiny seemed to have become the norm."* (**Exhibit D**.)

51.     Mr. Ritchie's evaluation also included this:

*"There is no doubt that Mr. Cass threw himself fully into his new position at Wayland High School, and spent many, many thankless hours reviewing, understanding and working within a new and somewhat cumbersome system of financial accounting – which resulted in his succeeding and overcoming the primary challenge thrown at him upon his arrival – dealing with a serious shortfall.  He is good at seeking advice and asking for help when he needs it, and he certainly made every effort to be a friendly and collegial member of the administrative team at Wayland High School.  I sincerely wish him all the success in the world as he enters his second year as Athletic Director."* (**Exhibit D**.)

52.     Mr. Ritchie's evaluation also included this:

*"Mr. Cass would benefit tremendously from making sure that any policies that pinch, any new directives that cause discomfort, are vetted by, endorsed by, and announced by the Wayland High School Administration, or even the Central Office of the District. I think this should have happened more in this past year, but if it doesn't happen next year, he may find himself increasingly-if unfairly-isolated, trying to make necessary changes that end up being resisted rather than embraced. One area that this sort of collaboration will be absolutely essential is in examining fundraising policies and practices. Changes in this area will be difficult, and success will only result from the Wayland High School administration, in partnership with the Athletic Director, leading the discussions and recommending new protocols or procedures."* (**Exhibit D**.)

53.    This evaluation was signed by both Mr. Cass and Mr. Ritchie. (**Exhibit D**.)

54.    On Thursday, May 1, 2014, Mr. Cass wrote an email to Ms. Mizoguchi indicating that, *"I just learned today that misc. teams have been raising thousands of dollars through solicitation without my knowledge or any approval process. This is a real problem that needs to be brought under control. This just doesn't go on anywhere most places. It will lead to problems – equity, ethical, parent discontent, ineffective Boosters, and a whole bunch of other things. Also, it makes me somewhat powerless to keep coaches under control and run a fair and effective Athletic Department if teams are going to be raising money without guidance or purpose."* (**Exhibit A** at 59).

55.    On May 1, 2014, Ms. Mizoguchi responded, *". . . , I wonder if we'll need to have a kind of 'phase-out' plan, or is this the kind of decision where a hammer drops?"* (**Exhibit A** at 60).

56.    On May 21, 2014, Mr. Cass met with Ms. Mizoguchi, Mr. Ritchie, and Scott Parseghian about athletic issues, including fundraising issues and policy violations by various coaches. (**Exhibit A** at 61).

57.    On June 23, 2014, Mr. Cass met with Principal Mizoguchi to discuss topics including the need to improve the quality of the girls' coaches, as well as impermissible division of coaches' stipends in violation of the Wayland Teachers Association Collective Bargaining Agreement. (**Exhibit A** at 62).

58.    On July 15, 2014, Mr. Cass met with Principal Mizoguchi and parent Cynthia Boyd regarding boys' soccer fundraising practices and a concern that boys soccer funds appeared missing. (**Exhibit A** at 63).

59.    On August 8, 2014, Mr. Cass wrote to Ms. Mizoguchi about a summer soccer camp in which girls' coach Guy Enoch was coaching. Mr. Cass noted that he *"watched our coach [Guy Enoch] coaching only our girls [Wayland High School] from 6:45 to 7:45. No other coach – just 20 Wayland HS girls training with the Wayland coach."* (**Exhibit A** at 72).

60.     Mr. Cass ended his August 8, 2014 email to Ms. Mizoguchi by stating *"So my concerns . . . (1) I feel it is a coach using his position of power to enrich himself; (2) conflict of interest – expectation of girls if they are trying out; (3) MIAA violation – seems very clear."* (**Exhibit A** at 73).

61.     On August 13, 2014, Mr. Cass wrote an email to Ms. Mizoguchi in which he stated:

> *"We need to sit down with Scott [Parseghian] and discuss the fundraising guidelines.  I do not expect this will be easy for him – just like my conversations with Sean Chase were not well received this year.  This is big change – I represent change to those guys and things in Wayland athletics have been very good to them for 25-30 years.  Unfortunately, I'm the guy that got the $100K budget hole and the change that goes with it."* (**Exhibit A** at 74).

62.     On Monday, August 25, 2014, Steve Cass wrote an email to Ms. Mizoguchi in which he stated:

> *"I am not looking to be best buddies with these guys [Scott Parseghian, Dave Gavron, and Sean Chase] – that will never happen.  What I need is for them (and the other coaches) to explicitly understand that there are new guiding policies in place and they need to conform.  These aren't my policies . . . I might have written them, but the impetus was a clear directive from the Superintendent.  I cannot have coaches going around me all the time because they don't like some new policy or decision.  And I can't have battle after battle after battle over the directives that were forced on me."* (**Exhibit A** at 75).

63.     From the start of 2014-2015 academic year, Mr. Cass sought the administration's assistance in implementing necessary and mandatory changes to fundraising practices and enforcing other school department policies, rules, and regulations.  (**Exhibit A** at 214).

64.     Throughout the 2014-2015 academic year, the administration did not support Mr. Cass – despite Mr. Ritchie's pronouncement that such support was fundamental to Mr. Cass's success as the Athletic Director.  (**Exhibit A** at 215).

65.     The four coaches continued to resist Mr. Cass's attempts to enforce the School Committee's mandatory fundraising policy, Title IX's funding requirements, as well as other School Department rules and policies.  (**Exhibit A** at 216).

66.     On Monday, September 1, 2014, Mr. Cass wrote an email to Ms. Mizoguchi in which he stated:

> *"I am quite concerned that the School Committee is not willing to support the initiatives designed to provide fiscal responsibility in*

8

> *athletics (and to support their own policies that are so casually disregarded). I realized that I am totally alone on an island regarding the issue of fiscal responsibility – at odds with select coaches, school administrators, and now parents."* (**Exhibit A** at 76).

67.     On Monday, September 1, 2014, Mr. Cass wrote an email to a number of parents of athletes at Wayland High School in which he wrote:

> *"I am on the side of the parents in <u>all this</u> – I hate that parents are being required to pay coaches' salaries, sell merchandise, or buy unnecessary apparel just so they can play on a Wayland team. Every other school/town has strict guidelines regarding fundraising so they can make the best use of Town resources, prevent parents from being financially 'exploited,' and minimize the inherent conflict of interest that comes from coaches raising money. We have little of the first and lots of the last two taking place."* (**Exhibit A** at 77).

