# **EXHIBIT EE**

Deposition of Bradley J. Crozier
June 29, 2018

---

Page 1

VOLUME: 1
PAGES: 1 - 304
EXHIBITS: 104 - 121

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

******************************

STEPHEN F. CASS,

    Plaintiff,

v.                                     Civil Action No.:
                                       1:17-cv-11441
TOWN OF WAYLAND, WAYLAND
PUBLIC SCHOOLS, WAYLAND
POLICE DEPARTMENT, PAUL
STEIN, BRAD CROZIER, ALLYSON
MIZOGUCHI and JAMES BERGER,

    Defendants
******************************

DEPOSITION OF BRADLEY J. CROZIER, a witness called on behalf of the Plaintiffs, taken pursuant to Rule 30 of the Massachusetts Rules of Civil Procedure, before Judith McGovern Williams, RPR, CRR, CSR and Notary Public in and for the Commonwealth of Massachusetts, at the Law Offices of Torres, Scammon, Hincks & Day, LLP, on Friday, June 29, 2018, commencing at 9:07 a.m.

CURRAN COURT REPORTING

---

Page 2

APPEARANCES

Representing the Plaintiffs:

TORRES, SCAMMON, HINCKS & DAY, LLP
By: Benjamin I. Hincks, Esquire
35 India Street
Boston, Massachusetts 02110
(617) 307-4426

Representing the Defendants:

PIERCE, DAVIS & PERRITANO, LLP
By: Adam Simms, Esquire
10 Post Office Square
Boston, Massachusetts 02109
(617) 350-0950

Also present:
Stephen F. Cass

CURRAN COURT REPORTING

---

Page 3

**WITNESS:** BRADLEY J. CROZIER

**Examination By:  DIRECT  CROSS  REDIRECT  RECROSS**
  BRAD CROZIER
  By Mr. Hincks    9

**E X H I B I T S**

| No. | Description | Page |
|---|---|---|
| No. 104, | Six pages headed "Discrimination," bearing production numbers SUPT00063 through SUPT00068 | 22 |
| No. 105, | One page headed "Personnel Records," bearing production number WSD00408 | 34 |
| No. 106, | One page headed "Evaluation of Professional Staff," bearing production number WSD00419 | 34 |
| No. 107, | Email chain, bearing production number BC00110 | 56 |
| No. 108, | Email chain, bearing production number BC00107 | 120 |
| No. 109, | Email chain, bearing production number KC00001 | 124 |
| No. 110, | Email chain | 155 |

CURRAN COURT REPORTING

---

Page 4

| No. | Description | Page |
|---|---|---|
| No. 111, | Email dated 1/27/2014 to Mr. Crozier from Mr. Cass | 165 |
| No. 112, | Email dated October 9, 2014, to Mr. Cass from Mr. Crozier, bearing production number BC00088 | 183 |
| No. 113, | Email chain, bearing production numbers SFC000255 through SFC000256 | 199 |
| No. 114, | Email chain, bearing production numbers SFC000397 through SFC000398 | 215 |
| No. 115, | Email chain, bearing production number CSFC000400 | 218 |
| No. 116, | Email chain, bearing production number SFC000403 | 220 |
| No. 117, | Email chain, bearing production numbers SFC000407 through SFC000408 | 223 |
| No. 118, | Email chain, bearing production numbers SFC000414 through SFC000415 | 226 |
| No. 119, | One-page chart headed "Additions and Reductions in Personnel Budget," bearing production number PS00095 | 227 |
| No. 120, | Memorandum dated September 4, 2015, to Dr. Stein from Ms. Bottan, bearing production numbers SFC001694 through SFC 001705 | 238 |

CURRAN COURT REPORTING

**Page 25**

after the investigation."
Q. Do you have an understanding of what the reference is to the term "principal" here?
A. The spelling indicates that it would be a school principal, although it is not capitalized, so I'm not --
Q. Right. And if you look at the chart below that, do you see there are three columns, and the middle column says "District," and you're listed under there as -- well, you are listed under there in regard to five of the six categories, from top to bottom?
A. I do see that.
Q. Okay. You are not a principal? Is that right?
A. I was not employed as a principal in 2013-2014.
Q. And then in the far-right corner under the heading "High school," in five of the six categories Ms. Mizoguchi is listed. Do you see that?
A. I do.
Q. And of course she is a principal?

