# **EXHIBIT KK**

## Page 1

VOLUME: I
PAGES: 1-245
EXHIBITS: 43-80

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO.: 1:17-cv-11441

STEPHEN F. CASS,

    Plaintiff

vs.

TOWN OF WAYLAND, WAYLAND PUBLIC SCHOOLS, WAYLAND POLICE DEPARTMENT, PAUL STEIN, BRAD CROZIER, ALLYSON MIZOGUCHI, and JAMES BERGER,

    Defendants

DEPOSITION OF JAMIE BERGER, taken pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before Deborah S. Gutierrez, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the law offices of Torres Scammon Hincks & Day, 35 India Street, Boston, Massachusetts, on Friday, May 18, 2018, commencing at 9:00 a.m.

CURRAN COURT REPORTING
21 Rowe Hill Road
Stoneham, MA 02180
(781) 279-8400

## Page 2

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

KRISTEN SCHULER SCAMMON, ESQUIRE
Torres Scammon Hincks & Day
35 India Street
Boston, MA 02110
(617) 307-4426
kscammon@tshdlegal.com

ON BEHALF OF THE DEFENDANTS:

JOHN M. WILUSZ, ESQUIRE
Pierce Davis & Perritano, LLP
10 Post Office Square, Suite 1100
Boston, MA 02109
(617) 350-0950
jwilusz@piercedavis.com

## Page 3

**INDEX**

| WITNESS | PAGE |
|---|---|
| Jamie Berger | |
| Examination by Ms. Scammon | 6 |
| Examination by Mr. Wilusz | 236 |

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 43 | Incident report | 16 |
| 44 | Email chain, dates ranging from 8/26/15 and 8/27/15 | 19 |
| 45 | Email chain, dates ranging from 9/2/15 and 9/3/15 | 27 |
| 46 | Email chain, dated 8/1/15 | 33 |
| 47 | Email chain, dates ranging from 9/2/15 and 9/3/15 | 36 |
| 48 | Police report, dated 9/4/15 | 38 |
| 49 | Email chain, dates ranging from 9/15/15 and 9/18/15 | 47 |
| 50 | Email chain, dated 10/21/15 | 51 |
| 51 | Email chain, dated 9/17/15 | 53 |
| 52 | Incident report, dated 10/26/15 | 60 |
| 53 | Search warrant | 80 |

## Page 4

**EXHIBITS** (cont.)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 54 | Booking sheet | 98 |
| 55 | Email chain, dates ranging from 10/28/15 and 11/3/15 | 105 |
| 56 | Email chain, dated 11/4/15 | 110 |
| 57 | Email chain, dated 10/28/15 | 117 |
| 58 | Press release | 120 |
| 59 | Email chain, dated 10/26/15 | 123 |
| 60 | Letter, dated 10/27/15 | 130 |
| 61 | Email chain, dated 10/26/15 | 137 |
| 62 | Consent to seize form | 143 |
| 63 | Consent to seize form | 149 |
| 64 | Investigation Management Case Review form | 155 |
| 65 | Email chain, dates ranging from 12/4/15 and 12/7/15 | 163 |
| 66 | Email, dated 10/30/15 | 169 |
| 67 | Email, dated 11/2/15 | 171 |
| 68 | Email, dated 10/30/15 | 181 |
| 69 | Email, dated 11/2/15 | 181 |
| 70 | Email chain, dates ranging from 11/2/15 and 11/3/15 | 184 |

///

**Page 53**

1  A. Other than there was a -- some type of
2     order, no.
3  Q. Do you know if it was a court order?
4  A. I don't know.
5         MS. SCAMMON: Exhibit 51,
6     please.
7         (Exhibit 51 was marked for
8         identification.)
9  Q. Showing you what's been marked as
10    Exhibit 51.
11 A. (Witness reading document.)
12 Q. Have you had a chance to review
13    Exhibit 51?
14 A. Yes.
15 Q. You see the handwritten note at the
16    top, "No charges in Maine filed
17    11/2/15?" Is that your writing?
18 A. Yes.
19 Q. Is it fair to say that you wrote that
20    when you learned that Maine wasn't
21    going to file any charges against
22    Mr. Cass?
23 A. Yes.
24 Q. And do you remember who from Winslow,

**Page 54**

1     Maine informed you of that?
2  A. I don't remember.
3  Q. It appears that you were dealing with
4     Sergeant Fleming and the detective was
5     a Detective Hubert.
6         Did you ever speak with
7     Detective Hubert?
8  A. I'm not sure.
9  Q. After you learned from somebody in
10    Maine that they weren't going to file
11    any charges, did you communicate that
12    to Chief Irving?
13 A. Most likely.
14 Q. Do you remember?
15 A. No.
16 Q. But it would have been your practice to
17    communicate that to Chief Irving?
18 A. Yes.
19 Q. How about Mr. Lampert, did you
20    communicate that to Mr. Lampert?
21 A. I don't know.
22 Q. How about Mr. Jones?
23 A. I don't know.
24 Q. Do you remember having any discussions

**Page 55**

1     with anyone, after learning that Maine
2     wasn't going to pursue criminal charges
3     against Mr. Cass, about that decision?
4  A. No.
5  Q. Did you think they should have
6     proceeded with criminal charges?
7  A. I don't know. I don't know Maine law.
8  Q. Did you discuss it with Officer Bowles?
9  A. I don't know.
10 Q. Now, you learned -- at the time you
11    learned of that, Mr. Cass had already
12    been arrested for a felony. Is that
13    accurate?
14 A. I guess.
15 Q. Did you inform the authorities in Maine
16    of his arrest in Massachusetts on
17    October 26th?
18 A. I don't believe so.
19 Q. So let's talk about October 2015 and
20    your involvement in the incident with
21    the computer.
22        When did you first hear
23    that there was a situation with a
24    computer and Mr. Cass in the Wayland

**Page 56**

1     schools?
2  A. Friday, the Friday before he was
3     arrested.
4  Q. So he was arrested on Monday, the 26th.
5     So the Friday before.
6  A. Yes.
7  Q. Okay. And from whom did you hear that
8     information?
9  A. Chief Irving.
10 Q. What did Chief Irving say?
11 A. He called me, I was at home, and told
12    me the school was missing a computer.
13 Q. Okay. Did he say which school?
14 A. I'm not sure.
15 Q. Did he mention Mr. Cass to you at that
16    point?
17 A. I believe so.
18 Q. And what did he say about Mr. Cass?
19 A. That the school had reported that there
20    was a computer missing and that the
21    belief was that he had the computer
22    because they were able to track it.
23 Q. Did Chief Irving give you any more
24    information about how they were able to

**Page 57**

1 track the computer?
2 A. No.
3 Q. And what did he ask you to do?
4 A. Look into it.
5 Q. Okay. So what did you do after
6 receiving that call from Chief Irving?
7 A. I told him I would look into it on
8 Monday.
9 Q. Did he ask you to look into it sooner?
10 A. No.
11 Q. And did you do anything between
12 receiving that call and Monday?
13 A. Yes.
14 Q. What did you do?
15 A. I called Brad Crozier.
16 Q. And when did you call Mr. Crozier?
17 A. After I hung up with Chief Irving.
18 Q. Did you call Mr. Crozier in his office?
19 A. No.
20 Q. How did you call him?
21 A. His cell phone.
22 Q. So you had Mr. Crozier's cell phone
23 number?
24 A. Yes.

