# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____
                                  )
STEPHEN F. CASS,                  )
                                  )
            Plaintiff,            )
                                  )
v.                                )          Civil Action
                                  )          No. 17-11441-PBS
TOWN OF WAYLAND, WAYLAND PUBLIC   )
SCHOOLS, WAYLAND POLICE           )
DEPARTMENT, PAUL STEIN, BRAD      )
CROZIER, ALLYSON MIZOGUCHI, and   )
JAMES BERGER,                     )
                                  )
            Defendants.           )
_____ )
```

## MEMORANDUM AND ORDER

May 30, 2019

Saris, C.J.

## INTRODUCTION

This case stems from the decision not to renew Plaintiff Stephen F. Cass's position as athletic director of the Wayland Public Schools. Cass asserts that his contract was not renewed in retaliation for his bringing Title IX concerns about gender equity and questionable budgetary and fundraising practices in Wayland's sports programs to school officials' attention. Cass also claims he was arrested and prosecuted for not returning a used school laptop in retaliation for his exercise of his First Amendment rights. Defendants contend that he was not renewed for

1

entirely performance-driven reasons. Cass has sued the Town of Wayland, and other institutional and individual defendants, alleging: unlawful retaliation and discrimination in violation of Title IX (Count I); unlawful retaliation and termination in violation of the Massachusetts Whistleblower Act (Count II); malicious prosecution (Count III); intentional infliction of emotional distress (Count IV); violations under 42 U.S.C. § 1983 and Mass. Gen. Laws ch. 12, § 11H (Count V); defamation (Count VI); and intentional interference with contractual relations (Count VII). Defendants move for summary judgment on all counts. After hearing, the Court **ALLOWS IN PART** and **DENIES IN PART** Defendants' motion (Docket No. 76).

**BACKGROUND**

Unless otherwise noted, the following facts are undisputed.

## I. **First Year (2013-2014)**

In the spring of 2013, Stephen F. Cass applied to be the athletic director for the Wayland Public Schools ("WPS") in Wayland, Massachusetts. During the interview, Dr. Paul Stein, superintendent of WPS, told Cass about the "need to tighten up on the athletic budget a little bit." Docket No. 96-1 at 5. Cass signed a 1-year employment contract for the 2013-2014 school year on July 31, 2013.

John Ritchie served as Wayland High School ("WHS") interim principal for the 2013-2014 school year. An ongoing source of

tension between the athletic coaches and Cass was the athletic department's budget and the school's fundraising policy for sports teams. Principal Ritchie and Assistant Superintendent Brad Crozier were helpful throughout the fall in supporting Cass's efforts to restrict expenditures. On November 24, 2013, Cass sent Superintendent Stein an email emphasizing his concerns about the imbalance in fundraising between different sports teams, and a resulting disparity in funding between the boys' and girls' sports teams. On January 6, 2014, Cass provided the Wayland School Committee with an overview of some of the fiscal issues facing the athletic department. As reported in the meeting's minutes, Stein "praised [Cass's] efforts in taking on a vast number of issues related to the athletic program in his first year as Athletic Director." Docket No. 81-12 at 2.

In early February 2014, Assistant Principal Allyson Mizoguchi was chosen as the next principal of WHS, to begin in July 2014. Throughout the spring, Cass continued to meet frequently with school officials concerning fundraising, fiscal issues, and problems with specific coaches. On May 21, 2014, Cass met with Principal Ritchie, Assistant Principal Mizoguchi, and Scott Parseghian – head football coach and another assistant principal at WHS – to review the year.

Ritchie's term as interim principal ended on June 30, 2014. At that time, Ritchie provided Cass with a generally favorable

performance evaluation. He stated that given the challenges Cass faced, "he did a good job in his first year in many ways, most particularly in beginning to bring order and control to expenditures, and imposing certain restrictions on how monies are spent." Docket No. 81-20 at 2. But Ritchie also pointed out two areas where Cass could improve:

> The first involves spending significant time trying to build supportive relationships with the coaching staff, and indeed with the teaching staff at the school. The second involves eliciting administrative support for any initiatives, alterations, or restrictions that need to be implemented, so that difficult changes or decisions are not perceived as emanating solely from the Athletic Director.

Id. One part of this, Ritchie continued, was for Cass to work on his "tendency to see himself as, and then be seen as, the 'new sheriff' in town." Id.

## II. **Second Year (2014-2015)**

In mid-June 2014, Cass entered into a second 1-year employment contract to serve as the athletic director for the 2014-2015 school year. Like the first contract, the second contract provided that "[i]f the Superintendent intends to reappoint Stephen Cass at the end of this contract, he will so notify Stephen Cass of that intention before April 1 of the year in which the contract would terminate." Docket No. 81-21 at 2.

## A. Fundraising Guidelines

Throughout the summer, Cass continued to discuss fiscal concerns about fundraising with now-Principal Mizoguchi. In mid-August, Cass sent an email to select parents of student-athletes to advise them of an informational meeting later that month to discuss, among other things, team fundraising policies. Additionally, at Cass's request, at the beginning of the 2014-2015 school year, Mizoguchi sent a letter to all WHS coaches containing new fundraising guidelines. On September 1, 2014, Cass sent Mizoguchi an email in which he stated that after "doing a lot of thinking [the past] weekend over the fiscal state of Wayland athletics and [his] role in fixing it," he "realized that [he was] totally alone on an island regarding the issue of fiscal responsibility – at odds with select coaches, schools administrators and . . . parents." Docket No. 81-28 at 2. Cass told Mizoguchi that he would like a meeting with her, Stein, Parseghian, and a member of the school committee to further discuss his concerns.

## B. Tension with Coaches

At the same time, Cass's relationship with some of WHS's coaches was becoming strained. In August, Cass had tense exchanges with Guy Enoch – the WHS girls' soccer coach – and Dave Gavron - the WHS boys' soccer coach. On September 8, 2014, Mizoguchi emailed Crozier and Stein, stating in part:

> I am struggling with supporting Stephen Cass and could
> really use a bit of time with either or both of you to
> get some advice. . . . [H]e is frustrating some
> coaches both because of these new practices (coaches
> are accustomed to having a long leash) and sometimes
> because of his interpersonal manner. I have mediated
> two difficult conversations between him and a coach in
> the last two weeks.
>
> . . .
>
> This is a point of transition for Athletics, and I
> have tried to understand and support Stephen with many
> of his ideas for change. . . . At the same time, I am
> feeling that I am spending a lot of (too much?) time
> on Athletics issues.

Docket No. 81-29 at 2.