68.     On September 2, 2014, Mr. Cass wrote to Ms. Mizoguchi and stated the following: *"Just FYI, one of the reasons for having an SC [School Committee] member is that the School Committee members (Barb, Jeanne) seems to disregard their own policies. If they are not concerned about their own policies as they pertain to fundraising, conflict of interest, out-of-state travel, etc., it makes it difficult for me to guess which rules to enforce and which to ignore."* (**Exhibit A** at 224).

69.     In an email sent to Ms. Mizoguchi on September 9, 2014, Mr. Cass writes, *"Then I happen upon the Varsity Boys' Soccer Table selling raffle tickets in blatant disregard of your email and exactly what we are trying to stop. David [Gavron] will come up with some convenient reason why he chose NOT TO ASK if it was okay. He never asks. I just don't know when it will ever end with David."* (**Exhibit A** at 79).

70.     In response to that email on September 7, 2014, Ms. Mizoguchi wrote back to Mr. Cass, *"Thanks for the report . . . ugh, ugh, ugh!"* (**Exhibit A** at 80).

71.     On September 8, 2014, Ms. Mizoguchi wrote to Mr. Crozier and Dr. Stein and stated the following:

> *"I am struggling with supporting Stephen Cass and could really use a bit of time with either or both of you to get some advice. He is entering into some pretty complicated discussions with members of our community about the long-term vision for financing athletics (which involves revamped fundraising practices) and some key families are confused and frustrated. Simultaneously, he is frustrating some coaches both because of these new practices (coaches are accustomed to having a long leash) and sometimes because of his interpersonal manner. I have mediated two difficult conversations between him and a coach in the last two weeks."* (**Exhibit A** at 81).

72.     On September 3, 2014, Mr. Cass met with various individuals including Mr. Mizoguchi, Dr. Stein and Mr. Parseghian, to discuss issues concerning gender equity, coaches being paid cash, accounting concerns, conflict of interest concerns, and violations of the Wayland School Committee policy on the $200 gift limitation.  (**Exhibit A** at 78).

73.     In September of 2014, Mr. Cass met with Susan Skeath van Mulbregt, a parent of a boy soccer player, who expressed her concern that fundraising money was disappearing. (**Exhibit A** at 82).

74.      Mr. Cass followed up with other parents of boys' soccer players and learned that there was an estimated $5,000 to $7,000 annually in funds being raised that were not reflected in the teams' accounts. (**Exhibit A** at 83).

75.     Mr. Cass also learned that the parents of boys soccer players were still being asked for money to pay for assistant coaches. (**Exhibit A** at 84).

76.     On September 10, 2014, Mr. Cass wrote to Ms. Mizoguchi pointing out that there were boys' soccer coaches who had not had their CORI paperwork completed. He wrote,  *"Why do we go through this process of doing paperwork, CORIs, mandatory concussion videos, if we're going to completely ignore it in many cases."*  (**Exhibit A** at 85).

77.     Mr. Cass pointed out that wrestling coach Sean Chase had his father serving as an assistant last year who had no CORI paperwork. (**Exhibit A** at 86).

78.     In the same email, Mr. Cass pointed out, *"We have three people/programs that have consumed so much of my time and energy over the last two years – football, wrestling, B soccer . . . the old guard.  The latter two have been by far the most selfish with their resources, and football works independently of the school and is a walking Title IX violation."* (**Exhibit A** at 87).

79.     On Monday, September 15, 2014, Mr. Cass wrote to his superiors, including Ms. Mizoguchi, Dr. Stein, and Mr. Crozier, indicating the following:

> *"I am beyond exhausted being the lightning rod for all the fiscal problems in athletics.  I did amazing things bringing us close to budget last year – and took lots and lots of abuse from parents and coaches to make that happen.  WHS athletics is a walking Title IX violation.  The gender inequity is atrocious and has been so for some time.  However, I cannot bring fairness and equity to the program by myself.  I would like some public support from the administration and School Committee on these issues.  Otherwise, this is a losing battle, and I am not going to fight it alone any longer."* (**Exhibit A** at 88).

80.     On September 18, 2014, Mr. Cass put together a memo called "Wayland High School Athletic Concerns" in which he focused on concerns about fundraising, as well as a lack of gender equity. (**Exhibit A** at 89).

81.     This memo was disseminated to the principal, as well as the Assistant Superintendent and Superintendent. (**Exhibit A** at 90).

82.     In the memo, Mr. Cass identified, among others, the following concerns: unlawful fundraising practices, gender inequity in use of athletic facilities and access to equipment and uniforms, coaches refusal to obtain court arraignment records ("CORI") in accordance with state law, unethical self-dealing by two coaches, and head coaches' payment of assistant coaches salaries "under the table" by funds raised from parents.  (**Exhibit A** at 225).

83.     Dr. Stein did not believe that team-specific fundraising, disallowed under the applicable rules, should be proscribed.  (**Exhibit C** at 148: 2-4.)

84.     According to Dr. Stein, upon his receipt of the September 15, 2014 email and the September 18, 2014 memo, he was concerned about the disclosures about possible Title IX violations (**Exhibit C** at 160:18-19) but did not personally reach out to Mr. Cass to discuss the violations and the two did not discuss the violations otherwise.  (**Exhibit C** at 162:6-8 and 164:5-10.)  Rather, Dr. Stein instructed Mr. Crozier to meet with Mr. Cass.  (**Exhibit C** at 164:11-13.)  This discussion was the only time that Dr. Stein and Mr. Crozier discussed Mr. Cass's September 2014 disclosures.  (**Exhibit C** at 168:7-19.)

85.     According to Mr. Crozier, he found Mr. Cass's characterization of Wayland High School Athletic Department as a "walking Title IX violation" alarming.  (**Exhibit EE** at 174:12-15.)  At that time, Mr. Crozier was charged with overseeing the School Department's human resources function, which included handling Title IX violation Complaints.  (**Exhibit EE** at 175:15-19.)