**Page 26**

Is that right?
A. She was the principal in 2013-2014. No. She wasn't. Actually it was John Ritchie in 2013-2014.
Q. Right. So I mean is it -- let me ask you. Below Ms. Mizoguchi's name in that high school category is Marybeth Sacramone. Do you see that?
A. Yes.
Q. Who is Ms. Sacramone?
A. She is the guidance department head at the high school.
Q. So she is not a principal now or never has been to your knowledge? Is that right?
A. Not to my knowledge.
Q. So in all of that, do you have an understanding that the reference to principal is generally making reference to the individuals indicated in the table for the various categories that are set forth in the left-hand column? Is that your understanding?
A. The last line under "Level I" says: "Complaints may be also filed with a

**Page 27**

member of the advisory committee."
This table may be referring to that advisory committee.
Q. Do you have an understanding of what the advisory committee is?
A. I don't know what the advisory committee is defined as.
Q. Okay. Let me ask it this way. Do you see the reference to "Title IX Gender" in the left-hand column of the chart?
A. I do.
Q. Okay. And do you see that you are designated under the column entitled "District"?
A. I do.
Q. Do you have an understanding that you are one of the people to whom a complaint might be made in regard to a perceived Title IX violation?
A. I am listed there as one of the people for Title IX complaints. Yes.
Q. Okay. And also Ms. Mizoguchi may be as well, is that right, because she is listed under the column entitled "High school" for

**Page 28**

that same category, Title IX?
A. Yes.
Q. Okay.
A. There are some other references on page 40 also.
Q. Okay. Have you ever been involved in overseeing the investigation of a Title IX complaint within the Wayland Public Schools?
A. I have.
Q. And on how many occasions?
A. I don't recall exactly.
Q. Do you recall when the first time was when you were involved in the investigation of a Title IX complaint within Wayland Public Schools?
A. Not in particular. No.
Q. Do you recall -- you don't recall how many times you have been involved in overseeing the investigation of a Title IX complaint?
A. I don't recall.
Q. Okay. Do you recall any of the instances in which you were involved in an investigation of a Title IX complaint for the

Deposition of Bradley J. Crozier
June 29, 2018

### Page 29

1 Wayland Public Schools?
2    A. I do recall.
3    Q. Okay. Please tell me about the
4 first matter you recall being involved in.
5    A. One of the last matters that I
6 recall being involved in is investigating the
7 complaints made by Mr. Cass.
8    Q. Okay. And we may come back to this,
9 but can you tell me when it was that you were
10 involved in that investigation?
11    A. The summer of 2015 and the fall of
12 2014.
13    Q. Please describe any other Title IX
14 investigations within Wayland Public Schools
15 that you recall being involved in aside from
16 the matter you just testified to that was
17 raised by Mr. Cass.
18    A. I don't recall any specific ones
19 with specific dates at this time.
20    Q. Was there any Title IX-related
21 investigation conducted at Wayland Public
22 Schools in connection with a former athletic
23 director named Martha Jamieson?
24    A. I'm not -- I am not aware of those

### Page 30

1 investigations.
2    Q. You don't recall or you weren't
3 involved in such an investigation?
4    A. I wasn't involved and I don't
5 recall.
6    Q. Okay. Do you recall being involved
7 in any Title IX investigation where the
8 procedures set forth on the first page of
9 Exhibit 104 were followed within Wayland
10 Public Schools?
11       MR. SIMMS: Objection. Go
12    ahead.
13    A. Can you repeat the question?
14       MR. HINCKS: Can you read it
15    back?
16       (The pending question was
17    then read.)
18       MR. SIMMS: Same objection.
19       THE WITNESS: I don't recall.
20 BY MR. HINCKS:
21    Q. Do you believe these procedures were
22 followed as set forth on Exhibit 104 in
23 connection with your involvement in reviewing
24 the Title IX issues raised by Mr. Cass that