**Page 58**

1 Q. Did you call him on his cell phone
2 because it was after school hours when
3 you called him?
4 A. Most likely.
5 Q. Do you typically call people on their
6 cell phone when they have a business
7 line?
8 A. Yes.
9 Q. Okay. And what did you and Mr. Crozier
10 discuss on that call on Friday?
11 A. That I would meet with them on Monday.
12 Q. Did he tell you anything about their
13 suspicions on Friday?
14     MR. WILUSZ: Objection.
15 A. He stated there was a computer missing
16 that was given to Mr. Cass and they
17 were able to track it to his residence.
18 Q. And what did he say he wanted you to do
19 about it?
20     MR. WILUSZ: Objection.
21 Q. If anything.
22 A. Nothing. I told them that I would meet
23 with them on Monday.
24 Q. When you say "them," who was your

**Page 59**

1 understanding you were going to be
2 meeting with?
3 A. The school.
4 Q. Did Mr. Crozier tell you who from the
5 school you would be meeting with?
6 A. I don't believe so. I'm not sure.
7 Q. How long were you on the phone with
8 Mr. Crozier on Friday?
9 A. I don't know. Not long.
10 Q. Why did you call Mr. Crozier instead of
11 somebody else from the school?
12 A. I believe he's the one that spoke with
13 Chief Irving. But I'm not sure.
14 Q. Did you -- did you speak with Officer
15 Bowles about it since he was involved
16 with the school?
17 A. I did at some point.
18 Q. Do you know if you spoke with him
19 before Monday?
20 A. I don't know. I don't remember.
21 Q. Anything else you did after receiving
22 the call from Chief Irving on Friday
23 and your meeting on Monday, aside from
24 speaking with Mr. Crozier?

**Page 60**

1 A. In regards to this?
2 Q. Yes.
3 A. No, I don't believe so.
4 Q. Okay.
5     (Exhibit 52 was marked for
6     identification.)
7 Q. Detective, I'm showing you what's been
8 marked as Exhibit 52.
9 A. (Witness reviewing document.)
10 Q. Okay. You've had a chance to review
11 Exhibit 52?
12 A. Yes.
13 Q. And do you recognize Exhibit 52?
14 A. Some of the items, yes.
15 Q. Well, what don't you recognize?
16 A. There's a lot of emails that are
17 involved that are not necessarily of my
18 involvement.
19 Q. We'll get to them.
20     And do you recognize this
21 to be an incident report that you
22 filled out?
23 A. Yes.
24 Q. Now, the date of this incident report

**Page 61**

1   is Monday, October 26th, 2015. You
2   note the time as 8:58 a.m.
3              Is that the time that you
4   had your meeting at the school?
5   A.  No.
6   Q.  No?
7              When was the meeting at the
8   school, before or after the 8:58 a.m.?
9   A.  Before.
10  Q.  What time did you go to the school?
11  A.  I'm not sure. It was between 7:00 and
12  8:00 a.m.
13  Q.  And the incident address is 264 Old
14  Connecticut Path. Is that the high
15  school address?
16  A.  It is.
17  Q.  If we go to the third page of the
18  document, which is your narrative, the
19  narrative starts with essentially a
20  court caption and calls it an affidavit
21  of Detective Sergeant Jamie D. Berger.
22             Why does it have that?
23  A.  The court makes us put that.
24  Q.  In an incident report?

**Page 62**

1   A.  Yes.
2   Q.  So every incident report I have should
3   have that in it?
4   A.  In which charges are brought. I'm
5   sorry.
6   Q.  Okay. So if we go to where -- the
7   sentence that starts, "On Monday."
8              "On Monday, October 26th,
9   2015, I met with Assistant
10  Superintendent Brad Crozier, MAC
11  Systems Administrator Susan Ginsberg,
12  IT Tech Keith Clevenger, and Youth
13  Officer Shane Bowles at the Wayland
14  High School."
15             And you say that meeting
16  was between 7:00 and 8:00 a.m.?
17  A.  Yes.
18  Q.  And why was Officer Bowles present?
19  A.  He's the youth officer.
20  Q.  Did this involve youth?
21  A.  Involves the school.
22  Q.  So it doesn't have to involve youth for
23  Officer Bowles to be involved?
24  A.  No.

**Page 63**

1   Q.  And then you go on, "Clevenger advised
2   me that on February 6, 2014, Stephen
3   Cass, the old athletic director for
4   Wayland High School, had been issued a
5   loaner MacBook laptop," with a variety
6   of numbers.
7              Did he refer to it as a
8   "loaner?" Did Mr. Clevenger refer to
9   the laptop as a loaner?
10  A.  That's what I wrote.
11  Q.  Well, do you recall asking him what it
12  meant for a laptop to be a loaner?
13  A.  No.
14  Q.  Okay. And further down, "On June 17th,
15  2015, J. Reid Lyons, human resources
16  director for the Wayland Public
17  Schools, had sent an email to Stephen
18  Cass stating that an agreement to meet
19  on June 23rd, 2015, was made and that
20  Cass is to bring computers, I.D. badge,
21  and keys to Lyons's office."
22             Was Mr. Lyons in that
23  meeting on October 26th?
24  A.  I don't believe so.

**Page 64**

1   Q.  So where did you get that information?
2   A.  The email, I believe.
3   Q.  So you were provided with copies of
4   emails?
5   A.  Yes.
6   Q.  Who provided you with those?
7   A.  I'm not exactly sure who. Someone at
8   the meeting.
9   Q.  So when you arrived -- let's go back to
10  the meeting.
11             Where did the meeting take
12  place at the school?
13  A.  Within the -- I'm sorry.
14  Q.  Where at the school was the meeting?
15  A.  Oh. At the administration -- like a
16  conference room.
17  Q.  And when you arrived, were Mr. Crozier,
18  Miss Ginsberg, and Mr. Clevenger
19  already there?
20  A.  I'm not sure if they were all there or
21  if some people came after. I'm not
22  sure.
23  Q.  Did someone have copies of emails ready
24  for you?

**Page 69**

1 any other computers had shown up on the
2 inventory as outstanding?
3 A. No.
4 Q. Did you ask?
5 A. I don't believe so.
6 Q. Did anyone at the meeting tell you what
7 had been done between June and October
8 with regard to obtaining the computers
9 still checked out to Mr. Cass?
10         MR. WILUSZ:   Objection.
11 A. No.
12 Q. Did you ask if anything had been done
13 between June and October?
14 A. No.
15 Q. So it was represented to you that the
16 inventory had been performed on
17 October 27th. And I believe that the
18 call to Chief Irving would have come on
19 the 23rd.
20         Is that fair to say?
21 A. I think you said 27th.
22 Q. The 22nd. Did I say 27th?
23 A. I think so.
24 Q. I'm sorry. I may have.

**Page 70**

1 A. Sorry.
2 Q. So it was represented -- let me start
3 that again.
4         It was represented to you
5 that the inventory occurred on
6 October 22nd. And I believe we
7 established earlier that the call to
8 Chief Irving that led to his call to
9 you came in on Friday, October 23rd.
10         Is that accurate?
11 A. I believe so.
12 Q. And your meeting with the people
13 involved the following Monday, the
14 26th, did you ask if they had tried to
15 get the computer back from Mr. Cass
16 after they learned it was outstanding?
17 A. I'm not sure.
18 Q. So there was no discussion of calling
19 Mr. Cass and getting the computer back?
20 A. I'm not sure.
21 Q. You're not sure.
22         Are you -- in this meeting
23 that you were at, do you recall any
24 discussion of whether it made sense to

**Page 71**

1 call Mr. Cass and ask him for the
2 computer?
3 A. I don't know if there was that
4 discussion or not.
5 Q. So you're saying you don't recall if
6 there was a discussion.
7 A. Correct.
8 Q. Did you ask the question? Did you ask
9 anybody, "Why don't you just call the
10 guy and get the computer?"
11 A. I don't recall if that was ever said.
12 Q. What did the meeting participants ask
13 you to do --
14         MR. WILUSZ:   Objection.
15 Q. -- at that meeting?
16 A. Nothing.
17 Q. Nothing?
18 A. They didn't ask me to do anything. No.
19 Q. So they handed you a stack of emails
20 and that was it?
21         They didn't ask you to do
22 anything? They didn't say, "Go get our
23 computer back"?
24 A. No.