Two days later, Cass emailed Mizoguchi with additional complaints about Parseghian, Gavron, and Sean Chase – the wrestling coach - because of perceived violations of school policies. Cass also noted Title IX concerns, stating:

> We have three people/programs that have consumed so
> much of my time and energy over the last two years –
> football, wrestling, BSoccer . . . the old guard. The
> latter two have been by far the most selfish with
> their resources, and football works independently of
> the school and is a walking Title IX violation.

Docket No. 81-30 at 4 (alteration in original). On September 12, 2014, Mizoguchi responded to Cass's complaints in part, and expressed her view that his last voicemail to her was a "rant" and that his comments about coaches were "pretty caustic and unproductive." Id. at 6; Docket No. 81-31 at 2. She did not appear to address his Title IX statement. Later that evening, Mizoguchi forwarded the email chain to Crozier, stating that she

6

had "stopped trusting that Stephen's communication can be civil or productive." Docket No. 81-32 at 2.

### C. "A Walking Title IX Violation"

On September 15, 2014, a WHS parent emailed Cass his thoughts in response to the informational meeting Cass held with select parents in late August. Cass forwarded the parent's email to Stein, Crozier, Mizoguchi, and others stating:

> Hello All,
>
> I am beyond exhausted being the lightening rod for all the fiscal problems in athletics. I did amazing things bringing us close to budget last year – and took lots and lots of abuse from parents and coaches to make that happen.
>
> WHS athletics is a walking Title IX violation. The gender inequity is atrocious and has been so for some time. However, I cannot bring fairness and equity to the program by myself.
>
> I would like some public support for [sic] the administration and school committee on these issues. Otherwise, this is a losing battle and I'm not going to fight it alone any longer.
>
> Thank you,
>
> Stephen Cass

Docket No. 81-33 at 2. This was the first time Cass raised Title IX concerns with Stein and Crozier, although he had voiced his concerns to Mizoguchi earlier in the month. Stein instructed Crozier to meet with Cass about the allegations. At the time, Crozier oversaw WPS's human resources function, including Title IX complaints. Crozier immediately responded to Cass: "This is

7

the first time that you are expressing a concern about a Title
IX issue. I would like to hear more about the specifics, so that
we can officially look into the concern and address any issues.
Please set up a meeting with me to discuss ASAP." Docket No. 81-
33 at 2.

At the time of Cass's email, the WHS staff handbook
included a discrimination policy which instructed that anyone
with a Title IX complaint "shall bring it to the attention of
the principal as soon as possible," and that "[t]he principal
will investigate the complaint and respond in writing within
seven days." Docket No. 91-32 at 2. Then, "[i]f the complaint is
not satisfactorily resolved, it may be forwarded to the
superintendent or his designee who will investigate the
complaint and respond in writing within fourteen days." Id.

Cass and Crozier met on September 18, 2014 to discuss
Cass's Title IX concerns. At some point during the meeting, Cass
stated that he raised the Title IX concerns to "cover [his]
ass." Docket No. 79-3 at 178:11-19; see also Docket No. 92 ¶ 54.
Cass explained that he "was putting Mr. Crozier on notice that
if they fire me for upholding gender equity, they would be in
violation of the law." Docket No. 91-1 ¶ 99. When Crozier asked
Cass about specific data or instances to support his
allegations, Cass provided an excel sheet he maintained
detailing expenditures broken-out by sports team, but not cost

per athlete. On October 9, 2014, Crozier emailed Cass to follow-up on the meeting. His email stated, in part:

> Thank you for meeting with me on 9/18 regarding an email you sent . . . . Several days have past and I wanted to be sure that you were clear that I was expecting some follow-up from the meeting.
>
> At the meeting you provided me with some general accounting expenses to support the claim of inequity. I asked for more background on the expenditures . . . specifically, historical data by sport for both boys and girls broken out by cost per athlete.
>
> In our meeting, you indicated that the Title IX claim was more to protect your job, never the less, now that you have raised the concern, I want to be assured that the concerns are addressed . . . . I would even suggest we seek a third party to review the data and your concerns. Please let me know your thoughts as soon as possible.

Docket No. 81-34 at 3. Cass did not respond to this email.

On October 28, 2014, Cass emailed Mizoguchi expressing concern about the Henley Foundation providing the boys' golf team, which had won the state tournament, with jackets because "[i]t's part of the gender equity piece that is still problematic and part of the need for things to flow through the athletic office and not have too many things done independently." Docket No. 81-39 at 2. Mizoguchi responded: "Got it. Add it to the list." Id.

The school department's outside counsel, Attorney Gini Tate, presented a ninety-minute Title IX training on November 4, 2014. Crozier, Mizoguchi, and Cass all attended the training.

Throughout the fall of 2014 and spring of 2015, Cass continued to experience tension with some of WHS's coaches on non-gender-related issues. For example, he sparred with the football coach, Parseghian, concerning the cancellation of the Thanksgiving Day football game due to snow and with the wrestling coach, Chase, about transportation costs.

### D. Evaluation and Non-Renewal

Around February 12, 2015, Mizoguchi provided Cass with a verbal performance evaluation. On March 31, 2015, Cass emailed Mizoguchi a document titled "Wayland Athletic Concerns," stating, "I feel it is important for me to put all things in writing going forward since I have been the subject of so many false accusations by the school administration over the past few weeks." Docket No. 81-46 at 2. The document, addressed to Mizoguchi and Stein, began: "I want to put a number of things in writing regarding my 20 months in Wayland. I am extremely frustrated with my role as athletic director; most specifically by the fact that I am constantly excluded from many of the most important decisions pertaining to athletics." Docket No. 91-25 at 4. Cass proceeded to list fourteen ongoing issues he had with Wayland athletics, many of which dealt with fundraising. The sixth issue specifically stated: "There is a significant gender equity issue in athletics resulting from fundraising and gifts

received from outside agencies that support our athletic

program." Id.

Superintendent Stein did not notify Cass whether he was

intending to renew Cass's employment contract prior to April 1,

2015 as specified in the contract. On April 1, 2015, Mizoguchi

recorded notes in her day planner – as she typically did –

related to meetings she had throughout the day. On that date,

she wrote the words "whistleblower," "Title 9 issue?" and "May 1

letter" in relation to Cass. Docket No. 91-7 at 2.

On April 8, 2015, Mizoguchi held a meeting with Stein,

Crozier, Parseghian, and Assistant Principal Ethan Dolleman to

discuss whether to renew Cass's employment contract. After the

meeting, Mizoguchi emailed her friend, Wayne Ogden, and stated,

in part:

> Good meeting today in the sense that we're all in
> synch. It also became clear that, although it is
> ultimately my decision, everyone thinks that the dude
> should go for a host of legitimate reasons. I really
> feel like Judas here. The next couple of weeks will be
> all about crafting my evaluation, meeting with him
> initially (probably early next week, with Ethan
> [Dolleman]), and then meeting for a final time,
> probably with Brad [Crozier]. . . .