86.     On September 18, 2014, Mr. Cass met with Mr. Crozier to discuss Athletic Department issues, including enforcing the School Committee's fundraising policy, which Mr. Cass explained would lead to greater gender equity. (**Exhibit A** at 91).  Additionally, Mr. Cass presented a spreadsheet to Mr. Crozier that supported his gender inequity claim.  (**Exhibit EE** at 177:21-23) and also discussed with Mr. Crozier conflicts of interest he found in the department. Mr. Crozier is unsure whether he kept a copy of this spreadsheet.  (**Exhibit EE** at 182:11-13.)

87.     In September 2014, the Wayland School Department had a well-established "Discrimination" policy that set forth the procedures for reporting and investigation of possible Title IX violations.  (**Exhibit FF**.)  Pursuant to this policy, Ms. Mizoguchi and Mr. Crozier are tasked with the investigation of all Title IX complaints.  (**Exhibit FF**.)  Specifically, the policy mandates the two administrators to immediately investigate all such complaints and to provide a written response within seven days of a complaint's filing.  (**Exhibit FF**.)  In addition, all unresolved complaints must be investigated by the superintendent or his designee who must provide a written a response within fourteen days of complaint's filing.  (**Exhibit FF**.)

88.     During the weeks following the September 18, 2014 meeting, Mr. Crozier spoke about Mr. Cass's disclosures only with the School Department's attorney and no one else. (**Exhibit EE** at 184:10-19).

89.     According to Mr. Crozier, he offered Mr. Cass to bring in a third party to investigate the alleged gender inequity within the Athletic Department.  (**Exhibit EE** at 180:1-2.) Mr. Crozier did not fulfill this promise.  (**Exhibit EE** at 186:23-24.)

90.     Although Mr. Crozier claims to have investigated Mr. Cass's complaint about Title IX violations made in September 2014, he does not recall whether he followed the investigation guidelines set forth in the "Discrimination" policy. (**Exhibit EE** at 28:6-9; 29:5-12; 30: 21-24 to 31:1-4).  Mr. Crozier also does not recall whether he reviewed the "Discrimination" policy at the time Mr. Cass made his Title IX complains.  (**Exhibit EE** at 32:19-23).

91.     A parent of former Wayland High School athletes, Eric Schwartz, wrote the following:

> *"It is with regret that I have reconsidered my $10,000 donation for the sports van and cannot in good conscience provide the money to the Boosters Club.  This morning I learned that parents were able to raise over $1,000 at the drop of a hat to provide Coach bus transportation for a single sports team, a lot of money for a single day asset.  I applaud the Boosters Club efforts to work on plugging the large athletic budget gap; soliciting donations for assets like the sports van is a great way to save money over the long term while at the same time providing athletic opportunities otherwise unavailable."* (**Exhibit F**.)

92.     On October 16, 2014, Mr. Cass sent an email, with an article attached, to Principal Mizoguchi, Dr. Stein and Mr. Crozier.  (**Exhibit GG**.)  The attached article was titled "Balancing General and Specific Booster Clubs."  In his email, Mr. Cass told the three administrators that the article discussed: "many of the issues and challenges Wayland Athletics is currently facing, from operational, fiscal efficiency, and equity perspectives'."  (**Exhibit GG**.)

93.     On October 28, 2014, Mr. Cass wrote an email to Ms. Mizoguchi in which he stated:

> *"I think you and I should have a meeting with Mike Henley sometime soon.  With the golf team winning states, I'd be most certain that his Steve Henley fund will be providing the team with jackets (an educated guess). If he's doing it for one team (as an athletic support organization), he needs to do it for every team.*
>
> *It's part of the gender equity piece that is still problematic and part of the need for things to flow through the athletic office and not have too many things done independently."*  (**Exhibit HH**.)

94.     On or about November 26, 2014, despite the plan in place that had Mr. Cass working with his opposite athletic director for the Wayland-Weston Thanksgiving football game, Mr. Parseghian allowed an unauthorized plow operator to plow the field, pushing snow into the end zone, creating a safety hazard which then required the referees to cancel the game. (**Exhibit**

**A** at 105).

95.     On December 4, 2014, Mr. Cass met with Ms. Mizoguchi, Dr. Stein and Mr. Parseghian about Athletic Department issues, including the Thanksgiving football game and facility planning. (**Exhibit A** at 108).

96.     On December 4, 2014, the issue of a $5,000 rental expense for the swim team's pool rental was discussed. (**Exhibit A** at 109).

97.     In that December 4, 2014 meeting, Mr. Parseghian made it clear that he would not allow money to pay for the pool rental redirected from the football program, nor would he allow eliminating freshmen baseball as a cost-saving measure. (**Exhibit A** at 110).

98.     On January 22, 2015, Mr. Cass met with Ms. Mizoguchi to discuss Athletic Department financial issues, athletic teams' use of funds, fundraising violations, paying coaches cash, coaches failing to perform CORI checks, conflicts of interest, and financial gifts from which parents would impact team selection. (**Exhibit A** at 111).

99.     On February 2, 2015, near the end of the wrestling season, Mr. Cass wrote to wrestling coach Sean Chase stating, *"As of Friday, four of your coaches have not turned in their concussion certificates for having completed the state-mandated course."* (**Exhibit A** at 112).

100.    In February of 2015, Mr. Cass met with Ms. Mizoguchi to discuss his concerns that preferential treatment was being provided to a student wrestler who was academically ineligible to participate on the wrestling team. (**Exhibit A** at 113).

101.    In March of 2015, Mr. Cass met with Ms. Mizoguchi to discuss spring coaching and Mr. Cass's concern that coaches were being paid under the table. (**Exhibit A** at 114).

102.    On March 9, 2015, Mr. Cass met with Ms. Mizoguchi, Dr. Stein, Scott Parseghian, and others about Athletic Department finances, fundraising, accounting issues, athletic expenditures, and policy violations by various coaches, including in particular the wrestling coach. (**Exhibit A** at 115).

103.    In the spring of 2015, Mr. Cass provided Ms. Mizoguchi with a document reflecting his concern that boys' soccer coach Dave Gavron was requiring parents to pay salaries for some assistant coaches which was a violation of School Committee rules. (**Exhibit A** at 116).