### Page 31

1 you have testified about a few minutes ago?
2       MR. SIMMS: Objection. Go
3    ahead.
4    A. I don't recall.
5 BY MR. HINCKS:
6    Q. Well, let me ask you this. Do you
7 recall -- did you --
8       MR. HINCKS: Strike that.
9 BY MR. HINCKS:
10    Q. Did you consider the issues raised
11 by Mr. Cass you were involved in reviewing in
12 the fall of 2014 to be a complaint in regard
13 to a possible Title IX violation within
14 Wayland High School?
15    A. He -- I -- I treated it as an
16 allegation and asked him to meet with me and
17 as part of the investigation and after meeting
18 with him, I -- I asked him for more
19 information to -- to understand the allegation
20 in depth.
21    Q. And my question was: Did you
22 consider his raising the Title IX issues with
23 you at that time, you and others at that time,
24 to have been a complaint in regard to a

### Page 32

1 possible Title IX violation?
2    A. And I answered that I believed it to
3 be an allegation that I needed to investigate
4 more fully.
5    Q. So you did not consider it to be a
6 complaint?
7       MR. SIMMS: Objection.
8    A. I --
9 BY MR. HINCKS:
10    Q. I just want an answer to my
11 question. Did you consider it to be a
12 complaint as set forth in Exhibit 104?
13       MR. SIMMS: Objection. Go
14    ahead.
15    A. It doesn't appear that in this
16 section of Exhibit 104 there is really a
17 definition of a complaint.
18 BY MR. HINCKS:
19    Q. So let me ask you this. Did you
20 review this policy or a policy of this same
21 nature when Mr. Cass raised his concerns in
22 regard to Title IX in the fall of 2014?
23    A. I don't recall.
24    Q. Do you think you might have reviewed

CURRAN COURT REPORTING

Page 97

1    MR. SIMMS: Objection. Go
2 ahead.
3    THE WITNESS: I don't believe
4 somebody specifically did research
5 on that particular computer. I
6 believe that they found that this
7 computer was active and that then
8 led them to let us know that the
9 missing computer that Mr. Cass had
10 reported that he had turned in was
11 actively being used.
12 BY MR. HINCKS:
13    Q. Okay. So this is where I'm
14 directing my questions. By the time you
15 learned that the computer was missing,
16 Mr. Crozier, did you also learn that there was
17 information about where the computer was
18 located, or did that second piece of
19 information come later in time?
20    A. That -- I emailed, as I testified a
21 question or two ago, I emailed Susan Ginsberg
22 to understand how she knew about the computer
23 and where it was.
24    Q. I guess what I am getting at is if

Page 98

1 you recall just learning that an inventory had
2 been completed and this computer was missing,
3 or did you when you learned that did you also
4 learn that the person reporting it to you had
5 information about where the computer actually
6 was?
7    A. I don't recall.
8    Q. Do you recall being involved in
9 discussions with members of the IT department
10 about attempting to locate the missing
11 computer?
12    A. Not between the time of June 22nd
13 and when it was reported to me that it had
14 been located.
15    Q. You testified that when you learned
16 about this you emailed Susan Ginsberg. Is
17 that right?
18    A. As I recall, yes.
19    Q. And do you recall any response you
20 received from Ms. Ginsberg to your inquiry?
21    A. I believe she emailed me back.
22    Q. Okay. Do you recall the substance
23 of the email generally?
24    A. Generally I think she described how

Page 99

1 the missing computer was identified and
2 located.
3    Q. Do you recall what you did next
4 after receiving that email back from
5 Ms. Ginsberg in connection with the missing
6 computer?
7    A. I recall wanting to have a
8 discussion with Dr. Stein, and when I went out
9 into the hallway to see if he was available, I
10 saw Chief Irving and talked to Chief Irving
11 about the discovery.
12    Q. Okay. What do you recall about your
13 discussion with Chief Irving?
14    A. That I explained to him the
15 information that Susan Ginsberg had provided.
16    Q. Do you recall what Chief Irving's
17 response was?
18    A. He wanted to have a discussion with
19 Dr. Stein about it.
20    Q. And did that discussion happen to
21 your knowledge while Mr. Irving was in the
22 building at that time?
23    A. I think once Dr. Stein became
24 available, then Chief Irving, myself, and