**Page 72**

1 Q. They didn't say what they wanted?
2 A. No.
3 Q. And your report goes on to talk about
4 how Miss Ginsberg was apparently able
5 to determine the location of the
6 computer.
7         If you go on to the next
8 page, after your description of her
9 process, did you have a discussion with
10 Miss Ginsberg about that, or did she
11 explain that to you in writing, her
12 process for locating the computer?
13 A. I'm not sure I understand your
14 question. I'm sorry.
15 Q. It's a fairly detailed explanation that
16 you provide in your narrative about
17 what Miss Ginsberg did, describing
18 software programs and the documentation
19 she provided.
20         Did you -- in the course of
21 your meeting with Miss Ginsberg, did
22 she sit there and explain that to you,
23 or did she provide you an explanation
24 in writing?

## Page 73

1  A.  I believe she verbally told me what she
2     did and provided me documentation of
3     the program tracking the computer.
4  Q.  And is that the documentation that's
5     attached to your incident report?
6  A.  Yes.
7  Q.  According to those pages, you can
8     correct me if I'm wrong, but I think
9     that the pages from Miss Ginsberg start
10    at 320 at the bottom?
11 A.  311.
12 Q.  311? Those are all from Miss Ginsberg?
13 A.  Yes.
14 Q.  Okay.
15 A.  Well, some of them are.
16 Q.  All right. Yeah, there might be some
17    repetition.
18         Let's look at 311 since you
19    just identified it.
20         It's an email from Miss
21    Ginsberg to Mr. Crozier copying a
22    Leisha Simon. Do you know who Leisha
23    Simon is?
24 A.  Yes.

## Page 74

1  Q.  And who's that?
2  A.  I don't know her title, but she works
3     for the school department.
4  Q.  Do you know in what capacity she works
5     for the school department?
6  A.  Something to do with computers. I
7     don't know her -- what her title is.
8     I'm sorry.
9  Q.  That's okay. And then Mr. Clevenger
10    who was also in the meeting.
11         Was Miss Simon ever in the
12    meeting on October 25th?
13 A.  No.
14 Q.  So Miss Ginsberg represents to you that
15    her research has shown that the
16    computer is still active and on
17    Woodland Road in Wayland.
18         Is that accurate?
19 A.  Yes.
20 Q.  And were you aware at the time of
21    Mr. Cass's address?
22 A.  What time?
23 Q.  At the time that you were in this
24    meeting at the school on October 25th.

## Page 75

1  A.  Yes.
2  Q.  And how were you aware of that?
3  A.  I'm not sure. I knew Woodland Road
4     but...
5  Q.  If we look at Page 4 of the document,
6     which is the final page of your
7     narrative, you state, "According to
8     Crozier, there are no other students
9     or teachers that are associated with
10    the Town of Wayland School District
11    that have been issued a Wayland High
12    School computer."
13         Is that what Mr. Crozier
14    actually said?
15 A.  I asked him.
16 Q.  You asked -- what did you ask him?
17 A.  If there were any students or teachers
18    that lived in that area that would be
19    issued a Wayland High School computer.
20 Q.  Okay. So the part about that they
21    lived in that area didn't make it into
22    your narrative. Because the way this
23    reads is that nobody ever got the
24    computer.

## Page 76

1         MR. WILUSZ: Just to
2     clarify, there's a reference to the
3     location in the paragraph above.
4         MS. SCAMMON: Right. But
5     I'm talking about this sentence which
6     states, "There are no other students or
7     teachers that are associated with the
8     Town of Wayland School District that
9     have been issued a Wayland High School
10    computer."
11 Q.  So it's your testimony today that the
12    discussion with Mr. Crozier was
13    actually about whether anyone else in
14    that area --
15 A.  Correct.
16 Q.  -- had been issued a Wayland High
17    School computer.
18         Okay. And so after the
19    meeting what did you do?
20         Do you know how long the
21    meeting was?
22 A.  I don't.
23 Q.  What did you do after?
24 A.  I went back to the Wayland Police

**Page 81**

1  Q. So did you do this at your desk at the
2     police department?
3  A. Yes.
4  Q. And you typed this in all on Monday
5     after the meeting?
6  A. Yes.
7  Q. If you look at paragraph two of your
8     affidavit, you state, "Based upon the
9     following, I believe that I have
10    probable cause to believe the evidence
11    of the crimes of larceny over $250 and
12    receiving stolen property would be
13    found at the residence of Stephen
14    Cass."
15       Why did you believe that
16    Mr. Cass -- there was probable cause
17    that Mr. Cass had committed larceny
18    over $250?
19 A. It was an Apple MacBook computer that
20    was at his residence.
21 Q. How did you determine that that
22    computer was worth over $250?
23 A. I myself have -- at that point in my
24    life was looking for an Apple MacBook

**Page 82**

1     computer as well, a used one, so I knew
2     the value, personal knowledge, that the
3     value was over $250.
4  Q. Did you ask the school how much the
5     computer was worth?
6  A. No.
7  Q. Why not?
8  A. Again, I have personal knowledge that
9     an Apple MacBook laptop computer was
10    over $250, a used one.
11 Q. Did you know how old the computer in
12    question was?
13 A. No.
14 Q. Did you know how much memory it had?
15 A. No.
16 Q. Did you know what condition it was in?
17 A. No.
18 Q. Yet, you still concluded it was worth
19    over $250 --
20 A. Yes.
21 Q. -- on your own personal knowledge.
22 A. Yes.
23 Q. Based on shopping for your own
24    computer.

**Page 83**

1  A. Yes.
2  Q. Okay. Now, I'm guessing you were aware
3     that the crime of larceny over $250 is
4     a felony.
5  A. Yes.
6  Q. You were aware of that at the time.
7  A. Yes.
8  Q. And were you aware that if Mr. Cass was
9     going to be charged with larceny of an
10    item or property less than $250 he
11    could not be arrested; you would have
12    to seek a criminal complaint?
13       Is that true?
14 A. Yes.
15 Q. Did you ever consider applying for a
16    complaint and summonsing him to a
17    clerk's hearing?
18       MR. WILUSZ:   Objection.
19    Can you narrow down the timeframe.
20       MS. SCAMMON:   Sure.
21 Q. At any time before you submitted this
22    affidavit under the pains and penalties
23    of perjury for larceny over $250, did
24    you ever consider charging him seeking

**Page 84**

1     a criminal complaint for larceny
2     instead?
3  A. I first had to wait to see if the
4     computer was there. I mean, if I did a
5     search warrant and the computer wasn't
6     there, --
7  Q. Uh-huh.
8  A. -- obviously there wouldn't be charges.
9  Q. Well, but your affidavit says that you
10    think it's larceny over 250 before you
11    get the warrant.
12 A. Right.
13 Q. Right.
14       Did you ever consider not
15    putting that in there and getting a
16    warrant and then valuing the computer
17    and then not arresting the guy?
18 A. No. Because I have -- again, I have
19    personal knowledge that an Apple
20    MacBook computer laptop is well over
21    $250, a used one, my own searching and
22    shopping for them.
23 Q. And you did nothing else except base it
24    on your own shopping.