Docket No. 91-26 at 3.

On April 13, 2015, Crozier emailed Tate with a draft of

Mizoguchi's evaluation, writing: "I wanted your thoughts on

Allyson's evaluation of the [Athletic Director]. There are

similarities between this Eval and last year's Eval. The plan is

11

to give the Eval on May 1st and non-renew later in May." Docket
No. 81-50 at 2. Mizoguchi met with Cass on April 15, 2015 and
provided him with his performance evaluation. While Mizoguchi
praised Cass as "extremely hard-working and dedicated when it
comes to the varied demands of the position," she also noted
that "[t]he overarching theme of concern is Mr. Cass's
leadership approach, which in style and substance has frequently
been ineffective." Docket No. 91-8 at 2. Mizoguchi quoted the
"new sheriff" observation from Cass's prior performance
evaluation, and also stated that "[s]ome of his relationships
with coaches are adversarial and have required the involvement
of another administrator in order to reach a comfortable
understanding." Id. at 3.  Mizoguchi was specifically thinking
of Cass's relationship with Parseghian, Chase, Gavron, and
Enoch. "Lastly," Mizoguchi wrote, "Cass's volatility in his
personal conduct has been of concern. . . . It is for these
reasons that I am uncertain whether to renew Mr. Cass's contract
for the 2015-2016 school year." Id.

On April 24, 2015, Cass emailed Stein about the performance
evaluation. He wrote, in part: "I felt the majority of points
[Mizoguchi] made regarding me and my ability were inaccurate and
was quite stunned to learn that my future as Wayland athletic
director is not secure." Docket No. 91-28 at 3. Stein, on the
advice of counsel, asked Cass to put his concerns in writing.

On May 5, 2015, Cass sent a six-page letter to Stein detailing his various complaints. He began by recalling the interview process and how Stein had told Cass that "the budget need[ed] to be tightened up," but did not disclose that the athletic department exceeded its budget by $60,000 the prior year. Docket No. 91-29 at 3. Cass stated that "had people on the search committee been transparent about the magnitude of the fiscal issues" he "would not have accepted the position." Id. Cass went on to state that Mizoguchi's evaluation of him was "blatantly false" because he had "a wonderful working relationship with almost every coach at Wayland" with the exception of three outlier coaches "who had built up their mini-empires over time and were not interested in fiscal responsibility or constraints on their way of doing things." Id. Cass specifically mentioned in the letter that football coach Parseghian, "publicly opposed measures designed to promote fiscal responsibility, preserve gender equity, and require ethical fundraising." Id. Finally, under the heading "Gender Equity" Cass wrote:

> When I arrived, athletic funds were not being disbursed in a fair or equitable manner. As mentioned, football and wrestling were travelled excessively, and girls did not receive fair treatment (for example, there were not enough girls track uniforms – the girls had to share uniforms). Since I arrived, I have purchased badly needed uniforms for many girls teams: [list of ten teams].

13

> Despite my efforts, gender equity has not been
> achieved. This is a result of fundraising that has
> directed a disproportionate amount of funds into the
> coffers of boys teams. In addition, funds from the
> Steve Henley Foundation (an athletic fundraising
> organization) have ended up mostly with boys teams.
> During my time at Wayland, this organization has
> purchased championship jackets for golf, boys soccer,
> hockey, and wrestling (I'm told but not confirmed). No
> girls team has received championship jackets.
>
> I instituted an athletic department policy to prevent
> teams from accepting outside funding, but the boys
> soccer and wrestling coaches have ignored this policy.
>
> I have issued complaints about this inequity through
> emails to Wayland administrators – in 9/2014 and
> 4/2015.

Id. at 7-8. Three days later, on May 8, 2015, Stein formally
advised Cass, via letter, that WPS would not be renewing Cass's
contract for another year. The letter did not list a specific
reason for the decision.

**E. Letter to Wayland School Committee**

On May 19, 2015, Cass sent a letter to the Wayland School
Committee reiterating his concerns previously expressed to
Mizoguchi and Stein. Cass focused on WPS's "long-standing fiscal
problem" and alleged that the behavior of some coaches ranged
"from unethical to blatantly illegal." Docket No. 81-56 at 2.
Cass, speaking about the fiscal reforms he implemented, wrote:

> As a result of these efforts, I experienced furious
> pushback from three coaches of boys' teams, and a lack
> of support from the principal. The more I pushed for
> fiscal responsibility and gender equity in athletics
> at Wayland, the more pushback I got. . . . It is
> apparent that my contract is not being renewed in

> retaliation for my bringing forth these violations of
> town, state and federal law and my advocacy for gender
> equity.

Id. Cass went on to state that he had obtained legal counsel and

was prepared to pursue legal remedies, but the "bottom line" was

that he wanted to keep his job for another year and hoped the

Committee could help resolve the situation without the need for

litigation. Id. at 3.

The Wayland School Committee met on June 3, 2015 to discuss

the letter and voted to refer Cass's allegations concerning

Title IX and other violations to the appropriate state and

federal agencies. Subsequently, Tate sent a copy of Cass's May

19 letter to the Massachusetts Department of Elementary and

Secondary Education, the Office of the Inspector General, the

State Ethics Commission, the Massachusetts Attorney General, and

the U.S. Department of Education's Office of Civil Rights

("OCR"). OCR responded on September 24, 2015 that it could not

move forward with a formal investigation without a signed

consent form from Cass. Cass never provided a signed form. He

eventually filed a complaint with OCR in the spring of 2016 but

decided not to pursue the claim on advice of counsel.

In a follow-up meeting on June 22, 2015, the Wayland School

Committee concluded that the decision not to renew Cass's

contract fell within the purview of the Superintendent.

### III. __End of Employment__

On June 7, 2015, while he was still an employee, Cass met two unidentified high school kids around WHS and arranged to meet them at a liquor store in Wayland. Cass paid them to distribute approximately one hundred fliers around WHS reading "STEIN/CROZIER/FRAUD/THE 3 AMIGOS." Docket No. 92 ¶ 89. The fliers were investigated by the Wayland Police Department ("WPD"), but no charges were filed. On June 12, 2015, Cass ran into Ritchie in the WHS parking lot. Ritchie described Cass's demeanor as "an uncontrolled rage" and suggested to Mizoguchi that she consider putting a safety plan in place. Docket No. 81-6 ¶ 15.

On June 16, 2015, Reid Lyons – the human resources director for WPS – emailed Crozier to let him know that Cass's last day would be June 23, 2015. Later that day, Crozier emailed Susan Ginsberg – a systems administrator for WPS – to ask what equipment had been issued to Cass. Ginsberg responded, "Stephen has 2 laptops (macbook pro and macbook). I have asked Keith [Clevenger] to verify that." Docket No. 81-60 at 2.