104.    On March 17, 2015, Mr. Cass wrote an email to Ms. Mizoguchi and Mr. Crozier in which he indicated: *"I'd like to get a handle on the salary piece, as the current practice of splitting salaries seems to be inconsistent with the policy of 'unions' negotiating salaries (only to have the Athletic Department change these figures in order to hire more coaches for certain programs)."* (**Exhibit A** at 117).

105.     On March 31, 2015, Mr. Cass distributed a memo called "Wayland Athletic Concerns" in the form of an email in which he alerted his superiors to concerns that existed in the Department. (**Exhibit Y**).

106.     In the March 31, 2015 memo, Mr. Cass listed fourteen areas of concern including: unregulated, unethical and possibly illegal fundraising by various Wayland High School teams; significant gender equity issues in the Athletic Department as a result of inequitable fundraising favoring boys' sports; various sports teams receipt of gifts from outside entities and individuals in excess of the allowable two hundred dollar threshold; splitting of coaches' salaries in violation of Wayland Teacher's Association's Collective Bargaining Agreement with the Town of Wayland; and head coaches' "under the table" payment of assistant coaches' salaries by funds raised by parents. (**Exhibit Y**.)

107.     On April 1, 2015, in Ms. Mizoguchi's day planner, she had a handwritten note concerning Mr. Cass in which she wrote the words: *"whistleblower," "Title 9 issue," and "May 1 letter."* (**Exhibit G**.)

108.     On March 31, 2015, Ms. Mizoguchi forwarded Mr. Cass's memo to Dr. Stein who forwarded it to Mr. Crozier.  (**Exhibit C** at 222:9-19).

109.     The School Department did not inform Mr. Cass by the April 1 deadline that his employment contract would not be renewed.  (**Exhibit A** at 121).

110.     April 1 is selected as the deadline date so that non-renewed employees could have sufficient time to secure employment.  (**Exhibit C** at 107:2-18).

111.     On April 8, 2015, Ms. Mizoguchi wrote to her mentor Wayne Ogden and told him that she had met with her two assistant principals, Scott Parseghian and Ethan Dolleman, on April 7, 2015 and discussed Mr. Cass's employment with them.  During the meeting, Messrs. Parseghian and Dolleman told Ms. Mizoguchi that she should terminate his employment. (**Exhibit Z.**)  Specifically, Ms. Mizoguchi told Mr. Ogden:

> *"Hi Wayne,*
>
> *Hope this fits the bill.  Let me know.*
>
> *Quick update on the battle front:*
> *- Briefly met with Scott and Ethan yesterday about our AD.*
> *- The three of us are having a meeting with Paul and Brad tomorrow.*
> *- In short, the ball is rolling and I am in a bit of emotional distress.  Just feeling a little sad about the whole thing.   (Yeah, I'm a big softie.)  But, I'm resolved and feel very supported.*
>
> *...."*

112.    On April 8, 2015, Ms. Mizoguchi held a group meeting with Dr. Stein, Mr. Crozier, Mr. Parseghian and Mr. Dolleman to discuss Mr. Cass's future employment at Wayland High School.  (**Exhibit AA** at 240:24 to 241:1-17.)  Ms. Mizoguchi did not view the presence of Mr. Parseghian at this meeting as a conflict of interest.  (**Exhibit AA** at 242:14 to 243:1-3.)  Ms. Mizoguchi solicited input from Mr. Parseghian.  (**Exhibit AA** at 236: 4-8.)  At that time, Mr. Parseghian was also the head coach of Wayland High School football team.  (**Exhibit A** at 218.)  Mr. Parseghian was aware of Mr. Cass's previous complaints about him and the football team's violations of Title IX and other Wayland School Department's rules and policies.  (**Exhibit A** at 218).

113.    On April 8, 2015, at 11:30 p.m., Ms. Mizoguchi again wrote to Mr. Ogden and stated:

" ….

*Good meeting today in the sense that we are all in synch.  It also became clear that, although it is ultimately my decision, everyone thinks that the dude should go for a host of legitimate reasons.  I really feel like Judas here.  The next couple of weeks will be all about crafting my evaluation, meeting with him initially (probably early next week, with Ethan), and then meeting for a final time, probably with Brad when I am back from Beijing.  Will of course apprise you of all of the gory details*."  (**Exhibit Z.**)

114.    In Ms. Mizoguchi's written evaluation of Mr. Cass, she included the following:

*"In his role, Mr. Cass has brought new ideas in order to strengthen the program and which respond to existing or new challenges.  These ideas often address the 'big picture' of the athletic program, and so are well reasoned and potentially effective.  For example, Mr. Cass has sought to invigorate the Boosters Association as a way of filling gaps in funding and responding to the newly-limited fundraising capacity of individual teams.  He worked to streamline the protocols around financial transactions, enlisting the help of Boosters.  Additionally, he is in the process of planning for formation of an 'advisory council' comprised of coaches and community members as a sounding board for the Athletic Director."*  (**Exhibit H**.)

115.    In Ms. Mizoguchi's written evaluation of Mr. Cass, she also stated:  "*It is for these reasons that I am uncertain whether to renew Mr. Cass's contract for the 2015-2016 school year*."  (**Exhibit H**.)

116.    Mr. Cass is unaware of signing his 2014-2015 performance evaluation purportedly drafted by Ms. Mizoguchi, which is required. (**Exhibit A** at 120).

117.    Ms. Mizoguchi, in drafting her evaluation of Mr. Cass, only took into account the opinions of the four coaches who disliked Mr. Cass.  (**Exhibit AA** at 269:13-24 to 271:1-10.)  These coaches were, Mr. Chase, Mr. Parseghian, Mr. Enoch, and Mr. Gavron.  (**Exhibit AA** 269: 20-24 to 270:1-2)  Ms. Mizoguchi, while drafting the evaluation, did not speak with any of the

more than sixty-five (65) coaches who worked with Mr. Cass.  (**Exhibit AA** 270:3-24 to 271:1-10.)