Page 100

1 Dr. Stein had a brief discussion, and they
2 continued the discussion after I left.
3    Q. Do you recall was that the same day
4 that you bumped into Chief Irving?
5    A. Yes.
6    Q. When you met with Chief Irving and
7 Dr. Stein, what do you recall about that
8 meeting? What was said?
9    A. The discussion centered around the
10 recovery of the equipment.
11    Q. Can you be more specific?
12    A. I don't recall more specifics.
13    Q. Okay. Was your objective or
14 Dr. Stein's objective to get the computer
15 back?
16    A. I don't recall.
17    Q. But you recall that the subject was
18 around recovery of the computer?
19    A. Yes.
20    Q. Did anybody in that meeting mention
21 the possibility of picking up the telephone
22 and calling Mr. Cass and asking why he still
23 had the computer?
24    A. The behavior that Mr. Cass had

## Page 101

1 exhibited from posting fliers, from being
2 involved in the distribution of the fire Gav,
3 from his interaction with me in the guidance
4 suite, to the finding of people's homes on his
5 computer, pictures of people's homes on his
6 computer, all pointed toward Mr. Cass's
7 unstable and erratic behavior, and the
8 decision was that no school department
9 employee would be involved in the recovery of
10 it.
11     Q. Okay. I'm going to come back to
12 that, but my question to you, Mr. Crozier, was
13 did anybody in that meeting while you were
14 present with Dr. Stein and Chief Irving
15 discuss the possibility, raise the
16 possibility, of calling Mr. Cass and asking
17 him why he was still in possession of that
18 computer?
19     A. I don't recall.
20     Q. You mentioned in your lengthy
21 response to my last question the finding of
22 people's homes on Mr. Cass's computer. Do you
23 remember that part of your answer?
24     A. Correct.

## Page 102

1     Q. I don't recall you answering that or
2 including that as information that you and
3 Mr. Saviatto had found in searching Mr. Cass's
4 computer in June of 2015.
5     A. I don't recall --
6     MR. SIMMS: Wait, wait, wait.
7     There is not even a question. He
8     made an affirmative statement.
9     MR. HINCKS: Okay.
10 BY MR. HINCKS:
11     Q. Is that when you found information
12 on people's homes on Mr. Cass's computer in
13 your search with Mr. Saviatto?
14     A. Can you just start again?
15     Q. I will just ask a question. You
16 mentioned in your last answer the finding of
17 people's homes on his computer as one of the
18 bases why nobody called Mr. Cass to ask about
19 the computer. Is that fair?
20     A. That his erratic behavior evidenced
21 by pictures of people's homes on his computer
22 made it such that we didn't want school
23 employees involved in the recovery of the
24 equipment.

## Page 103

1     Q. Now I will ask you. Where is it
2 that you had information that there were
3 pictures of people's homes on Mr. Cass's
4 computer?
5     A. We discovered the people's --
6 pictures of people's homes on his computer
7 when we reviewed the Internet history on his
8 computer.
9     Q. Okay. All right. So let's go back
10 to that. This is the search that you and
11 Mr. Saviatto conducted in June of 2015 of
12 Mr. Cass's MacBook Pro? Is that right?
13     A. That's correct.
14     Q. Okay. And you did mention that you
15 had reviewed Internet history, and I did not
16 ask you at the time what you found of concern
17 when you reviewed the Internet history.
18     One of items that you found that was
19 of concern to you was pictures of people's
20 homes on the search history? Is that right?
21     A. That's correct.
22     Q. And do you recall whose homes --
23 pictures of whose homes were found in that
24 search?

## Page 104

1     A. I believe there were several school
2 committee members, but the specific one that
3 was surprising to find was my home.
4     Q. We'll call it other than school
5 committee members and your home, pictures of
6 the homes of any other employees of or
7 affiliates of Wayland Public Schools?
8     A. I don't recall at this time.
9     Q. And beyond pictures of people's
10 homes, do you recall other information that
11 you discovered in reviewing the search history
12 of Mr. Cass's computer that was of concern?
13     A. I recall finding searches for escort
14 services in the California area.
15     Q. And why was that of concern to you?
16     A. It was surprising that someone would
17 have the lack of judgment to do searches for
18 escort services on a school-owned machine.
19     Q. Was that particular discovery that
20 you and Mr. Saviatto made of Mr. Cass's
21 computer one of the bases why you determined
22 that somebody from Wayland Public Schools
23 should not call Mr. Cass and ask him why he
24 still had the computer?