### Page 85

1  A. Correct.
2  Q. When you applied for the warrant, was
3     it your plan to arrest him if you found
4     the computer?
5     MR. WILUSZ: Objection.
6  A. I need to make a decision within
7     seconds after finding the computer. My
8     decision was to arrest him.
9  Q. Well, if you hadn't found the computer,
10    obviously you wouldn't have arrested
11    him. Is that accurate?
12 A. Yes.
13 Q. What if you found the computer and it
14    was completely trashed, would you have
15    arrested him and charged him with
16    larceny over 250?
17    MR. WILUSZ: Objection.
18 A. I'm here for facts. I'm not going to
19    make questions about "what ifs."
20 Q. You're here for questions.
21 A. I don't know, then.
22 Q. I mean, you're an experienced
23    detective. I'm asking you: If you had
24    walked into a suspect's house who you

### Page 86

1     believe committed larceny over $250 and
2     found that the property in question was
3     completely trashed, would you have
4     still arrested him for that crime?
5     MR. WILUSZ: Objection.
6  A. I don't know.
7  Q. So after you put together the search
8     warrant application, what did you do
9     with it?
10 A. I sent it to the Middlesex District
11    Attorney's Office, Appeals Bureau.
12 Q. Okay. Is that your standard practice?
13 A. It is.
14 Q. Okay. Do you have a particular contact
15    there, or does it go to a central --
16 A. The Middlesex District Attorney's
17    Office has an Appeals Bureau. So the
18    standard practice for any police
19    department within the Commonwealth of
20    Massachusetts in Middlesex County is
21    that they review and approve all search
22    warrants. That is my practice.
23 Q. All search warrant applications?
24 A. Yes.

### Page 87

1  Q. And so was your application approved by
2     somebody at the DA's office?
3  A. It was.
4  Q. Okay. And how long did that take?
5  A. Not that long.
6  Q. And then once it was approved by
7     somebody at the DA's office, what did
8     you do?
9  A. I went to the Framingham District
10    Court.
11 Q. So you personally went to Framingham
12    District Court?
13 A. Yes.
14 Q. Okay. And what did you do when you
15    arrived at Framingham District Court?
16 A. I asked for a clerk or a judge or
17    someone for a search warrant approval.
18 Q. And which clerk or judge did you go
19    before for your search warrant?
20 A. This was before Brian Kearny who is a
21    clerk.
22 Q. Do you know who the other signature is
23    on the front?
24 A. Which one?

### Page 88

1  Q. The one on the left.
2  A. Under "witness?"
3  Q. Yeah.
4  A. David W. Cunis.
5  Q. Who's that?
6  A. He's the presiding justice at
7     Framingham District Court.
8  Q. And so you submit your application to
9     Clerk Brian Kearny. And did you
10    discuss it with him, or did he just
11    review your affidavit and issue the
12    warrant?
13 A. He reviews it and if he has any
14    questions he would ask.
15 Q. Did he have any questions?
16 A. I don't believe so.
17 Q. Did Judge Cunis have any questions?
18 A. I didn't see Judge Cunis.
19 Q. And so you leave with the search
20    warrant.
21 A. Yes.
22 Q. I'll bring you back to the incident
23    report --
24 A. Are you done with that?

93

1　A.　To put our bulletproof vests on.
2　Q.　And so did you park your separate
3　　　vehicles up the street?
4　A.　Yeah. I mean, we were parked, yes, for
5　　　a minute or two while we put our vests
6　　　on.
7　Q.　And after you put your vests on, did
8　　　you walk to Mr. Cass's house, or did
9　　　you take one vehicle?
10　A.　We all drove.
11　Q.　So you drove yourselves?
12　A.　Yes.
13　Q.　You go on to state in your narrative,
14　　　"Upon our arrival at 21 Woodland Road,
15　　　I located Stephen Cass."
16　　　　　How did you locate
17　　　Mr. Cass?
18　A.　I knocked on the door.
19　Q.　And did he answer the door?
20　A.　Well, we -- there's two doors. We
21　　　knocked on the lower door and there was
22　　　no response and then we -- there was
23　　　another door up top. We went to that
24　　　door and knocked on it.

94

1　Q.　And Mr. Cass opened that door?
2　A.　Yes.
3　Q.　And then you go on to state, "Cass
4　　　opened the front door to the residence,
5　　　and I advised him that I had a search
6　　　warrant to look for a white Apple
7　　　MacBook computer that belonged to
8　　　Wayland Public Schools. I asked him if
9　　　he knew the computer I was talking
10　　　about, and he stated that he did."
11　　　　　Was Mr. Cass cooperative?
12　A.　Yes.
13　Q.　You go on to state, "I asked him where
14　　　the computer was and if it was in the
15　　　residence. He stated that it was and
16　　　began to look for it. He located the
17　　　computer on the couch in his living
18　　　room."
19　　　　　Did Mr. Cass hand the
20　　　computer over to you at that point?
21　A.　No.
22　Q.　Did you -- how did you take possession
23　　　of the computer?
24　A.　I picked it up.

95

1　Q.　But he showed you where it was?
2　A.　He pointed it out.
3　Q.　And then you go on to say that, "He
4　　　stated that he didn't return the
5　　　computer because he had a lot of stuff
6　　　on it."
7　　　　　Did you ask him what he had
8　　　on it?
9　A.　No.
10　Q.　"Cass further stated that they knew he
11　　　had the computer and why is the town
12　　　doing this to him."
13　　　　　Did you ask him who he was
14　　　referring to when he said "they" knew
15　　　he had the computer?
16　A.　No.
17　Q.　Why not?
18　A.　It didn't matter.
19　Q.　It doesn't matter if somebody consents
20　　　to somebody having property --
21　　　　　MR. WILUSZ: Objection.
22　Q.　-- to determine whether it's been
23　　　stolen?
24　A.　The school reported the computer

96

1　　　missing. It was located at his house.
2　　　I had filed a search warrant, and I
3　　　executed the search warrant and found
4　　　the computer.
5　Q.　Yet, the individual in question is
6　　　telling you that the school knew he had
7　　　it. And you didn't follow up on that
8　　　before arresting him?
9　A.　No.
10　Q.　Why not?
11　A.　I didn't think it was necessary to.
12　Q.　Because you believed the school instead
13　　　of Mr. Cass. Correct?
14　　　　　MR. WILUSZ: Objection.
15　A.　The school reported that the computer
16　　　was missing.
17　Q.　Right.
18　A.　I performed the search warrant,
19　　　executed it, and found the computer.
20　Q.　And Mr. Cass informed you that the
21　　　school was aware he had it.
22　A.　He didn't say "the school." He said
23　　　"they" knew he had the computer.
24　Q.　And you didn't ask who "they" were?

## Page 101

1　A.　No.
2　Q.　What about in Wayland police policy?
3　A.　Mr. Cass was a subject of
4　　　investigation. Under Massachusetts law
5　　　I have the right of arrest under
6　　　probable cause, which I had and was
7　　　granted by the Framingham District
8　　　Court, to search for the computer which
9　　　was located in his house.
10　　　　　　I did that. I located the
11　　　computer. I seized the computer. And
12　　　he was placed under arrest under
13　　　probable cause.
14　Q.　And you never -- did you think about
15　　　getting an arrest warrant?
16　A.　No.
17　Q.　Was there any concern that Mr. Cass was
18　　　a flight risk?
19　　　　　　MR. WILUSZ: Objection.
20　A.　No.
21　Q.　No?
22　　　　　　Was there any concern that
23　　　he was going to destroy the property in
24　　　question?

## Page 102

1　A.　People that possess stolen property, if
2　　　they're notified of the police looking
3　　　for that, those items, most likely
4　　　would destroy them or get rid of them.
5　　　　　　So that is why I didn't
6　　　contact him before that and why I
7　　　applied for a search warrant and was
8　　　able to obtain a search warrant.
9　Q.　So you're saying you were required to
10　　　arrest him because you found the
11　　　computer?
12　　　　　　MR. WILUSZ: Objection.
13　A.　No.
14　Q.　No?
15　　　　　　What else could you have
16　　　done?
17　A.　It was my discretion to arrest him.
18　Q.　Right.
19　　　　　　What else could you have
20　　　done in your discretion?
21　　　　　　MR. WILUSZ: Objection.
22　Q.　What were your other options?
23　A.　I have lots of options, but that's the
24　　　decision I made.