On June 17, Lyons emailed Cass to follow-up, stating: "Now that we agree next Tuesday June 23rd is your last day can you come to my office around three and drop off your computers, ID badge and your keys?" Docket No. 81-61 at 2. And the next day, on June 18, Wayland IT Technician Keith Clevenger emailed Cass

16

to retrieve laptop WPS08204, a white macbook that had been loaned to Cass in February 2014 as a replacement machine while his school-issued MacBook Pro was being repaired. Cass did not reply to Clevenger's email. The parties dispute whether IT Specialist Mary Barber told Cass in the summer of 2014 that he could keep the loaner laptop, WPS08204.

Finally, on the afternoon of June 23, on Cass's last day, Crozier asked Cass about failing to drop-off his laptops, keys, and ID badge with Reid. See Docket No. 96-1 at 225:6-9. Cass responded that he told Reid he would drop his things off the next day, but Crozier asked him to return the items that afternoon. See id. at 225:12-13; see also Crozier Dep. Cass testified:

> I gave him my keys. . . . Then he asked for my I.D. card. I told him I did not have an I.D. card, that I had lost my I.D. card on the day of the Thanksgiving Day football game . . . . Then he asked for my computer. I gave him my computer and my – my MacBook Pro computer and my power cord. He asked me for my other MacBook Pro. I said, [m]y other MacBook Pro, that's the one that – that's the one I stepped on the computer and broke the screen.

Docket No. 96-1 at 225:16-226:8. According to Cass, Crozier specifically asked about a second MacBook Pro and Cass said he had stepped on it. At the time, Cass did not offer that he still had the laptop WPS08204, the loaner computer, because he did not "even think about any other computer." Docket No. 91-1 ¶ 129.

IV. <u>**Summer of 2015 and Arrest**</u>

    **A. Interactions with Parents and School Officials**

    Beginning in August 2015, several incidents involving Cass were reported to the Wayland Police Department ("WPD"). First, on August 14, Cass sent two emails to James Lampert, the father of a WHS student, who had supported the school administration during Cass's nonrenewal. In the emails, Cass pretended to be Lampert's son's lacrosse coach contacting coaches at Colgate University and other NESCAC schools. The emails stated: "Basically, [the son] is not D1 player even though he may have been advertised as such. . . . Plus, throw in character issues and a very high-maintenance father, and it is a recipe for failure." Docket No. 81-65 at 7. Cass did not actually send either email to any college lacrosse coach. Lampert also received a note in his mailbox he believed came from Cass stating, "Payback is a bitch." <u>See</u> Docket Nos. 81-69, 81-70, 81-71. Lampert reported these incidents to the WPD, which assigned Detective Sergeant Jamie Berger to investigate.

    Second, on August 24, Cass drove to Camp Caribou in Winslow, Maine to watch the WHS football team. Cass suspected the team of violating Massachusetts Interscholastic Athletic Association ("MIAA") rules. After gaining access to private property, and without consent from the team, students, or parents, Cass took photos of the students' football practice and

saved the photos to a flash drive to show to the MIAA. When Cass
learned that the WPD was involved, he disposed of the photos.
Chief of Police Robert Irving received emails from parents
complaining that Cass had taken photos of their children without
permission and assigned the case to Detective Berger. Berger
spoke with Cass about the incident on September 8, 2015. It was
the one and only interaction between Cass and Detective Berger
prior to Cass's arrest on October 26, 2015.

Third, on August 27, Cass created fliers with "Fire GAV" on
them – in reference to Gavron, the boys' soccer coach. He
enlisted his brother, David Cass, to distribute them in the WHS
parking lot early that morning before athletic team practices.
Witnesses, believing it was Stephen Cass who distributed the
fliers, reported the incident to the WPD.

Fourth, on August 28, Cass went to the WPS's offices where
he spoke with Stein. The parties dispute how confrontational the
interaction was, but Stein reported the interaction to Chief
Irving, and shortly thereafter the court issued a no-trespass
order against Cass. After these incidents, Chief Irving was
"concerned about the number of things that were occurring with
Mr. Cass and whether or not this could escalate into more of a
problem than there already was." Docket No. 79-4 at 46:2-7.

**B. Arrest**

On October 22, 2015, WPS Systems Administrator Ginsberg emailed Crozier that she had been "looking through computer inventory and found that Stephen Cass' macbook (the one never turned in) is still active and that it is showing a location of Woodland Rd (Stephen lives on Woodland Rd)." Docket No. 81-75 at 12. Ginsberg provided screen shots of the macbook's location and activity log, and asked Crozier how to proceed. The screen shots indicated that for laptop WPS08204, the "Last Inventory Update" had been performed on October 21, 2015 at 11:05 PM, and the last time Cass had logged in was on October 19, 2015 at 1:49 PM.

Chief Irving, Stein, and Crozier discussed the laptop at a meeting that afternoon. Chief Irving was informed that WPS had issued a loaner laptop to Cass, which WPS had asked Cass to return at the end of his employment, but that he had not returned it. Irving also learned that inventory software had located the missing macbook at Cass's home. Chief Irving suggested that the police could investigate. Stein reported the computer as stolen, and subsequently, Irving assigned the matter to Detective Berger.

On Monday, October 26, 2015, Detective Berger met with Crozier, Ginsberg, Clevenger, and others at WHS. School staff provided Berger with the email messages between Cass and school officials described above, and location information for laptop

WPS08204. Relying on this information, Berger prepared an
affidavit in support of an application for a search warrant and
sent the application to the Middlesex District Attorney's
office, as was standard practice, which approved the
application. The clerk magistrate of the Framingham District
Court approved and signed the warrant that same day.

Detective Berger served the search warrant at Cass's home
on October 26, 2015. When Cass answered the door, Detective
Berger explained his presence, and Cass directed Berger to the
laptop on the couch. The computer was marked with a tag reading
"PROPERTY OF WAYLAND PUBLIC SCHOOLS/WPS08204." See Docket Nos.
81-78, 81-79. Detective Berger took possession of the laptop and
placed Cass under arrest for possession of stolen property and
larceny of an item valued over $250.

After the arrest, Berger returned to WPD where another
officer booked Cass. Berger issued a press release which stated:

> On Monday, October 26, 2015, the Wayland Public School
> District reported that an employee no longer employed
> by the district was believed to be in possession of a
> computer owned by the district. The Wayland Police
> Department conducted an investigation, was issued a
> search warrant and recovered the stolen computer.
> Subsequently, Stephen F. Cass of Wayland was arrested
> and charged with [larceny over $250 and receiving
> stolen property over $250].