118.    On April 12, 2015, Ms. Mizoguchi wrote to Wayne Ogden and stated the following:

> *"A part of me was hoping that Paul [Stein] or Brad [Crozier] would swoop in and tell me what to do, and even better, tell Stephen what their decision is!  Instead, it is my decision and although this dude is going to hate (and probably sue) me, I am at peace with letting him go.*
>
> *....*
>
> *I've written a draft of an evaluation and sent it to Paul and Brad, who will forward it along to our counsel for her review.  The plan is to meet with S on Wednesday (with Ethan), just before I quite conveniently (and cowardly) fly off to Beijing on Thursday morning.  Then the final decision will be communicated before May 1, when I'm back.*
>
> *...."*  (**Exhibit I**.)

119.    On April 13, 2015, Dr. Stein provided detailed instructions to Ms. Mizoguchi on how to handle her upcoming meeting with Mr. Cass.  Ms. Mizoguchi memorialized these instructions in her diary:

> *"Paul – 1 Say things to him, then hand evaluation*
> *or*
> *2 – hand evaluation, allow to read, then respond to questions*
>
> *I've written this up – concerned you will have a strong*
> *Reaction – read and sit down – and discuss*
> *Be clearer with him – timeline? Deserves an opportunity to respond."*

(**Exhibit II**.)

120.    On April 13, 2015, Mr. Crozier wrote to the School Department's employment lawyer, Regina Tate, the following:

> *"I am on the train headed to D.C. with the eighth grade class, but I wanted your thoughts on Allyson's evaluation of the AD.  There are similarities between this Eval and last year's Eval.  The plan is to give the Eval on May 1st and non-renew later in May."* (**Exhibit J**.)

121.    On April 15, 2015, Attorney Tate wrote the following to Mr. Crozier: "*Made changes directly to the draft you sent me.  See below.*" (**Exhibit J.**)

122.    On April 15, 2015, Ms. Mizoguchi met with Mr. Cass and discussed Mr. Cass's performance evaluation with him.  (**Exhibit AA** at 236:19-21.)

123.    In Ms. Mizoguchi's written evaluation of Mr. Cass, she did not recite a single specific instance of Mr. Cass's alleged insufficient work performance.  (**Exhibit H**.)

124.    Mr. Cass and Ms. Mizoguchi did not meet again to discuss Mr. Cass's performance, avenues to correct the alleged deficiencies, other than delivering his non-renewal letter written by Dr. Stein.  (**Exhibit A** at 217).

125.    On April 24, 2015, Mr. Cass wrote an email to Dr. Stein and asked to meet with Dr. Stein.  (**Exhibit BB**.)  Initially, Dr. Stein did not respond to Mr. Cass's email or his request to meet.  (**Exhibit BB**.)  Rather, Dr. Stein asked Attorney Tate to draft a response to Mr. Cass's email.  (**Exhibit BB**.)  Four days later, Dr. Stein asked Mr. Cass to elaborate on his concerns in writing.  (**Exhibit BB**.)

126.    In May of 2015, Mr. Cass wrote to Dr. Stein stating the following:

> *"During my interview, I asked two very specific questions.  1.  Is the athletic program fully funded, and 2. Are there any major issues for the new Athletic Director.  The only response that I received from YOU, which was 'the budget needs to be tightened up.'  Thus, in a July 29, 2013 meeting with Geoff MacDonald, and after only two weeks on the job, I was shocked to learn that I would have to reduce the budget by over $60,000 (and that number soon swelled to $100,000 when all past purchases were factored in).  Fixing a long-standing budget problem was not a task I wanted and I would not have accepted the position in Wayland had people on the search committee been transparent about the magnitude of the fiscal issues or the fact that my predecessor had been fired over those issues."* (**Exhibit A** at 124).

127.    In May 5, 2015, Mr. Cass also stated the following to Dr. Stein:

> *[w]hen I arrived, athletic funds were not being disbursed in a fair or equitable manner.  As I mentioned, football and wrestling were [sic] travelled excessively, and girls did not receive fair treatment [for example, there were not enough girls track uniforms – the girls had to share uniforms).  Since I arrived, I have purchased badly needed uninforms for many girls teams ...*
>
>     * **
> *Despite my efforts, gender equity has not been achieved.  This is a result of fundraising that has directed a disproportionate amount of funds into the coffers of boys teams.  In addition, funds from the Steve Henley Foundation (an athletic fundraising organization) have ended up mostly*

*with boys teams.  During my time at Wayland, this organization has purchased championship jackets for golf, boys soccer, hockey, and wrestling ....  No girls team has received championship jackets.*

*I instituted an athletic department policy to prevent teams from accepting outside funding, but the boys soccer and wrestling coaches have ignored the policy.*

*I have issued complaints about this inequity through emails to Wayland administrators – in 9/2014 and 4/2015.*  (**Exhibit CC**.)

128.    On May 5, 2015, Dr. Stein forwarded Mr. Cass's letter to Attorney Tate. (**Exhibit CC**.)

129.    Dr. Stein never provided a denial of any of those assertions. (**Exhibit A** at 125).

130.    Mr. Cass provided Dr. Stein with the following assessment:

*"Despite the challenge and the disadvantage of having an interim principal, I accomplished what YOU asked me to do – come in on budget. This feat was not achieved by little cuts here and there, but required new policies and procedures that were not well-received by a few coaches.  In the end, predictably it was the three coaches who had built up their mini-empires over time and were not interested in fiscal responsibility constraints on their way of doing things.  The other 90+ coaches and 30 varsity head coaches have had no issue.  Given the enormity of the fiscal cuts – having 95% of the coaches happy is a pretty impressive percentage."* (**Exhibit A** at 126).

131.    On May 8, 2015, Dr. Stein sent a non-renewal letter to Mr. Cass informing him that his employment contract would not be renewed.  (**Exhibit DD**).  That letter did not provide any specific reasons for this decision.  (**Exhibit DD**).

132.    On May 9, 2015, Mr. Cass wrote to Dr. Stein stating the following: *"I was certainly surprised to receive the information on my 'non-renewal' and feel that decision was retaliation for standing up against long-standing unethical/illegal practices at Wayland HS. However, I certainly would be willing to meet with you if that is still something you would like to do."* (**Exhibit A** at 127).