Deposition of Bradley J. Crozier
June 29, 2018

173

A. From September 15th?
Q. Yes.
A. Vaguely, yes.
Q. All right. Before I come back to that, you mentioned the C. Jones email. Do you know who C. Jones is?
A. From the email I gather that he is a parent of --
MR. SIMMS: Well --
A. You can look at --
BY MR. HINCKS:
Q. You don't need to gather. Do you know a gentleman named Clayton Jones, Mr. Crozier?
A. I --
Q. So my question is if you know a gentleman named Clayton Jones.
A. I might have met Mr. Jones at one point at an athletic game.
Q. You don't have any recollection of speaking with him about any subject in particular? Is that fair?
A. I don't recall.
Q. All right. Do you recall speaking

174

with him about the subject matter --
MR. HINCKS: Strike the question.
BY MR. HINCKS:
Q. We will go to Mr. Cass's email. Do you recall -- you said you have a vague recollection of receiving this email? Is that right?
A. Yes.
Q. Do you recall your reaction to receiving it?
A. I thought that Mr. Cass's characterization of Wayland High School being "a walking Title IX violation" was alarming and I wanted to understand why.
Q. So what did you do to understand why?
A. I emailed him and asked him to come to a meeting as soon as possible.
Q. And did that meeting take place?
A. I believe it did. Yes.
Q. Okay. Before we get to that meeting, did you have any other reaction to receiving Mr. Cass's email?

175

A. Not that I recall.
Q. Do you recall having any reaction to his expression that he is "exhausted being the lightning rod for all the fiscal problems in athletics"?
A. I don't recall.
Q. Do you recall a reaction to his stating "I would like some public support from the administration and school committee on these issues"?
A. I don't recall reaction to that.
Q. You don't recall the Title IX reaction? Is that right?
A. Yes.
Q. And is that because, as a person overseeing the HR function, complaints or allegations regarding Title IX violations is particularly important to you?
A. Yes.
Q. Going back to your email, you say to Mr. Cass:
"This is the first time that you are expressing a concern about a Title IX issue."
Is that right?

176

A. Correct.
Q. By that you mean the first time that you are aware of Mr. Cass expressing such an issue? Is that right?
A. That's the first time I have heard of a Title IX issue at the high school, yes.
Q. In connection with Mr. Cass's tenure or ever?
A. Specifically in connection to Mr. Cass.
Q. I take it Ms. Mizoguchi never expressed to you any communications or conversations she had with Mr. Cass about gender equity concerns or Title IX concerns that Mr. Cass had prior to September 15 of 2014?
A. Not that I recall.
Q. And again because it was in your purview, don't you think you would remember if Ms. Mizoguchi had mentioned such concerns to you as relayed by Mr. Cass?
MR. SIMMS: Objection. Go ahead.
A. I believe that if Ms. Mizoguchi

CURRAN COURT REPORTING

**Page 177**

expressed concern about a Title IX issue I would have been attuned to that.
BY MR. HINCKS:
Q. Let's talk about the meeting that you are proposing in your email. I believe you said you think that such a meeting happened? Is that right?
A. That's correct.
Q. And what do you recall -- do you recall when that meeting happened in relation to this email chain?
A. I don't recall the exact date, but it could have been on the 9-18.
Q. You say that because it is proposed here?
A. Correct.
Q. What do you recall about the meeting itself?
A. I recall that Mr. Cass was very frustrated with the sort of public email from Mr. Jones, the parent, and that when I asked him about specifics around gender equity, he showed me a spreadsheet that he put together, but the spreadsheet didn't have enough detail

**Page 178**

to really substantiate his accusation. I asked him for more detail around those things. I sent him a subsequent email making it clear that after our meeting I did expect followup, which he never did provide followup.
Q. Okay.
A. He also said in the meeting that he raised the issue because he was wanting to cover his ass, as he said, because he was worried about his job.
Q. Are you putting -- I want you to put quotes around that statement as well as you can. Do you specifically remember the statement Mr. Cass made about covering his ass?
A. Yes.
Q. Okay. Please tell me as specifically as you can what he said to you.
A. "I raise the issue to cover my ass."
Q. Okay. You don't remember any other context he provided in making that statement to you?
A. No, I don't.
Q. Do you recall Mr. Cass saying that