## Page 103

1　Q.　I'm asking you: In the course of your
2　　　duties as a detective, what are your
3　　　other options in a situation like you
4　　　were presented with Mr. Cass?
5　A.　You can do nothing. You can summons
6　　　somebody. But I chose and it was my
7　　　discretion to arrest him.
8　Q.　Okay. Over the course of your career,
9　　　have you ever been involved in any
10　　　other situations where you obtained a
11　　　search warrant to look for stolen
12　　　property?
13　A.　Yes.
14　Q.　Did you always arrest -- have you
15　　　always arrested the individual in
16　　　question who possess the stolen
17　　　property?
18　A.　I believe so.
19　Q.　You've always arrested them right on
20　　　site?
21　A.　I believe so.
22　Q.　Can you give me an example of what kind
23　　　of property was involved in those
24　　　situations.

## Page 104

1　A.　Could be from a house break we've
2　　　arrested people. I don't know exactly
3　　　off the top of my head but...
4　Q.　Well, had you ever been presented with
5　　　a situation where the property in
6　　　question was a computer, prior to
7　　　Mr. Cass?
8　A.　I believe so. I'm not sure if it was
9　　　before or after, but I have had cases
10　　　where property was stolen, computers.
11　Q.　Now, the case went to trial. Correct?
12　A.　Yes.
13　Q.　But he didn't go to trial on larceny
14　　　over 250. Correct?
15　A.　Correct.
16　Q.　Why not?
17　A.　Because the insurance company for the
18　　　school advised the school that the
19　　　property value was $220.
20　　　　　　MR. WILUSZ: Are you done
21　　　with this?
22　　　　　　MS. SCAMMON: Yeah.
23　Q.　And when did the insurance company
24　　　advise the school of that?

**Page 121**

1  A. I do them for every arrest a detective
2     is originally involved in. Yes.
3  Q. And then what did you do with the press
4     release after you drafted it?
5  A. I sent it out to the press.
6  Q. And it says on here "faxed." Did you
7     fax it?
8  A. Yes.
9  Q. And which press recipients did you fax
10    it to?
11 A. They would be the local ones, like the
12    MetroWest Daily News. I don't know the
13    exact list, but it's -- we usually --
14    MetroWest Daily News and the local
15    papers.
16 Q. So did you have a set list of fax
17    numbers to send your press releases to
18    that you used every time?
19 A. Yeah. So there's a button on the fax
20    machine that you press and it sends it
21    out to -- that's already established.
22 Q. Okay.
23 A. That list that's already established.
24 Q. Okay. So there's a -- on the fax

**Page 122**

1     machine at the police station there's a
2     code that you press --
3  A. Yeah. Yes.
4  Q. -- and it automatically sends it to all
5     the press recipients.
6  A. Yes.
7  Q. Is that accurate?
8  A. Yes.
9  Q. Who programmed the fax machine that
10    way?
11 A. That I don't know.
12 Q. Okay. Did you get -- did you have to
13    get this approved by anyone before you
14    faxed it out?
15 A. No.
16 Q. No?
17    Did you run it by anybody
18    before you faxed it out?
19 A. No.
20 Q. Now, you have on here, time 11:21.
21    What is that? What did you
22    intend that to indicate?
23    Is that the time of arrest?
24 A. Yes.

**Page 123**

1  Q. And I believe your testimony was that
2     you did this press release after you
3     completed your report.
4  A. Correct.
5  Q. Okay.
6     (Exhibit 59 was marked for
7     identification.)
8  Q. Showing you what's been marked as
9     Exhibit 59.
10 A. (Witness reviewing document.)
11 Q. Do you recognize Exhibit 59?
12 A. Yes.
13 Q. It appears to be an email chain between
14    you and a Norman Miller.
15 A. Yes.
16 Q. Who's Norman Miller?
17 A. He's a reporter for the -- he's, like,
18    police reporter for the MetroWest Daily
19    News.
20 Q. And you appear to be emailing him your
21    press release at 1:15 p.m. on the 26th.
22    Was Mr. Miller not on the
23    fax list?
24 A. He may not have been. I don't know.

**Page 124**

1  Q. Do you remember it being your practice
2     to separately send press releases to
3     Mr. Miller?
4  A. He would always get press releases,
5     yes. I've sent press releases to him
6     as well as other via email in the past.
7     Yes.
8  Q. Okay. And then further up in the chain
9     at 1:27 p.m, twelve minutes after he
10    receives the press release, he says,
11    "Thank you. Can I get his mugshot?"
12    And at 1:30 you respond,
13    "It appears," attaching a mugshot.
14    Was it your practice to
15    provide mugshots to the press for
16    individuals who were arrested?
17 A. Yes. It's the police department's,
18    yes.
19 Q. It's the police department's practice
20    to always provide a mugshot to the
21    press?
22 A. When requested, yes.
23 Q. When requested.
24    Is that a written policy?

**Page 129**

1  press release on Facebook when you
2  arrested somebody?
3  A. Yes.
4  Q. And who was that?
5  A. I forgot his name.
6  Q. What did he do?
7  A. It was a home invasion case.
8  Q. And about how long before Mr. Cass's
9  arrest was that?
10 A. I think it was a few months.
11 Q. Did you post it that same day as the
12    press release? I apologize if I
13    already asked you that.
14         Did you post on Facebook
15    the same day?
16 A. I'm not -- I'm sorry.
17 Q. The same day that you did the press --
18    did you post it on Facebook the same
19    day that Mr. Cass was arrested?
20 A. I'm confused. What -- what -- I'm
21    sorry. I'm confused on what you're
22    asking me.
23 Q. All right. I'm asking you: Did you
24    post Mr. Cass's mugshot on Facebook the

**Page 130**

1  day he was arrested?
2  A. Yes.
3         MS. SCAMMON: Let's mark
4     this one.
5         (Exhibit 60 was marked for
6          identification.)
7  Q. I think you said something that you
8     posted it because it was important to
9     the community.
10        Do you remember saying
11    that?
12 A. Yes.
13 Q. Was this arrest more important than any
14    other arrest?
15        MR. WILUSZ: Objection.
16 A. No.
17 Q. Yet, you only really gave me one
18    example of another arrest that was
19    posted on Facebook. Is that correct?
20        MR. WILUSZ: Objection.
21 A. You only asked me for one. There were
22    many others that have been posted to
23    Facebook.
24 Q. Okay. No, I asked you for -- you said

**Page 131**

1  one so I asked you about it.
2         So what other -- what other
3     people arrested where you posted to
4     Facebook?
5  A. There have been numerous arrests that
6     have been posted to our Facebook page.
7  Q. By you?
8  A. Yes.
9  Q. You gave me an example of a home
10    invasion a few months before.
11 A. Mm-hmm.
12 Q. Can you give me any other examples?
13 A. There are many that have been posted
14    via links to other media outlets that
15    write reports or write news articles or
16    -- that we would take the link and put
17    it onto our Facebook page, and I've
18    certainly been involved with that.
19 Q. And would you always include the
20    arrested individual's mugshot?
21 A. There have been arrested individuals'
22    mugshots, I believe, yes.
23 Q. Okay. And I think you identified this
24    home invasion case as one.