Docket No. 81-80 at 2. Berger faxed the press release to a pre-
set list of local media outlets. He provided a copy of Cass's
booking photograph to one reporter from the MetroWest Daily News

upon request. Berger also posted a copy of the press release and booking photo to the WPD Facebook page. Chief Irving was away at this time due to a death in the family; when he returned to Wayland the next day, he requested that Berger take down the Facebook post. This was not the first time the WPD had posted about an arrest on its Facebook page, although posting was infrequent. Prior to trial, the charge of receiving stolen property over $250 was dropped, and the felony charge of larceny over $250 was reduced to a misdemeanor. The trial resulted in a directed verdict for Cass.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute precludes summary judgment if it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). An issue is "genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation." Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011) (quotation omitted).

The moving party is responsible for "identifying those portions of [the record] which it believes demonstrate the

absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet this burden "either by offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" Rakes v. United States, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting Celotex, 477 U.S. at 325). If the moving party shows the absence of a disputed material fact, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. "[C]onclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact to survive summary judgment. Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009) (quotation omitted). When ruling on a motion for summary judgment, the court "view[s] the facts in the light most favorable to the party opposing summary judgment." Rivera-Colón v. Mills, 635 F.3d 9, 10 (1st Cir. 2011).

**DISCUSSION**

## I. Retaliation

Cass asserts that the Town of Wayland and the Wayland Public Schools did not renew his employment contract as retaliation for his raising concerns about gender equity in the athletic program in violation of 20 U.S.C. § 1681 ("Title IX")

and the Massachusetts Whistleblower Act, Mass. Gen. Laws ch. 149, § 185, et seq. Defendants argue that undisputed evidence establishes Cass was not renewed due to his performance as athletic director, and that a retaliatory motive did not play a "substantial part" in the employment decision. Because there are genuine disputes of material fact, Cass's retaliation-based claims survive summary judgment.

### A. Title IX

Title IX provides that, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The statute also prohibits retaliation against third parties, such as teachers and coaches, because they complained about Title IX violations. See Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 174, 181 (2005). Claims under Title IX, like Title VII, involve a burden-shifting framework. See Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 350 (1st Cir. 2018) ("As a general rule, federal courts employ the McDonnell Douglas burden-shifting framework when analyzing employment retaliation claims at the summary judgment stage."); see also Doe v. Brown Univ., 896 F.3d 127, 132 n.5 (1st Cir. 2018) (holding that a court "may turn to Title VII for guidance on Title IX claims" (quotation omitted)).

First, the plaintiff must establish a prima facie case. To do so, he must show that "[he] engaged in activity protected by Title IX, that the alleged retaliator knew of the protected activity, that the alleged retaliator subsequently undertook some action disadvantageous to [him], and that a retaliatory motive played a substantial part in prompting the adverse action." Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 67 (1st Cir. 2002). Once the plaintiff has made a prima facie showing, the "defendant must articulate a legitimate, non-retaliatory reason for its employment decision." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 26 (1st Cir. 2004). If the defendant meets its burden, then the plaintiff must "show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." Id.

For purposes of summary judgment, Defendants acknowledge that Cass engaged in activity protected by Title IX, that school officials were aware of his complaints, and that the school subsequently did not renew Cass's contract. To establish a prima facie case, Cass must show causation – that a retaliatory motive played a "substantial part" in prompting the adverse action.

Cass relies primarily on the timing of the non-renewal to establish his prima facie showing. The First Circuit has held that "a showing of discharge soon after the employee engages in

an activity specifically protected . . . is indirect proof of a
causal connection between the firing and the activity because it
is strongly suggestive of retaliation." Id., 355 F.3d at 25
(quoting Oliver v. Dig. Equip. Corp., 846 F.2d 103, 110 (1st
Cir. 1988)). The Supreme Court has advised that "cases that
accept mere temporal proximity between an employer's knowledge
of protected activity and an adverse employment action as
sufficient evidence of causality to establish a prima facie case
uniformly hold that the temporal proximity must be very close."
Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001)
(per curiam) (quotation omitted). Cass told school officials
that Wayland athletics was a "walking Title IX violation" in
September 2014, and later sent two letters sent on March 31,
2015 and May 5, 2015. In his March 31 letter to Stein and
Mizoguchi, Cass wrote, "[t]here is a significant gender equity
issue in athletics resulting from fundraising and gifts received
from outside agencies that support our athletic program." Docket
No. 91-25 at 4. The next day, Mizoguchi wrote in reference to
Cass, "whistleblower," "Title 9 issue?" and "May 1 letter."
Docket No. 91-7 at 2. Within a week, on April 8, school
officials decided not to renew him. On May 5, Cass wrote Stein a
long letter which included complaints about gender equity. Three
days later, Stein sent Cass a formal letter indicating that WPS
would not be hiring him for a third year. The temporal proximity

between these events is sufficient to make a prima facie case.
See Calero-Cerezo, 355 F.3d at 26 (finding that a month between
complaint and adverse employment action was close enough in
temporal proximity to make out a prima facie case of
retaliation).

Defendants have offered legitimate, non-retaliatory reasons
for not renewing Cass's contract. In their view, he had poor
relationships with certain coaches, he was a high-maintenance
employee who left his supervisor ranting voicemails, and he was
an ineffective leader with a caustic communications style.

There is no "mechanical formula" to determine whether
Defendants' proffered reasons are pretextual. Billings v. Town
of Grafton, 515 F.3d 39, 55 (1st Cir. 2008) (quotation omitted).
"[D]eviations from standard procedures, the sequence of
occurrences leading up to a challenged decision, and close
temporal proximity between relevant events" can "give rise to an
inference of pretext." Harrington v. Aggregate Indus.-Ne.
Region, Inc., 668 F.3d 25, 33 (1st Cir. 2012). Here, there are
disputed issues of fact that preclude summary judgment. One
reasonable inference is that school officials perceived Cass to
be a whistleblower, who called a foul on the way certain boys
teams were funded.  The timing of the non-renewal followed
multiple complaints about gender equity. Cass claims that he had
good relationships with most coaches, and that the performance

27

evaluation unfairly relied on opinions from specific coaches who
were most resistant to Cass's reforms and who were the main
cause of WPS's gender equity problems. While Defendants have
produced evidence of unprofessional, angry behavior on the part
of Cass, viewing the facts in the light most favorable to him,
the Court concludes there is a disputed question as to the
motive for the nonrenewal. See id. at 33 ("Courts should be
especially cautious before granting summary judgment when
pretext and retaliatory animus are at issue."). Therefore,
Defendants' motion for summary judgment on Count I is denied.