133.    On June 23, 2015, when Mr. Crozier asked Mr. Cass to return his computer, Mr. Cass went to his car, got his MacBook Pro, and handed it back to Mr. Crozier. (**Exhibit A** at 128, 129).

134.    Between August 26, 2015 and August 27, 2015, Wayland High School parent Jim Lampert communicated via email with Detective Jamie Berger, seeking police intervention relative to several issues he had with Stephen Cass. (**Exhibit K**.)

135.    Chief Irving testified that although the Wayland Police had investigated other town employees failing to return town owned equipment, charges were only filed against Stephen Cass - not the other employees. (**Exhibit L** at 54-55.)

136.    With respect to the fact that the Wayland Police posted Mr. Cass's mugshot on its Facebook page, Chief Irving testified that "he may have explained to him [Detective Berger] why I felt it was important to take it down" and "it probably would have been better not to have been put on at that time." (**Exhibit L** at 82-83.)

137.    Chief Irving and the Wayland Police were aware that Dr. Stein obtained a No Trespass Order issued upon Mr. Cass in the late summer early fall of 2015. (**Exhibit L** at 33-34.)

138.    Both the Superintendent and Assistant Superintendent of the Wayland School Department informed the Wayland Police of allegedly unpleasant experiences with Mr. Cass in the summer or early fall of 2015. (**Exhibit L** at 13, 41, 117-118).

139.    On September 2, 2015, Ms. Mizoguchi sent a letter to parents of Wayland football players indicating that the school found that the football team engaged in a physical fitness assessment Monday morning at Wayland before leaving for Camp Caribou, where they had a full practice later in the day. (**Exhibit M**.)

140.    Ms. Mizoguchi also wrote that the school would be sending the MIAA assurance that the school will not repeat this kind of fitness assessment separate from the two-hour practice. (**Exhibit M**.)

141.    This letter was the response to the fact that Mr. Cass reported that he had seen the Wayland football team practicing at Camp Caribou in the afternoon after he had already seen the football team conduct an early morning practice session at Wayland High School. (**Exhibit A** at 142).

142.    On September 2, 2015, Clayton Jones, the parent of two Wayland High School football players, wrote an email to the other parents of football players indicating that Mr. Cass was "stalking" their kids. (**Exhibit N**.)

143.    Mr. Jones characterized Mr. Cass's actions as harassment and asked parents to send emails to Police Chief Robert Irving. (**Exhibit N**).

144.    On September 2, 2015, Clayton Jones also wrote to Police Chief Robert Irving indicating the fact that Stephen Cass had been "stalking" two of his "children." (**Exhibit O**.)

145.    Mr. Jones also indicated that he wanted to "*make sure he [Mr. Cass] answers for this action and is punished accordingly.*" (**Exhibit O**.)

146.    Mr. Cass never threatened Dr. Stein, Mr. Crozier, a police officer, a coach, a student or anyone else in Wayland. (**Exhibit A** at 148).

147.    Prior to October 22, 2015, Wayland Police Chief Irving and/or the members of the Wayland Police Department were aware of the following allegations or actions involving Mr. Cass:

(1)    Dr. Stein claimed that he was fearful of Mr. Cass, who spoke aggressively to him;

(2)    Dr. Stein obtained a No Trespass Order against Mr. Cass;

(3)    Jim Lampert making a number of allegations against Mr. Cass;

(4)    A number of football parents claimed that Mr. Cass stalked their children when he videotaped them conducting an illegal practice session in Maine;

(5)    Complaints that Mr. Cass created fliers that said "Stein-Crozier-Fraud – The Three Amigos;"

(6)    Claims that Mr. Cass created leaflets that said "Fire Gav;"

(7)    The fact that when Mr. Cass attended School Committee meetings a police officer stood in attendance when he pointed out improper policies, procedures, and protocols undertaken by the Wayland Athletic Department. (**Exhibit L** at 89-90).

148.    When arresting Mr. Cass at his home on October 26, 2015, Wayland Police Detective Jamie Berger did not adhere to the Wayland "Policies and Procedures" for arrest, as outlined below. (**Exhibit A** at 182).

149.    The Wayland Police Department's own "Policies and Procedures" for arrest include the following:

*(2) That a warrant* (arrest warrant) *should be obtained prior to making an arrest when the offender does not create a threat to the public, or is not likely to flee, and especially where less serious offenders are involved; and*

*(3) when appropriate circumstances exist, officers may exercise discretion and not make an arrest.  In such limited cases, citations, summonses, informal resolutions, warnings and referrals to other agencies may be alternatives to arrest.* (**Exhibit P** at 1-2).

150.    In addition, the Wayland Police arrest "Policies and Procedures" also  includes the following:

*B.      Arrests in General*
    *2.      An arrest should never be made to show authority or to vent personal feelings.*

. . .

> 3.   *An arrest should not be used to resolve a problem when other options are available.* (**Exhibit P** at 3).

151.    The Wayland Police Department "Policy and Procedures" with respect to media relations states the following:

> *When an individual is charged with a criminal offense and is sought by law enforcement authorities, CORI information, as well as photographs or mug shots may be released to the media to warn the public and to help locate the individual.* (**Exhibit P** at 7.)

152.    There is no evidence to support the fact that the photograph or mug shot of Mr. Cass was released to the media to "*warn the public and to help locate the individual*." (**Exhibit A** at 186).

153.    Detective Berger failed to adhere to the Wayland Police policies and procedures with respect to media relations when he published Mr. Cass's photograph on Facebook. (**Exhibit A** at 187).

154.    In Detective Jamie Berger's incident report regarding the laptop, after he indicates that Mr. Cass located it for the officers on his couch, he also indicated that Mr. Cass stated, "*They know he [I] had the computer*" and "*why is the Town doing this to him [me]*." (**Exhibit Q**.)

155.    Shortly after arresting Mr. Cass (that same day), Detective Berger posted Mr. Cass's mugshot with the following caption on the Wayland Police Department's Facebook page:

> "****Wayland Police Department Press Release****
> On Monday, October 26, 2015, the Wayland Police Department conducted an investigation regarding a complaint brought forward by the Wayland Public Schools.  During this investigation, the Wayland Police Department was issued and served a search warrant and subsequently located a computer that belonged to the Wayland Public School District.
>
> Arrested and charged with Larceny over $250 and Receiving Stolen Property over $250 was Stephen Cass of Wayland.  He was booked in the usual manner and transported to Framingham District Court for arraignment."