**Page 179**

he believed, at least words to the effect, that this is a very serious issue and if there are Title IX violations happening in the athletic department that I am overseeing I could lose my job? Is that a fair characterization of the message that you were given?
A. From what I know about the Title IX laws, there is not like personal liability, so it would be the institution that would be liable. So I don't know why he was making the statement that he was worried about his job in raising such an issue.
Q. You don't think you could lose your job even if you don't have personal liability under Title IX if Title IX violations were happening on your watch?
MR. SIMMS: Objection to form.
A. If he was raising -- as I said in my email response back to him, if he is raising the issue, I wanted to investigate. I wanted him to provide me with more detail so we could substantiate whether this was happening or

**Page 180**

not. I even offered to get a third party to come in and look at this and got no response from him on that.
BY MR. HINCKS:
Q. Okay. Going back to his alleged statement about covering his ass or preserving his job, Mr. Crozier, is it true that you don't recall the entire context of the statement that Mr. Cass made to you about that?
MR. SIMMS: Objection. Go ahead.
A. No. I was -- I understood what he was saying because he was backing off of his statement it was clear.
And the fact that he never responded to my email, never provided me with followup data also added evidence to that.
Q. Let's talk about the evidence that he did provide. You said it was a spreadsheet; is that right?
A. It was a printout that looked like a spreadsheet.
Q. It was a printout?

Deposition of Bradley J. Crozier
June 29, 2018

### Page 181

```
02:04:21  1   A. Yes.
02:04:22  2   Q. In what format if you know?
02:04:24  3   A. Paper format.
02:04:26  4   Q. Was it an Excel spreadsheet if you
02:04:29  5  know?
02:04:29  6   A. It could have been, yes.
02:04:30  7   Q. And do you recall exactly how many
02:04:32  8  sheets of paper you were presented?
02:04:34  9   A. I don't recall.
02:04:41 10   Q. And do you recall you were just
02:04:43 11  given a spreadsheet? There was no supporting
02:04:46 12  documentation in what he presented you?
02:04:49 13   A. I believe it was just a spreadsheet.
02:04:55 14   Q. Do you recall what the information
02:04:56 15  was that was depicted in the spreadsheet?
02:04:59 16   A. It was the amount spent on different
02:05:07 17  sports, and what I felt was missing was the
02:05:15 18  amount spent per athlete, which would then,
02:05:21 19  you know, sort of add information about
02:05:25 20  whether there was a discrepancy based on
02:05:30 21  gender for the spending in sports.
02:05:32 22   Q. Do you remember any other
02:05:34 23  information that was depicted in the
02:05:35 24  spreadsheet as you have called it??
```

### Page 182

```
02:05:37  1   A. Not as we sit here today.
02:05:41  2   Q. Do you remember was there any
02:05:43  3  information in the spreadsheet regarding
02:05:46  4  fund-raising on a program-by-program basis or
02:05:50  5  team-by-team basis?
02:05:51  6   A. I think that was built into the
02:05:53  7  overall cost of spending per sport.
02:05:57  8   Q. And was it broken out separately,
02:06:00  9  the fund-raising by sport, if you recall?
02:06:02 10   A. I don't recall specifically.
02:06:05 11   Q. Did you keep a copy of what Mr. Cass
02:06:11 12  presented to you?
02:06:11 13   A. I don't recall.
02:06:12 14   Q. Wouldn't you have kept a copy of
02:06:14 15  information your athletic director had
02:06:17 16  prepared and presented to you in connection
02:06:20 17  with making -- raising issues of Title IX?
02:06:24 18       MR. SIMMS: Objection. Go
02:06:25 19  ahead.
02:06:26 20   A. Again he had just made a very
02:06:30 21  serious allegation and then said he made it to
02:06:33 22  cover his ass and backed away from it.
02:06:36 23  BY MR. HINCKS:
02:06:36 24   Q. So you don't think it would be
```