**Page 132**

1         Can you give me other
2     examples where the arrested
3     individual's mugshot was included in a
4     Facebook post?
5         MR. WILUSZ: To clarify, is
6     this a post that Sergeant Berger made
7     or another individual in the
8     department, in the department or the
9     press?
10        MS. SCAMMON: I'm asking if
11    he posted -- if he ever posted anybody
12    else's mugshot.
13 Q. Can you give me any more examples than
14    the one?
15 A. Other than that one specific mugshot?
16 Q. Mm-hmm.
17 A. I mean, so I definitely know there was
18    that one.
19 Q. Right.
20 A. But there were other times when I cut
21    and pasted links obviously that bring
22    in news articles with people's
23    mugshots. Sure. Yes.
24 Q. So the news article would have the

## Page 133

1         mugshot.
2   A.   Yes.
3   Q.   And you post a link to it.
4   A.   Yes.
5   Q.   Right?
6         My question is: You, aside
7         from this home invasion case, did you
8         ever affirmatively post anyone else's
9         mugshot on the Facebook page?
10  A.   So, like, a mug that we've taken.
11  Q.   Yes.
12  A.   There have been other individuals which
13        I have posted on Facebook, their photos
14        and looking to identify and things like
15        that so --
16  Q.   I'm talking -- I'm not talking --
17  A.   -- just mugshot.
18  Q.   -- looking to identify.
19        I'm talking about somebody
20        who's been arrested and had their
21        mugshot taken.
22  A.   So I believe just that one other one
23        that I have done.
24  Q.   Okay. Show you what's been marked as

## Page 134

1        Exhibit 60.
2   A.   (Witness reviewing document.)
3   Q.   Do you recognize Exhibit 60?
4   A.   It's a letter.
5   Q.   Have you ever seen this letter before?
6   A.   Yes.
7   Q.   And it's obviously not addressed to you
8        so how did you come to see it?
9   A.   Chief Irving had showed it to me.
10  Q.   And what did Chief Irving say when he
11        showed you this letter?
12  A.   "Take the picture down."
13  Q.   Was there any further discussion beyond
14        him ordering you to take the picture
15        down?
16  A.   No.
17  Q.   And did you take the picture down?
18  A.   I did.
19  Q.   Now, since October of 2015, have you
20        posted any other mugshots on Facebook?
21  A.   I have not.
22  Q.   Has there been any direction from
23        Chief Irving with regard to posting
24        mugshots on Facebook?

## Page 135

1   A.   Chief Irving's not there anymore.
2   Q.   Or from -- that's right.
3        When did Chief Irving
4        leave?
5   A.   I don't know. I think September I
6        think.
7   Q.   Okay. Well, since October of 2015, has
8        there been any instruction from Chief
9        Irving or his successor with regard to
10       posting mugshots on Facebook?
11  A.   I have not asked. Nobody has said to
12        me one way or the other.
13  Q.   So there's been -- has there been any
14        change in the policy to use social
15        media?
16  A.   I don't believe we have a social media
17        policy.
18  Q.   Well, you testified earlier that there
19        was an effort being made to use social
20        media more. Is that still happening?
21  A.   Yes.
22  Q.   And are you still part of that effort?
23  A.   Yes.
24  Q.   And so who currently has access to the

## Page 136

1        Facebook page?
2   A.   Chief Swanick, Lieutenant Gibbons,
3        myself, Detective Chris Cohen,
4        Administrative Sergeant Christopher
5        Custodie. I think that's it.
6   Q.   So pretty much the same people, just
7        adding Mr. Custodie.
8   A.   Yes.
9   Q.   When Chief Irving told you to take down
10       the photo, did you -- did you resist
11       that? Did you argue that you should be
12       able to leave it up?
13        MR. WILUSZ: Objection.
14  A.   No.
15  Q.   Did you feel like you should be able to
16        leave it up?
17  A.   He told me to do something and I did
18        it.
19  Q.   Now, after Mr. Cass was arrested, did
20        you discuss his arrest with Mr.
21        Lampert who you had previously
22        communicated with?
23  A.   I don't know.
24  Q.   How about Mr. Jones?

**Page 197**

1  Report dated December 10th, 2015,
2  entered by -- it indicates you as the
3  reporting officer but yet signed by
4  Officer Bowles.
5       Is that accurate?
6  A. That's what it says. That's incorrect,
7     though.
8  Q. Okay. How would -- what would make it
9     correct?
10 A. I'm not the reporting officer. I
11    didn't write the report.
12 Q. Okay. So the reporting officer should
13    be Officer Bowles?
14 A. It should.
15 Q. Okay. If we go to Officer Bowles's
16    narrative, he states, "On 12/10/15 at
17    approximately 0900 hours I was asked by
18    Detective Sergeant Berger to follow up
19    with Mizoguchi, Allyson and Parseghian,
20    Scott at the high school about their
21    tires that had been flattened over the
22    summer."
23       Did you ask Officer Bowles
24    to follow up with Miss Mizoguchi and

**Page 198**

1     Mr. Parseghian about those issues?
2  A. Yes.
3  Q. Do you remember asking him to do that?
4  A. No.
5  Q. Do you remember how you found out that
6     their tires had been flattened over the
7     summer?
8  A. I'm not sure.
9  Q. It is now December, correct,
10    December 10th, 2015?
11 A. Correct.
12 Q. And somehow you received information
13    that these two individuals' tires had
14    been flattened over the summer and
15    asked Officer Bowles to follow up.
16       Is that accurate?
17 A. Yes.
18 Q. And then Officer Bowles goes on to
19    state that he spoke to Mr. Parseghian
20    who stated that his vehicle was parked
21    at 14 Whispering Pines in Gilmanton
22    Iron Works, New Hampshire and one of
23    his tires was slashed.
24       Did you discuss that with

**Page 199**

1     Mr. -- with Officer Bowles?
2  A. I don't remember.
3  Q. Is an incident that happened in
4     Gilmanton Iron Works, New Hampshire in
5     Wayland police jurisdiction?
6  A. No.
7  Q. Officer Bowles goes on to state, "I
8     then spoke to Mizoguchi, Allyson who
9     stated that approximately two weeks
10    after Parseghian's tire was vandalized
11    her rear driver's side tire was
12    flattened while parked in front of her
13    house. Mizoguchi was told that there
14    was a nail in her tire which caused the
15    flat."
16       What, if anything, did you
17    do after Officer Bowles had these
18    conversations?
19 A. I don't know.
20 Q. Did you instruct anyone to follow up on
21    these flattened tires?
22 A. I think they were just -- this was for
23    documentation.
24 Q. Why was this report in Mr. Cass's file?

**Page 200**

1       MR. WILUSZ: Objection.
2  A. I don't know.
3  Q. Okay. If I represent to you that this
4     was produced as in this litigation as
5     part of an investigative file of
6     Stephen Cass, you don't know why this
7     report was in there?
8  A. I didn't write the report or sign the
9     report. I don't know.
10 Q. Well, you instructed Officer Bowles to
11    have these conversations.
12       Do you remember being
13    suspicious that Mr. Cass had vandalized
14    these two individuals' tires?
15 A. It is possible.
16 Q. Did you ever suspect anyone else?
17 A. I didn't suspect it, no.
18 Q. Okay. And as far as you know, there
19    was no further investigation of these
20    incidents?
21 A. I don't believe so.
22 Q. So the case -- criminal case regarding
23    the computer went to trial, and what
24    charge did Mr. Cass ultimately go to

**Page 201**

1 trial for?
2 A. Larceny under 250.
3 Q. And not for receiving stolen property?
4 A. Correct.
5 Q. And who made that decision?
6 A. The assistant district attorney.
7 Q. Did you testify at that trial?
8 A. I did.
9 Q. Who else testified, if you know?
10 A. I don't know. I was sequestered. I'm
11 not sure who got called.
12 Q. What was the outcome of the trial?
13 A. It was a directed verdict.
14 Q. In favor of Mr. Cass?
15 A. Yes.
16 Q. And did you discuss with the district
17 attorney after that why she thought
18 that the directed verdict had entered?
19 A. There was a conversation. I'm not
20 sure -- I'm not sure. I think there
21 was a conversation, but I'm not sure.
22 Q. So you had a conversation with her but
23 you don't recall it?
24 A. I'm not sure. Right.