### B. Massachusetts Whistleblower Act

Cass's state whistleblower claim mirrors his Title IX
claim, with the addition that he also alleges Defendants
retaliated against him because he described improper fundraising
practices. The MWA provides:

> An employer shall not take any retaliatory action
> against an employee because the employee . . .
> [d]iscloses, or threatens to disclose to a supervisor
> or to a public body an activity, policy or practice of
> the employer . . . that the employee reasonably
> believes is in violation of a law, or a rule or
> regulation promulgated pursuant to law. . . .

Mass. Gen. Laws ch. 149, § 185(b)(1). Similar to Title IX, the
MWA employs a burden-shifting framework at summary judgment. For
a plaintiff to prevail on an MWA claim he:

> must show that he engaged in protected activity and
> that his participation in that activity played a
> substantial or motivating part in the retaliatory

action. The employer may subsequently avoid liability
by proffering a legitimate, nonretaliatory reason for
the adverse action. The burden then shifts back to the
employee to adduce some significantly probative
evidence showing both that the proffered reason is
pretextual and that a retaliatory animus sparked his
dismissal.

Pierce v. Cotuit Fire Dist., 741 F.3d 295, 303 (1st Cir. 2014)

(cleaned up). Given the similarities between the Title IX and

MWA legal standards, the Court also denies Defendants' motion

for summary judgment on Count II.

## C. Intentional Interference with Contractual Relations

Cass alleges Stein, Crozier, and Mizoguchi intentionally

interfered with his employment contract by writing a negative,

false performance review with a retaliatory motive. Defendants

move for summary judgment, arguing that the school officials are

entitled to qualified privilege as Cass's supervisors.

To support a claim of tortious interference with

contractual relations, a plaintiff "must prove that (1) he had a

contract with a third party; (2) the defendant knowingly

interfered with that contract . . .; (3) the defendant's

interference, in addition to being intentional, was improper in

motive or means; and (4) the plaintiff was harmed by the

defendant's actions." O'Donnell v. Boggs, 611 F.3d 50, 54 (1st

Cir. 2010) (quoting Harrison v. NetCentric Corp., 744 N.E.2d

622, 632 (Mass. 2001)). Generally, "an employee cannot bring a

claim of tortious interference with an employment contract

against his own employer." <u>Pierce</u>, 741 at 304 (citing <u>Harrison</u>, 744 N.E.2d at 632).

However, "a supervisor may be personally liable if he tortiously interferes with a subordinate's employment relationship." <u>Zimmerman v. Direct Fed. Credit Union</u>, 262 F.3d 70, 76 (1st Cir. 2001). The individual defendant-supervisor is entitled to "qualified privilege" if the employment decision was "within the scope of his supervisory duties." <u>Id.</u> In order to overcome the privilege, a plaintiff has the burden of proving that the supervisor acted with "actual malice" which was the "controlling factor in the supervisor's interference." <u>Id.</u> "Proof of actual malice requires more than a showing of mere hostility." <u>Id.</u>; <u>see also</u> <u>King v. Driscoll</u>, 638 N.E.2d 488, 495 (Mass. 1994) (explaining that "personal dislike will not warrant an inference of the requisite ill will").

Accordingly, the school officials can only be held liable if Cass proves that actual malice was the controlling factor in their decision not to renew his contract. Because "it follows logically that the elements underlying a claim for unlawful retaliation may be used to show malice when a tortious interference claim is brought against a supervisor," <u>Zimmerman</u>, 70 F.3d at 77, the Court leaves it to the jury to determine whether Mizoguchi, Stein, and Crozier were motivated by

retaliatory animus and . The Court denies Defendants' motion on Count VII.[1]

## III. <u>Arrest and Prosecution</u>

Cass asserts four claims against Defendants stemming from his arrest in October 2015, none of which survives summary judgment.

### A. Malicious Prosecution

In Count III of the complaint, Cass asserts a claim of malicious prosecution against all Defendants except Principal Mizoguchi. He argues that Defendants "actively participated in initiating legal process against [him] knowing that the criminal charges they sought were baseless and lacked any probable cause." FAC ¶ 110. In Massachusetts, "[t]o prevail on a claim of malicious prosecution, a plaintiff must prove that the defendant instituted a prior civil or criminal proceeding without probable cause and with improper purpose, and that the prior proceeding terminated in favor of the plaintiff (who was the defendant in

---

[1] Because Plaintiff's contract was not renewed, this count is better analyzed as a claim for interference with advantageous relations. The elements of the two claims are very similar. See <u>Blackstone v. Cashman</u>, 860 N.E.2d 7, 12–13 (Mass. 2007) ("To make a successful claim for intentional interference with advantageous relations, a plaintiff must prove that (1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions."). Both causes of action only allow for public officials who are acting within the scope of their employment to be held liable if they are motivated by actual malice. See <u>id.</u> at 13.

the prior proceeding)." <u>Billings v. Commerce Ins. Co.</u>, 936
N.E.2d 408, 411-12 (Mass. 2010). As an initial matter, the Town
of Wayland, WPS, and WPD are immune from this intentional tort
claim pursuant to Mass. Gen. Laws ch. 258, § 10(c) (preserving
sovereign immunity for municipalities from "any claim arising
out of an intentional tort, including . . . intentional mental
distress, malicious prosecution, . . . libel, slander, . . .").

   With respect to Detective Berger, the claim also fails
because there is no evidence that he lacked probable cause to
either apply for a search warrant or arrest Cass. The absence of
probable cause is "[a]n essential element" of a malicious
prosecution claim, and "[t]he burden of proof on this issue is
placed firmly on the plaintiff." <u>Seelig v. Harvard Coop. Soc'y.</u>,
296 N.E.2d 825, 827-28 (Mass. App. Ct. 1973). Probable cause in
the context of a malicious prosecution claim "has long been
defined as 'such a state of facts in the mind of the . . .
(defendant) as would lead a man of ordinary caution and prudence
to believe, or entertain an honest and strong suspicion,' that
the plaintiff had committed a crime." <u>Carroll v. Gillespie</u>, 436
N.E.2d 431, 435 (Mass. App. Ct. 1982) (alteration in original)
(quoting <u>Lincoln v. Shea</u>, 277 N.E.2d 699, 702 (Mass. 1972)). It
is an objective standard, and "defendant's conduct must be
adjudged by his honest and reasonable belief at the time he
instituted the complaint rather than by what may turn out later

to have been the actual state of things." <u>Lincoln</u>, 277 N.E.2d at 702 (quotation omitted).