(**Exhibit R**); *see also* (**Exhibit LL** at 127, 129, 130.)

156.    Responses under that Facebook posting included:

> *Sam Pepper:  "I wonder how many MacBooks have 'walked away' with any action by the administration?  (Bet his is not the first)"*

*Nancy Funkhouser:  "Geoff, I am wondering same"*

*Ann Gordon:  "I wonder why it was decided to post this on FB [Facebook] and with the photo"*

*John Flaherty:  "I wonder that too.  This seems unnecessarily humiliating. And what purpose does it serve?"* (**Exhibit R**).

157.    On Monday, October 26, 2015, Dr. Stein wrote to the School Committee members indicating *"two media outlets (Fox News and WBZ) have contacted me for a statement regarding the arrest of Mr. Cass."* (**Exhibit S**.)

158.    A November 4, 2015 email from Mike Lowery to Town Administrator Nan Balmer, Dr. Stein, and Police Chief Robert Irving, indicated that he found the Superintendent's FY2016 recommended budget for December 15, 2014 and under the section of "Staff Computers," it states,

> *"We are requesting $65,000 to replace 80% of our teaching staff computers that will become 4 years or older in 2015.  These computers were purchased as part of our teacher 1:1 initiative in 2010 and 2011.  Teacher computers that are 4 years old will be used to replace labs that are 6+ years old in our elementary school and/or distributed to TAs who currently do not have computers.  Computers that are 5+ years old will be retired/recycled.*

> This suggests the School Department's own valuation of computers 5+ years old is zero.  In my personal opinion:  if the computer which Mr. Cass is alleged to have stolen is more than 5 years old, then the School Department's assertion that it is worth $250 or more is so questionable that the charges against Mr. Cass should be dropped." (**Exhibit T**.)

159.    In an email from Wayland High School parent Jim Lampert – an individual who had a beef with Mr. Cass as a result of his son's lacrosse – he wrote to Detective Jamie Berger stating *"Jamie, could we search Cass's computer to see if he sent those emails we discussed earlier?"* (**Exhibit U**.)

160.    An investigation of gender based financial data in athletics was conducted by Susan Bottan after Mr. Cass was relieved of his job. (**Exhibit A** at 192); (**Exhibit V**.)

161.    Ms. Bottan's Title IX report opened with the caveat, *"A review of female participation in the Athletics program was also conducted **excluding** football . . . ."* (**Exhibit V** at 3).

162.    Football is one of the largest participation sports at Wayland High School. (**Exhibit A** at 194).

163.    The data provided by Ms. Bottan showed that when football was NOT excluded from the compiled data there were noticeable inequities in athletics between the boys' and girls' sports. (**Exhibit V** at 7); (**Exhibit A** at 195).

164.    In 2015, after Mr. Cass had been discharged, Northeastern University completed a study called the "Wayland High School 2015 Athletics Culture Study Report."  The report contained the following:

> *"The focus group discussions and open-ended responses yielded <u>no evidence </u>to indicate that providing an equal experience for male and female student-athletes is perceived as being a priority for the members of the Athletic Department."  "While one female student-athlete described a positive experience relative to equity, no additional positive examples were provided in the focus group discussions or in the open-ended survey responses."* (**Exhibit W** at 1).

165.    Two responses in the Northeastern survey included the following:

> *Female, junior student athlete: "We are constantly getting kicked out of practice facilities and sometimes even our home field by boys' sports."*
> -and-
> *Female, senior student athlete: "There is ZERO equality or care for girls' sports.  I am sad that I have to leave this year and will never have felt like I mattered as an athlete to this school."* (**Exhibit W** at 2).

166.    Mr. Cass perceived gender inequity in the Wayland High School athletic programs when he heard from female athletes, as above, who believed their sports were considered secondary and did not matter. (**Exhibit A** at 198).

167.    Mr. Cass perceived gender inequity in Wayland High School athletics when many of the girls' sports teams did not get the same quality of uniform as comparable boys' sports teams. (**Exhibit A** at 199).

168.    Mr. Cass perceived gender inequity through the disparity in the number of experienced, qualified coaches hired for girls' teams as opposed to those hired for boys teams. (**Exhibit A** at 200).

169.    Mr. Cass perceived gender inequity because some of the fields and facilities to which girls' teams were assigned were inferior to those provided to the boys' teams. (**Exhibit A** at 201).

170.    Mr. Cass perceived gender inequity when a boys' state championship team would be given championship jackets, but girls' state championship team did not. (**Exhibit A** at 202).

171.    Mr. Cass perceived gender inequity when he viewed a senior skit which parodied the school administration's financial support for football as compared to girls' soccer. (**Exhibit A** at 203).

172.    While he was the Athletic Director, Mr. Cass reported to his superiors his belief that Scott Parseghian had a conflict of interest when he placed orders for Wayland High School sports wear business through his father's sportswear company. (**Exhibit A** at 204).

173.    On December 12, 2017, a press release was published from the Massachusetts Ethics Commission which indicated that football coach Scott Parseghian would be censured by receiving a "Public Education Letter" as a result of a conflict of interest in which his father's athletic apparel business received over $150,000 worth of purchases from Wayland athletic teams. (**Exhibit X**.)

174.    The press release also indicated that "*Mr. Parseghian also facilitated the purchase of merchandise from his father's business by other Wayland High School staff members by taking orders, maintaining catalogues and merchandise samples in his office, and delivering the merchandise.*" (**Exhibit X**.)

175.    Mr. Parseghian represented his father's business in 46 such purchases also totaling approximately $60,000." (**Exhibit X**.)

176.    The Ethics Commission press release indicated that because Wayland High School investigated the matter and imposed a financial penalty on [Mr. Parseghian], they resolved it with providing him a Public Education Letter. (**Exhibit X**.)

177.    Intentionally omitted.

178.    Mr. Cass believed he had permission to keep a school-issued laptop, after receiving permission from Mary Barber that he could do so.  (**Exhibit JJ** at 96, 228).