### Page 183

```
02:06:39  1  important to have kept the information he was
02:06:41  2  providing you to support his allegations?
02:06:47  3       MR. SIMMS: Objection. Go
02:06:48  4  ahead.
02:06:49  5   A. No. I felt like the follow-up email
02:06:52  6  I sent with the expectation of him following
02:06:54  7  up was sufficient.
02:07:01  8  BY MR. HINCKS:
02:07:01  9   Q. Tell me again what you asked him for
02:07:04 10  as the followup if you can recall.
02:07:09 11   A. It was in an email that I sent in
02:07:11 12  October.
02:07:42 13       MR. HINCKS: 112.
02:07:42 14  (Deposition Exhibit No. 112, Email
02:07:42 15  dated October 9, 2014, to Mr. Cass
02:07:42 16  from Mr. Crozier, bearing production
02:07:42 17  number BC00088, marked for
02:08:04 18  identification.)
02:08:04 19  BY MR. HINCKS:
02:08:04 20   Q. Mr. Crozier, you have been handed
02:08:06 21  what has been marked as Exhibit 112.
02:08:06 22       (Handing Exhibit 112 to the
02:08:10 23  witness.)
02:08:10 24   Q. Can you identify this document?
```

### Page 184

```
02:08:10  1       (Pause.)
02:08:15  2       (Witness viewing Exhibit 112)
02:08:15  3   A. This is the email I sent to Mr. Cass
02:08:17  4  in October after my meeting. It looks like
02:08:21  5  the meeting was on 9-18.
02:08:22  6   Q. So you were sending this email to
02:08:25  7  Mr. Cass as a followup to the meeting three
02:08:30  8  weeks prior? Is that correct?
02:08:31  9   A. That's correct.
02:08:35 10   Q. What had you done on your own to
02:08:38 11  investigate Mr. Cass's Title IX allegations
02:08:42 12  between September 18 and October 9, 2014?
02:08:47 13   A. I don't recall.
02:08:49 14   Q. Do you recall speaking with anybody,
02:08:52 15  for example, about Mr. Cass's allegations
02:08:55 16  between the date of that meeting, the 9-18
02:09:01 17  meeting, and the October 9 meeting?
02:09:05 18   A. The only specific person that I
02:09:08 19  recall talking with was Attorney Tate.
02:09:11 20   Q. Okay. And what do you recall about
02:09:13 21  that conversation?
02:09:14 22   A. I let her know how that meeting went
02:09:21 23  on the 18th. I conveyed to her the items I
02:09:30 24  asked for followup. She recommended I give
```

CURRAN COURT REPORTING

**Page 185**

him some time, Mr. Cass some time for followup, and then followup with him to see whether he had completed and gathered the information that we needed.

Q. Do you recall Mr. Cass agreeing at the 9-18 meeting to provide this information to you or do you just recall requesting it from him?

A. I don't recall.

Q. Do you recall offering Mr. Cass any assistance or other support in preparing the follow-up data and information you were requesting?

A. I don't recall.

Q. Do you believe that you were just asking Mr. Cass to do that work by himself?

A. As I recall, he had an administrative assistant. He had access to other administrative assistants in the high school office. I don't think I made an assumption that he would do this work by himself, but I don't believe we had an explicit conversation around that.

Q. Back to your communications with

**Page 186**

Attorney Tate, do you recall whether you spoke with Attorney Tate on the phone or whether you had email exchanges with her or both?

A. I believe both.

Q. You make a reference in the third paragraph of Exhibit 112:

"I would rather be sure there is no issue. I would even suggest we seek a third party to review the data and your concerns."

Do you see that?

A. I do.

Q. Did you ever undertake to engage a third party to review Mr. Cass's concerns about possible Title IX violations within the Wayland athletic community?

MR. SIMMS: Can you read that back?

(The pending question was then read.)

THE WITNESS: I mean eventually I did do some investigation in regards to the Title IX claims. We didn't seek a third party outside of the district.

**Page 187**

However, our business administrator did review the data that had been submitted to the office of civil -- the U. S. Office of Civil Rights and determined that there was no significant difference in the genders in sports at Wayland High School.

BY MR. HINCKS:

Q. Okay. So breaking down that response, you started by saying that you did eventually do some of your own investigation or analysis of Mr. Cass's Title IX concerns? Is that right?

A. That's correct.

Q. And was that independent of I believe you were referring to Ms. Bottan's analysis that was done in 2015?

A. Yes.

Q. And when did you do your analysis of Mr. Cass's Title IX allegations?

A. In the summer of 2015.

Q. Okay. And did you do those on your own?

**Page 188**

A. I did it in concert with Attorney Tate.

Q. And what did you do in connection with that investigation as best you can recall?

A. Interviewed coaches, interviewed teachers, interviewed parents on their perceptions of the athletic programs and specifically relating to Cass's -- Mr. Cass's later allegations.