**Page 202**

1 Q. Did you discuss the directed verdict
2 with Chief Irving?
3 A. Yes.
4 Q. And what was your discussion with him
5 about the directed verdict?
6 A. I told him it was a directed verdict.
7 Q. And what did he say?
8 A. I don't remember.
9 Q. Okay. Did you have any communications
10 with Mr. Stein after the directed
11 verdict about the fact that there had
12 been a directed verdict in the case?
13 A. I don't think so.
14 Q. How about Mr. Crozier, any
15 communications with him about the
16 directed verdict?
17 A. I don't think so.
18 Q. Miss Mizoguchi?
19 A. No.
20 Q. Officer Bowles?
21 A. I'm not sure.
22 Q. Well, so the directed verdict enters
23 and you go back to the station, or next
24 time you're in the station was there

**Page 203**

1 any discussion in the station about
2 it?
3 A. I'm not sure if anybody else discussed
4 it.
5 Q. I'm asking what you observed, if you
6 observed any discussion in the station
7 about the directed verdict in favor of
8 Mr. Cass.
9 A. Nobody talked about it with me.
10 Q. Okay. Were you upset about it?
11 A. Was I upset about it? Not really.
12 Q. As far as -- do you know if you or
13 anyone at the Wayland Police Department
14 was ever asked to investigate any other
15 computers missing from the high school?
16 A. We've investigated other larcenies,
17 yes.
18 Q. Of computers from the high school?
19 A. Yes.
20 Q. And what were the circumstances of
21 those?
22 A. They were stolen.
23 Q. Were there ever any similar
24 circumstances that an employee or

**Page 204**

1 student had failed to return a
2 computer?
3 A. I'm not sure.
4 Q. Would it be accurate to say that you --
5 if somebody came to the Wayland police
6 with an issue about Mr. Cass, it became
7 -- it would hit your desk and you were
8 the one assigned to it?
9 A. In what regard?
10 Q. Well, were you the go-to detective if
11 somebody came in with a complaint about
12 Mr. Cass?
13         MR. WILUSZ: Objection.
14 A. No. Mr. Cass came in numerous times
15 and didn't deal with me.
16 Q. I'm not talking about Mr. Cass. I'm
17 talking about when people came in and
18 complained about his actions.
19         Was any investigation of
20 him under your supervision?
21         MR. WILUSZ: Objection.
22 A. I'm not sure.
23         MR. WILUSZ: You can
24 answer.

## Page 221

1      (Exhibit 78 was marked for
2      identification.)
3  Q.  Show you what's been marked as 78.
4  A.  (Witness reviewing document.)
5  Q.  Have you had a chance to review 78?
6  A.  Yes.
7  Q.  Are you familiar with Exhibit 78, the
8      Code of Ethics of the Wayland Police
9      Department?
10 A.  Yes.
11 Q.  Did you ever sign the code of ethics?
12 A.  I don't recall.
13 Q.  You notice there's a part of this
14     that's italicized, but the very last
15     sentence isn't italicized. It says,
16     "All employees will be required to
17     complete ethics training every two
18     years. Upon completion of the
19     training, a certificate will be
20     forwarded to the Wayland Town Clerk to
21     be kept on file."
22         Did you ever complete
23     ethics training every two years?
24 A.  Yes.

## Page 222

1  Q.  And who conducts that training?
2  A.  I believe the Lieutenant.
3  Q.  Okay. When was the last one you did?
4  A.  I want to say last year.
5  Q.  Do you recall what the subject matter
6      of the training was?
7  A.  No. It's an electronic program.
8  Q.  Okay. So there wasn't a training
9      session where everybody sits in a room
10     and listens to the Lieutenant?
11 A.  No.
12 Q.  So it was the online --
13 A.  Yes.
14 Q.  -- ethics training.
15 A.  Sorry. Yes.
16 Q.  That's okay.
17         And so did you receive an
18     email that said, "Hey, click here. You
19     have to go do your ethics training."
20     Is that how it worked?
21 A.  Yes.
22 Q.  Okay.
23     (Exhibit 79 was marked for
24     identification.)

## Page 223

1  Q.  Handing you what's been marked as
2      Exhibit 79, do you recognize
3      Exhibit 79?
4  A.  It's a policy of arrests.
5  Q.  And have you reviewed that policy?
6  A.  Today?
7  Q.  Ever.
8  A.  I'm sure I have.
9  Q.  I direct your attention to a few things
10     in this.
11         The second sentence under
12     "General Considerations and Guidelines"
13     states, "Whenever there is sufficient
14     time and opportunity to do so, a
15     warrant should be obtained in advance
16     of an arrest."
17         Was there sufficient time
18     and opportunity to obtain a warrant for
19     Mr. Cass's arrest --
20         MR. WILUSZ:  Objection.
21 Q.  -- in this situation?
22 A.  I guess.
23         MR. WILUSZ:  I don't want
24     you to guess.

## Page 224

1  Q.  Well --
2  A.  So --
3  Q.  Sorry, go ahead.
4  A.  I obtained the search warrant. I
5      searched for the -- searched for --
6  Q.  This is talking about an arrest
7      warrant, not a search warrant.
8  A.  And then I made a decision within
9      seconds to arrest him.
10 Q.  The next sentence says, "In any case
11     where the offender does not create a
12     threat to the public or is not likely
13     to flee, it is good police practice to
14     obtain a warrant prior to the arrest."
15         When you went to Mr. Cass's
16     home to execute the search warrant, did
17     you determine that he created a threat
18     to the public?
19 A.  Again --
20 Q.  No. Did you determine that he created
21     a threat to the public?
22 A.  No.
23 Q.  Did you determine that he was likely to
24     flee?

**Page 229**

1  legal justification for such action."
2  Number two, "Arrest
3  alternatives include citations,
4  summonses, informal resolutions,
5  warnings, and referrals to the other
6  agencies."
7  You had the discretion to
8  issue a summons to Mr. Cass that day.
9  Is that correct?
10 A. I could have summonsed him, yes.
11 Q. You could have summonsed him. You
12  didn't have to arrest him and book him
13  that day. Correct?
14 A. Correct.
15 Q. And under that section of this policy,
16  "Circumstances where alternatives to
17  arrest may be appropriate include the
18  following: When an arrest could
19  aggravate community conflict."
20  Did you think about whether
21  your arrest of Mr. Cass would aggravate
22  community conflict?
23  MR. WILUSZ: Objection.
24 A. No.

**Page 230**

1  Q. No?
2  You didn't -- did you look
3  at this policy about warrantless
4  arrests before you went to execute the
5  search warrant?
6  MR. WILUSZ: At any time
7  before the execution of the search
8  warrant?
9  MS. SCAMMON: Sure.
10 A. At any time I'm sure I did.
11 Q. Right. I think we had talked -- we had
12  established earlier that you were -- if
13  you had found the computer, you planned
14  to arrest him.
15  MR. WILUSZ: Objection. I
16  don't think that was his testimony.
17 A. I didn't say that. You just said that.
18 Q. All right. Well, you show up at his
19  house in your vest with a search
20  warrant looking for a computer.
21  What did you intend to do
22  before you went in if you found the
23  computer?
24 A. Again, I've said this before. A search

**Page 231**

1  warrant was obtained. I had probable
2  cause.
3  Q. I understand that. You don't have to
4  repeat it 15 times.
5  A. So I --
6  Q. You show up at the house with your
7  search warrant looking for the
8  computer.
9  A. Mm-hmm.
10 Q. In Detective Berger's mind as he's
11  standing outside the house, at that
12  point if you found that computer did
13  you plan to arrest him?
14 A. I don't know.
15 Q. You don't know.
16 A. No.
17 Q. So you made the decision only after you
18  found the computer.
19 A. Correct.
20 Q. Did Mr. Cass do anything else in the
21  time you were in his house that made
22  him somebody -- made you think you had
23  to arrest him instead of summonsing
24  him?