In preparing his affidavit in support of a search warrant, Detective Berger was provided with information from school officials to support an honest and reasonable belief that Cass had intentionally failed to return the macbook. First, he was provided with emails indicating Cass had been asked by Wayland IT Technician Clevenger to return laptop WPS08204, and to return his laptops – plural – before leaving his job. Second, System Administrator Ginsberg provided Berger with readouts indicating that Cass had logged in to laptop WPS08204 as recently as a few days ago, and that the computer was located in Cass's home. It was reasonable for Berger to rely on this information in applying for a search warrant for the computer. And the clerk magistrate approved the search warrant. <u>See</u> <u>Messerschmidt v.</u> <u>Millender</u>, 565 U.S. 535, 546 (2012) ("[T]he fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner, or, as we have sometimes put it, in objective good faith.") (quotation omitted). Additionally, when Detective Berger located the laptop in Cass's home, it was reasonable for him to believe that the laptop's value exceeded $250, thereby permitting an arrest for a felony. Objectively, Detective Berger had probable cause for the search warrant and the arrest.

In response, Cass contends that WPS IT Specialist Mary Barber told him he could keep the laptop in the summer of 2014. While this fact is in dispute, even if true, the information was never conveyed to Berger. Cass also argues that Berger unreasonably arrested and charged him since he was later acquitted. However, a "conviction require[s] the higher standard of proof beyond a reasonable doubt," so a criminal acquittal does not "establish that [Berger] lacked the requisite probable cause" to arrest Cass at the time. Gillis v. Chase, 894 F.3d 1, 3 (1st Cir. 2018).

The claim also fails as a matter of law because there is no evidence that Detective Berger acted with actual malice. "To raise a genuine issue of material fact on the question of malice, the plaintiff must come forward with some evidence that would permit a fact finder to conclude that [Berger] (1) knew there was no probable cause, and (2) acted with an improper motive." Sklar v. Beth Isr. Deaconess Med. Ctr., 797 N.E.2d 381, 387 (Mass. App. Ct. 2003). Cass argues that Berger's failure to conduct a thorough investigation is evidence suggesting actual malice. Although Berger should have done an investigation into the price of the used macbook rather than estimate its value based on his personal belief, negligence does not rise to the level of actual malice. See Beecy v. Pucciarelli, 441 N.E.2d 1035, 1039 (Mass. 1982) (noting that even mere "wilful and

wanton conduct does not constitute malicious conduct"); Sklar, 797 N.E.2d at 387 ("Wanton or negligent behavior is insufficient without some evidence of an ulterior purpose.").

Cass's claim against Stein and Crozier is closer because of the antagonism between Cass and these officials. Generally speaking, "[t]he mere transmission of information to a police officer, who using his or her independent judgment, then pursues the matter and institutes criminal proceedings, has never been held sufficient to support an action for malicious prosecution." Correllas v. Viveiros, 572 N.E.2d 7, 10 (Mass. 1991). Given the events over the summer, it can reasonably be inferred that Stein and Crozier felt ill will towards Cass at the time of his arrest. Moreover, a jury could reasonably find that asking the police to search for the macbook was an overly aggressive response to a former employee's retention of a used laptop. Still, the undisputed evidence is that they had probable cause to believe he refused to return school property despite earlier requests to do so. Therefore, although the request for a police investigation is admissible as evidence of malice at trial, the Court allows Defendants' motion for summary judgment with respect to Count III.

## B. Violations of § 1983 and Mass. Gen. Laws ch. 12, § 11H

In Count V, Cass asserts claims under 42 U.S.C. § 1983 and Mass. Gen. Laws ch. 12, § 11H (the Massachusetts Civil Rights

Act) against Detective Berger.[2] Cass argues that Berger's arrest violated his rights under the First and Fourth Amendments.

A § 1983 claim "has two essential elements: the defendant must have acted under color of state law, and his or her conduct must have deprived the plaintiff of rights secured by the Constitution or by federal law." Gagliardi v. Sullivan, 513 F.3d 301, 306 (1st Cir. 2008) (quotation omitted). Additionally, the plaintiff must show "that the [defendant's] conduct was the cause in fact of the alleged deprivation." Id. (quotation omitted). The MCRA is the state analogue to § 1983 but "is narrower than § 1983 in that it limits its remedy to conduct that interferes with a secured right 'by threats, intimidation or coercion.'" Nolan v. CN8, 656 F.3d 71, 76 (1st Cir. 2011) (quoting Mass. Gen. Laws ch. 12, § 11H)).

The First Circuit has "assume[d] without deciding that malicious prosecution can, under some circumstances, embody a violation of the Fourth Amendment and thus ground a cause of action under section 1983." Nieves v. McSweeney, 241 F.3d 46, 54 (1st Cir. 2001); see also Harrington v. City of Nashua, 610 F.3d 24, 30 (1st Cir. 2010) ("It remains an unanswered question whether a malicious prosecution claim is cognizable under the

---

[2] The complaint also asserts claims against the WPD; however, at the hearing Cass's counsel conceded that there was no Monell-type claim against the police department arising from his arrest.

Fourth Amendment and section 1983 . . . .”). A plaintiff seeking
to sustain a malicious prosecution claim under § 1983 must do
more than merely satisfy the elements of the common law tort of
malicious prosecution. See Britton v. Maloney, 196 F.3d 24, 28
(1st Cir. 1999). The “plaintiff must show a deprivation of
liberty, pursuant to legal process, that is consistent with the
concept of a Fourth Amendment seizure.” Harrington, 610 F.3d at
30. Because Cass fails to provide evidence to support his common
law malicious prosecution claim, his § 1983 claim on this basis
also fails.[3]

“Claims of retaliation for the exercise of First Amendment
rights are cognizable under § 1983.” Powell v. Alexander, 391
F.3d 1, 16 (1st Cir. 2004). To prove a First Amendment
retaliatory arrest claim, a plaintiff must show that he engaged
in constitutionally protected conduct and that he was subjected
to an adverse action by the defendant. D.B. ex rel. Elizabeth
B. v. Esposito, 675 F.3d 26, 43 (1st Cir. 2012). “The plaintiff
pressing a retaliatory arrest claim must [also] plead and prove
the absence of probable cause for the arrest.” Nieves v.
Bartlett, -- S.Ct. --, 2019 WL 2257157, at *6 (2019). “Absent
such a showing, a retaliatory arrest claim fails.” Id. at *8.

---

[3] Defendants also assert that Detective Berger is entitled to qualified
immunity on Cass’s Fourth Amendment claim. See Docket No. 77 at 23-25.
Because Cass does not provide sufficient evidence of a constitutional
violation, the Court declines to decide whether Berger is immune from any
liability.

But, "[i]f the plaintiff proves the absence of probable cause, then the Mt. Healthy test governs: The plaintiff must show that the retaliation was a substantial or motivating factor behind the [arrest], and, if that showing is made, the defendant can prevail only by showing that the [arrest] would have been initiated without respect to retaliation." Lozman v. City of Riviera Beach, 138 S. Ct. 1945, 1952 (2018).