179.    Dr. Stein testified that he did not reach out Mr. Cass prior to reporting to Chief Irving that Mr. Cass had stolen the subject laptop.  (**Exhibit C** at 275).  Similarly, Mr. Crozier testified that he also did not reach out to Mr. Cass prior to discussing the issue with Chief Irving. (**Exhibit EE** at 100-01).

180.    Chief Irving testified that he had a meeting with Paul Stein and Brad Crozier regarding the report of the stolen laptop.  (**Exhibit L** at 62).

181.    Detective Berger testified that he received a call from Chief Irving on October 23, 2015, asking that he investigate that report.  (**Exhibit KK** at 55-57).

182.    Detective Berger testified that immediately following that phone call, he called Mr. Crozier to set up a meeting for the following Monday, October 26, 2015.  (**Exhibit KK** at 57.)

183.     Detective Berger testified that sometime between 7:00-8:00 a.m. on October 26, 2015, Detective Berger met with Mr. Crozier and some employees of the IT department. (**Exhibit KK** at 61).

184.     Detective Berger testified that, during that meeting with Mr. Crozier, he was informed that a few days earlier a school inventory revealed that Mr. Cass had not returned the laptop when he was terminated.  (**Exhibit KK** at 70).

185.     Detective Berger testified that the laptop contained a tracking device, which established that it was located at Mr. Cass's home.  (**Exhibit KK** at 72-73).

186.     Detective Berger testified that he made no attempt to contact Mr. Cass, prior to applying for and effectuating the search warrant; instead, immediately upon leaving that meeting with Mr. Crozier, Detective Berger prepared an affidavit for a search warrant to retrieve the laptop.  (**Exhibit KK** at 101-102).

187.     Detective Berger testified that he prepared an affidavit for a search warrant asserting that he had probable cause to believe Mr. Cass had committed two felonies.  (**Exhibit KK** at 81, 87; (**Exhibit Q.**)

188.     Detective Berger has admitted that, at the time he applied for the search warrant, obtained the search warrant, and then arrested Mr. Cass without a warrant, he did not know—nor did he even inquire as to—any of the laptop's specifications.  (**Exhibit KK** at 82).  Indeed, Detective Berger testified that he did not know or ask how much it was worth (he did not know or ask the cost, he did not know or ask the value, and he did not know or ask the replacement value); he did not know or ask the model of the laptop; he did not know or ask the age of the laptop; he did not know or ask how much memory it had; and he did not know or ask the condition of the laptop at the time it has been issued to Mr. Cass.  (**Exhibit KK** at 82).

189.     Despite admittedly not knowing and having made *no inquiry* about the specifications of the laptop (and having received *no information* about the actual condition, specification or value of it) Detective Berger concluded that the value of the laptop exceeded $250.  (**Exhibit KK** at 81).

190.     Following Mr. Cass's arrest, but prior to trial, the "Receiving Stolen Property over $250" charge was completely dropped. The "Larceny over $250" felony charge was reduced to a misdemeanor charge prior to trial.   (**Exhibit KK** at 200-201).

191.     Detective Berger testified that in valuing the laptop in excess of $250, the larceny charge against Mr. Cass would be a felony; valuing the laptop at less than $250 would have rendered a larceny charge as a misdemeanor.   (**Exhibit KK** at 83).

192.     Detective Berger testified that he would have had no authority to arrest Mr. Cass without first obtaining a criminal complaint and a summons if he had charged Mr. Cass with a misdemeanor.  (**Exhibit KK** at 83).

193.    Detective Berger testified that Mr. Cass was fully cooperative at the time he effectuated the search warrant.  (**Exhibit KK** at 94).

194.    Detective Berger testified that, at the time he effectuated the search warrant, Mr. Cass did not create a threat to the public.  (**Exhibit KK** at 224).

195.    Detective Berger testified that, at the time he effectuated the search warrant, Mr. Cass was not likely to flee.  (**Exhibit KK** at 101).

196.    Detective Berger testified that there were other options available to him rather than arresting Mr. Cass without a warrant.  (**Exhibit KK** at 102).  For example, he admitted that, rather than placing Mr. Cass in handcuffs and arresting him without a warrant in his own home, he could have issued him a summons to appear in court on the charges.  (**Exhibit KK** at 103, 229).

197.    Detective Berger testified that after Mr. Cass directed him to the laptop located on his couch, he told Detective Berger and the other officers that "*they knew he had it and why are they doing this to him*."  (**Exhibit KK** at 95).

198.    Detective Berger testified that he made an alleged "within seconds" decision to put Mr. Cass in handcuffs and arrested him on the spot on two felony charges: Larceny over $250 and Receiving Stolen Property over $250.  (**Exhibit KK** at 224).

199.    Detective Berger testified that he that he had not been appointed as the Public Information Officer, and that he did not seek Chief Irving's approval before he published Mr. Cass's mugshot and arrest caption on Facebook (nor did he seek Chief Irving's approval before releasing the caption to Wayland media outlets).  (**Exhibit KK** at 122, 234).

200.    Detective Berger testified that the only other time he ever published a mugshot on its Facebook page regarding an arrest in the town of Wayland was in a "home invasion case"— which involved a violent offense about which the public had actual concern.  (**Exhibit KK** at 131-133).

For the Plaintiff,
STEPHEN F. CASS,
By his Attorneys,

*/s/ Jamie J. Bachant*
TODD D. WHITE (#565924)
twhite@apslaw.com
ALI KHORSAND (#675060)
akhorsand@apslaw.com
JAMIE J. BACHANT (#684244)
jbachant@apslaw.com
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI  02903-1345
Tel:  401-274-7200
Fax:  401-751-0604

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11th day of January, 2019, I filed the within through the ECF system and that notice will be sent electronically to the below listed counsel who are registered participants identified on the mailing information for Case No. 17-11441.

Adam Simms, Esq.
John M. Wilusz, Esq.
John J. Davis, Esq.
Pierce Dams & Perritano LLP
10 Post Office Square, Suite 1100
N Boston, MA 02109
(617) 350-0950
asimms@piercedavis.com
jwilusz@piercedavis.com
jdavis@piercedavis.com

*/s/ Jamie J. Bachant*

930699.v1