Q. Okay. And did you draw conclusions from your investigation as you just described it?

A. I don't recall whether I had specific conclusions or I had findings that then I submitted to Dr. Stein.

Q. And so you did submit findings to Dr. Stein?

A. Yes.

Q. Is that true?

A. I was hung up on the "conclusions" word.

Q. Understood. So you made findings as a result of that investigation? Correct?

## Page 301

```
05:35:24  1   having any physical altercation with anybody
05:35:29  2   in the Wayland school community?
05:35:33  3          MR. SIMMS:  The same
05:35:33  4   objection, but you can answer.
05:35:35  5      A.  I don't believe he has had physical
05:35:43  6   interactions with other people.  No.
05:35:58  7          MR. HINCKS:  That's all I
05:36:00  8   have.
05:36:02  9        R E C R O S S   E X A M I N A T I O N
05:36:02 10   BY MR. SIMMS:
05:36:03 11      Q.  Mr. Crozier, from on or after
05:36:05 12   June 23, 2015, up and through the time of
05:36:08 13   Mr. Cass's criminal trial, did you ever
05:36:11 14   receive an email or a voicemail message or a
05:36:15 15   communication of any sort from Mr. Cass
05:36:19 16   suggesting that you should speak with Mary
05:36:22 17   Barber, Mary Barber authorized or gave him
05:36:28 18   consent to keep the so-called missing
05:36:30 19   computer?
05:36:30 20      A.  No.
05:36:31 21          MR. SIMMS:  No further
05:36:31 22   questions.  Thank you.
05:36:34 23          MR. HINCKS:  Thank you.
05:36:34 24   Mr. Crozier.
                  CURRAN COURT REPORTING
```

## Page 302

```
 1       (Whereupon, the deposition
 2   suspended at 5:39 p.m.)
```

                  CURRAN COURT REPORTING

## Page 303

```
 1   COMMONWEALTH OF MASSACHUSETTS
     PLYMOUTH, SS.
 2
 3       I, Judith McGovern Williams, RPR,
     CRR, CSR and Notary Public in and for the
 4   Commonwealth of Massachusetts, do hereby
     certify that pursuant to appropriate notice of
 5   taking deposition, there came before me the
     following-named person, to wit:  BRADLEY J.
 6   CROZIER, who was by me duly sworn; that he was
     thereupon examined upon his oath and his
 7   examination reduced to writing by me; and that
     the deposition is a true record of the
 8   testimony given by the witness.
 9       I further certify that I am not a
     relative or employee or counsel or attorney
10   for any of the parties, or a relative or
     employee of such counsel or attorney, nor am I
11   financially or otherwise interested in the
     outcome of the action.
12
         IN WITNESS WHEREOF, I have hereunto set
13   my hand and seal this 12th day of July, 2018.
14
15
16
17   My Commission Expires
     April 19, 2024
18           _____
                 Notary Public
19
20
     The foregoing certification of this transcript
21   does not apply to any reproduction of the same
     in any respect unless under the direct control
22   and/or direction of the certifying reporter.
23
24
                CURRAN COURT REPORTING
```

## Page 304

```
 1   WITNESS:  BRADLEY J. CROZIER
     DATE:  June 29, 2018
 2   CASE:  STEPHEN F. CASS v. TOWN OF WAYLAND, ET
     AL
 3
     DISTRIBUTION TO COUNSEL:
 4     The original signature page/errata sheet
     was sent to ADAM SIMMS, ESQUIRE, to obtain
 5   signature from the deponent.  When signed,
     please send original to BENJAMIN I. HINCKS,
 6   ESQUIRE, who will supply a copy of the signed
     errata sheet to other counsel present at the
 7   deposition.

 8   WITNESS INSTRUCTIONS:
         After reading the transcript of your
 9   deposition, please note any change or
     correction and the reason for it on the errata
10   sheet.  DO NOT make any notations on the
     transcript itself.  Use additional sheets if
11   necessary.

12   SIGN AND DATE THE ERRATA SHEET and return it,
     along with the transcript, to your counsel.
```

                  CURRAN COURT REPORTING