**Page 232**

1  A. No. It's my discretion and I chose to
2  arrest him.
3  Q. All right.
4  (Exhibit 80 was marked for
5  identification.)
6  Q. I'll show you what's been marked as
7  Exhibit 80.
8  A. (Witness reviewing document.)
9  Q. Do you recognize Exhibit 80?
10 A. Oh, sorry.
11 Q. That's okay.
12 A. It's a police media --
13 Q. It's the last one; you can do it.
14 A. It's the police media relations policy
15  and procedure.
16 Q. And have you reviewed this before?
17 A. At some point.
18 Q. Okay. If we go to Page 2, so it's
19  section Roman Numeral 4, duties of the
20  public information officer, it states
21  that "The Chief of Police will act as
22  or will designate an officer to act as
23  Department's public information
24  officer."

**Page 233**

1             I think you said earlier
2       that you did not have a public
3       information officer. Is that true?
4  A.  We don't have someone that is
5       designated as one. The Chief has in
6       the past talked to the media. The
7       Lieutenant in the past has talked to
8       the media as well as I have.
9  Q.  Okay. So you don't have -- there's no
10      designated PIO in the Wayland Police.
11  A.  Correct.
12  Q.  And has that been the case since you've
13      been on the force?
14  A.  Correct.
15  Q.  It goes on to state, "Only the Chief or
16      the PIO is authorized to supply
17      information to the media."
18            So if the Lieutenant or you
19      provided information to the media,
20      wouldn't you be violating this policy?
21            MR. WILUSZ: Objection.
22  A.  I don't think so.
23  Q.  Why not?
24  A.  Because he has designated to me in the

**Page 234**

1       past as well as the Lieutenant.
2  Q.  He hasn't designated you to act as a
3      public information officer, has he?
4  A.  He has designated me to speak with the
5      media in the past. Absolutely.
6  Q.  Has he ever told you you're the public
7      information officer?
8  A.  No. There have been numerous times
9      where he's designated me to speak to
10     the media on various cases,
11     investigations. I've been involved
12     with the media for a murder
13     investigation. 48 Hours has done a TV
14     show when I've been involved. There
15     have been many times when I've been
16     involved with the media.
17  Q.  Okay. But Chief Irving's never said to
18     you, "You're the public information
19     officer for this department."
20  A.  Correct.
21  Q.  Okay. If you go to Page 4 to the
22     section that starts on Page 3, Section
23     B, "Cooperation with the Media." Just
24     for context, if you want to see the

**Page 235**

1       whole section it's "Cooperation with
2       the Media." The part I want to direct
3       your attention to is No. 6 where it
4       states, "Written press statements shall
5       be released by the PIO only following
6       approval of the Chief of Police."
7            Did you get your press
8       release that you released approved by
9       the Chief before you sent it out about
10      Mr. Cass?
11  A.  No.
12  Q.  If you go to Page 7 -- actually, it
13      starts on Page 6, Section D,
14      "Information which may be released."
15            If you go down to No. 4
16      about arrests, "Arrest Warrant and
17      Indictment. Following arrest, issuance
18      of an arrest warrant or indictment, it
19      is permissible to release," and it
20      lists some items."
21            Can we agree that your
22      communications with the press regarding
23      Mr. Cass occurred after he was
24      arrested?

**Page 236**

1  A.  Yes.
2  Q.  There was no warrant and there was no
3      indictment. Correct?
4  A.  Correct.
5  Q.  Okay. If you could look at the four
6      categories of permissible information
7      to release, tell me if the subject's
8      mugshot is listed there.
9  A.  It's not. I'm sorry. It's not.
10           MS. SCAMMON: That's all I
11     have.
12           MR. WILUSZ: I have a few
13     follow-up questions for you.
14           MS. SCAMMON: Okay.
15           (Discussion off the
16     record.)
17 **EXAMINATION BY MR. WILUSZ:**
18  Q.  Detective, do you recall generally your
19     testimony about the meeting that you
20     had with several school officials in
21     the morning of October 26th, 2015?
22  A.  Yes.
23  Q.  Do you recall your testimony generally,
24     again, to the effect that after you

**241**

1  A. Yes.
2  Q. As you sit here today, do you know the
3     names of any of the other Wayland High
4     School football team coaches?
5  A. No.
6  Q. As of, say, the summer of 2015, did you
7     know the names or identities of any
8     other Wayland High School football
9     coaches aside from Mr. Parseghian?
10 A. One maybe. I'm not sure if he was
11    still there or not, though.
12 Q. Okay. And who was that individual?
13 A. Cincotta is his last name. I don't
14    know his first name.
15 Q. How did you know Mr. Cincotta?
16 A. I knew that he was just a coach.
17 Q. Was Mr. Cincotta a friend of yours?
18 A. No.
19           MR. WILUSZ: I don't have
20    any further questions.
21           MS. SCAMMON: You're done.
22
23           (The proceedings were
24    adjourned at 2:25 p.m.)

**242**

COMMONWEALTH OF MASSACHUSETTS )
                              ) ss.
COUNTY OF MIDDLESEX           )

          I, Deborah S. Gutierrez, a Registered Professional Reporter, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that pursuant to appropriate notice of taking deposition, there came before me the following-named person, to wit: Jamie Berger, who was by me duly sworn; that he was thereupon examined upon his oath and his examination reduced to writing by me; and that the deposition is a true and accurate record of the testimony given by the witness.

          I further certify that I am not a relative or employee or attorney for any of the parties, or a relative or employee of such counsel or attorney, nor am I financially or otherwise interested in the outcome of the action.

          IN WITNESS WHEREOF, I have hereunto set my hand this 4th day of June, 2018.

                    _____
                    Deborah S. Gutierrez
                    Notary Public
                    My Commission Expires
                    February 1, 2019

The foregoing certification of this transcript does not apply to any reproduction of the same in any respect unless under the direct control and/or direction of the certifying reporter.

**243**

DEPONENT'S ERRATA SHEET
AND SIGNATURE INSTRUCTIONS

     The original of the Errata Sheet has been delivered to John M. Wilusz, Esquire.
     When the Errata Sheet has been completed by the deponent and signed, a copy thereof should be delivered to each party of record and the original delivered to Kristen Scammon, Esquire to whom the original deposition transcript was delivered.

INSTRUCTIONS TO DEPONENT:

     After reading this volume of your deposition, indicate any corrections or changes to your testimony and the reasons therefor on the Errata Sheet supplied to you and sign it. DO NOT make any marks or notations on the transcript volume itself.

REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVED.

**244**

ATTACH TO THE DEPOSITION OF JAMIE BERGER
CASE: CASS VS. TOWN OF WAYLAND

### ERRATA SHEET

INSTRUCTIONS: After reading the transcript of your deposition, note any change or correction to your testimony and the reason therefor on this sheet. DO NOT make any marks or notations on the transcript volume itself. Sign and date this Errata Sheet (before a Notary Public, if required). Refer to Page 243 of the transcript for Errata Sheet distribution instructions.

PAGE ____ LINE ____ CHANGE_____
                    REASON_____

PAGE ____ LINE ____ CHANGE_____
                    REASON_____

PAGE ____ LINE ____ CHANGE_____
                    REASON_____

PAGE ____ LINE ____ CHANGE_____
                    REASON_____

PAGE ____ LINE ____ CHANGE_____
                    REASON_____

PAGE ____ LINE ____ CHANGE_____
                    REASON_____

PAGE ____ LINE ____ CHANGE_____
                    REASON_____

PAGE ____ LINE ____ CHANGE_____
                    REASON_____