There is a "narrow qualification" to the no-probable-cause requirement "for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." Nieves, 2019 WL 2257157, at *9. This exception is necessary because "an unyielding requirement to show the absence of probable cause could pose a risk that some police officers may exploit the arrest power as a means of suppressing speech." Id. (quotation omitted). Thus, a plaintiff can overcome the requirement if he "presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." Id. If the plaintiff shows objective evidence, then "the plaintiff's claim may proceed in the same manner as claims where the plaintiff has met the threshold showing of the absence of probable cause." Id.

Cass asserts that his protected First Amendment activities include distributing the "Three Amigos" fliers, distributing

leaflets stating, "Fire GAV," and recording the Wayland football team practice in Maine. See Docket No. 90 at 45. Cass has not asserted a violation of his First Amendment rights against the school officials, but to the extent his whistleblowing activity could be the basis for this claim, that argument has been disclaimed. See Docket No. 90 at 45 n.18 (stating that his "whistleblowing activity . . . is not the specific protected First Amendment activity that gives rise to this claim").[4]

Detective Berger had probable cause to arrest Cass, and that would normally be the end of the analysis under Nieves v. Bartlett. However, in light of the minor nature of the crime of failing to return a used laptop in the context of an employment dispute, an objective inquiry might produce evidence that an officer would typically exercise his discretion not to arrest other similarly situated individuals.[5] Even if Cass could prove that the "narrow qualification" applies, his claim still fails because there is no evidence that Berger was motivated by Cass's First Amendment activities as opposed to his retention of the purloined laptop. While Berger was likely aware of Cass's

---

[4] Defendants also argue that Cass's First Amendment claim is barred by the Supreme Court's ruling in Garcetti v. Ceballos that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. 410, 421 (2006). Garcetti does not appear to apply in this case because all the asserted protected activity occurred after Cass was nonrenewed.

[5] The decision in Nieves v. Bartlett was issued after the parties completed briefing this motion.

summertime incidents, Chief Irving directed Detective Berger to investigate the missing laptop based on information from school officials. Berger applied for and received a search warrant, and when he served that warrant on Cass at his home, he quickly found the laptop in question on Cass's couch, in plain view. Being aware of protected speech is not sufficient evidence that it was a substantial or motivating factor in the arrest. Cass's MCRA claim also fails as there is no evidence of a constitutional violation. Therefore, the Court grants summary judgment for the Defendants on Count V.

### C. Defamation

In Count VI, Cass asserts a claim of defamation against the WPD and Detective Berger for posting his booking photo and related press release on Facebook. To prove a claim of defamation, the plaintiff must show "(1) that the defendant made a statement, concerning the plaintiff, to a third party; (2) that the statement was defamatory such that it could damage the plaintiff's reputation in the community; (3) that the defendant was at fault in making the statement; and (4) that the statement either caused the plaintiff economic loss or is actionable without proof of economic loss." Shay v. Walters, 702 F.3d 76, 81 (1st Cir. 2012) (cleaned up). "[I]n a defamation action a threshold issue is whether the statement is reasonably susceptible of a defamatory meaning, and that determination is a

question of law for the court." Foley v. Lowell Sun Publ'g. Co.,
533 N.E.2d 196, 197 (Mass. 1989). When determining whether a
statement is defamatory, "the court must analyze the statement
in light of the totality of the circumstances, including the
entire context of the publication." Shay, 702 F.3d at 81
(quotation omitted).

In this case, the publication of the press release –
whether to the media or on Facebook – was unnecessarily
demeaning and contrary to police policy, but it was not
defamatory. The press release stated that Cass had been arrested
and charged with larceny over $250 and receiving stolen property
over $250. The statement was not false. See Foley, 533 N.E.2d at
197 (addressing the issue of a "police log" column and finding
that when the statement was read in context, "its clear meaning
is to report that [plaintiff] was arrested for assaulting an
officer — and not that he either had been convicted of the
offense or had actually committed the assault"). Indeed, "[t]he
publication of the fact that one has been arrested, and upon
what accusation, is not actionable, if true." Lambert v.
Providence Journal Co., 508 F.2d 656, 658 (1st Cir. 1975)
(quotation omitted). It is worth pointing out that Chief Irving,
upon returning to work, promptly and wisely took the post down
upon request.

41

Cass argues that even if the statement is true, Massachusetts law provides for an exception when the statement was made with actual malice. See Mass. Gen. Laws ch. 231, § 92 ("[T]he truth shall be a justification [to a defamation action] unless actual malice is proved."). However, the Supreme Judicial Court has held that application of the statute to a truthful defamatory statement on a matter of public concern, even if the statement is malicious, is unconstitutional. Shaari v. Harvard Student Agencies, Inc., 691 N.E.2d 925, 929 (Mass. 1998). Even assuming the press release was published with malice, the claim still fails because the publication of an arrest report involving the alleged theft of town property is a matter of public concern. Therefore, the Court allows Defendants' motion for summary judgment on Count VI.

### D. Intentional Infliction of Emotional Distress

Cass asserts that his claim for intentional infliction of emotional distress ("IIED") "did not arise during [his] employment; rather, it relates to the malicious prosecution and subsequent defamation of" him. Docket No. 90 at 42 n.15. To succeed on an IIED claim, Cass must show: "(1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and

(4) that the plaintiff suffered severe distress." Sena v. Commonwealth, 629 N.E.2d 986, 994 (Mass. 1994) (citing Agis v. Howard Johnson Co., 355 N.E.2d 315, 318-19 (Mass. 1976)). "To be considered extreme and outrageous, the defendant's conduct must be beyond all bounds of decency and ... utterly intolerable in a civilized community." Id. (alteration in original) (quotation omitted).

Because neither Cass's malicious prosecution claim nor his defamation claim survives summary judgment, they cannot provide a basis for his IIED claim. The police conduct, while ill-advised in these circumstances, does not qualify as extreme or outrageous behavior. See Robinson v. Cook, 706 F.3d 25, 38 (1st Cir. 2013). And the Supreme Court has held that "a failed defamation claim cannot be recycled as a tort claim for negligent or intentional infliction of emotional distress." Shay, 702 F.3d at 83 (citing Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 56-57 (1988)).

Additionally, as public employers, the Town of Wayland, WPS, and WPD are immune from claims arising from intentional torts. See Mass. Gen. Laws ch. 258, § 10(c). Therefore, Cass's IIED claim fails as a matter of law, and the Court grants summary judgment for the Defendants on Count IV.

## ORDER

For the reasons stated above, the Court **ALLOWS** Defendants'

motion (Docket No. 76) with respect to Counts III, IV, V, and VI

and **DENIES** it with respect to Counts I, II, and VII.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
Chief United States District Judge